UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MAUREEN E. CALISI, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE #: 1:11-cv-10671-DJC |
| | § | |
| ABBOTT LABORATORIES, | § | |
| Defendant. | § | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO ABBOTT'S
MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

PERDUE KIDD & VICKERY

*/s/ Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery
Texas Bar No. 20571800
Jim M. Perdue, Jr.
Texas Bar No. 00788180
Fred H. Shepherd
Texas Bar No. 24033056
510 Bering Dr., Suite 550
Houston, TX  77057-1469
Telephone:  713-520-2500
Facsimile:  713-520-2525
Email:  andy@justiceseekers.com
Email:  jperduejr@justiceseekers.com
Email:  fred@justiceseekers.com
*Lead Counsel for Plaintiff*
[Admitted *Pro Hac Vice*]

Christopher C. Trundy
Massachusetts Bar #555622
P. O. Box 1203
New Bedford, MA  02741
Telephone:  508-984-4000
Facsimile:  508-999-1670
Email:  christrundy@trundylaw.com
*Counsel for Plaintiff*

## Table of Contents

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

I.      PLAINTIFF HAS AMPLE ADMISSIBLE EVIDENCE OF CAUSATION. . . . . . . . . . . . .

     A.      Abbott's Admissions and Plaintiff's Expert Testimony Provide Ample
        Evidence of Causation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

     B.      Epidemiological Evidence Is Not Required, But It is Present in this
        Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

     C.      Dr. Soiffer Reliably Carries Specific Causation. . . . . . . . . . . . . . . . . . . . . . . . . . . .

II.     SUMMARY JUDGMENT IS INAPPROPRIATE WITH REGARD TO CALISI'S
        FAILURE TO WARN THEORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

     A.      Abbott Has Voluntarily Assumed a Duty to Warn Maureen Calisi. . . . . . . . . . . . . .

     B.      Abbott Has Failed to Provide Dr. Pastan with Legally Adequate
        Warnings -  and the *Garside* Presumption and Prediction Preclude
        Summary Judgment on this Theory as Well. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

          1.      The Supreme Judicial Court of Massachusetts has
                never sanctioned summary judgment based on the
                testimony of a prescribing physician. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

          2.      Dr. Pastan was not adequately warned. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

          3.      The failure to warn was a proximate cause. . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.     THE SUPREME COURT HAS REJECTED ABBOTT'S ARGUMENT FOR FEDERAL
        PREEMPTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V.      ABBOTT DOES NOT CHALLENGE THE WARRANTY/DESIGN THEORY. . . . . . . .

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Table of Authorities**

**Cases**                                                                                      **Page(s)**

*Allen v. Martin Surfacing*,
    263 F.R.D. 47, 65 (D. Mass. 2009) citing *Baker v. Dalkon Shield Claimants Trust,*
    156 F.3d 248, 253 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Back v. Wickes Corp.*,
    375 Mass. 633, 639, 378 N.E.2d 964 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Bartlett v Mut. Pharm. Co., Inc.*,
    678 F3d 30, 39 (1st Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . .

*Best v. Lowe's Home Centers, Inc.*,
    563 F.3d 171, 178 (C.A.6 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Brochu v. Ortho Pharm. Corp.*,
    642 F.2d 652, 657 (1st Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Cigna Ins. Co. v. Oy Saunatec, Ltd.*,
    241 F.3d 1, 15 (1st Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Correia v. Firestone Tire and Rubber Co.*,
    388 Mass. 342, 354–355, 446 N.E.2d 1033 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Cottam v. CVS Pharmacy*,
    436 Mass. 316, 326, 764 N.E.2d 814, 822-24 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . .

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579, 596 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Dobbs v. Wyeth Pharms.*,
    797 F.Supp.2d 1264, 1270 (W.D. Okla. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Donovan v. Philip Morris USA, Inc.*,
    2012 WL 957633 (D. Mass. Mar. 21, 2012) (citing *Donovan v. Philip Morris USA,*
    *Inc.*, 914 N.E.2d 891, 903 (2009)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Feliciano-Hill v. Principi*,
    439 F.3d 18, 25 (1st Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Forst v. SmithKline Beecham Corp.*,
     639 F. Supp.2d 948, 954 (E.D. Wis. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Garside v. Osco Drug, Inc.*,
     895 F.2d 46, 50 (1st Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Garside v. Osco Drug, Inc.*,
     976 F.2d 77, 80 (1st Cir.  1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Genereux v. Am. Beryllia Corp.*,
     577 F.3d 350 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Gurski v. Wyeth-Ayerst Div. of Am. Home Products Corp.*,
     953 F. Supp. 412, 417 (D. Mass. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Haglund v. Philip Morris, Inc.*,
     446 Mass. 741, 747, 494 N.E.2d 315, 322-23 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . .

*Hoffman v. Houghton Chem. Corp.*,
     434 Mass. 624, 636, 751 N.E.2d 848, 859 &n.19 (2001). . . . . . . . . . . . . . . . . . . . . . . . .

*In re Chantix (Varenicline) Products Liab. Litig.*,
     2:09-CV-2039-IPJ, 2012 WL 3871562 (N.D. Ala. Aug. 21, 2012). . . . . . . . . . . . . . . . . .

*In re Credit Suisse-AOL Sec. Litig.*,
     02CV12146-NG, 2011 WL 3813204 (D. Mass. Aug. 26, 2011). . . . . . . . . . . . . . . . . . . .

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liab. Litig.*,
     MDL 1203, 2012 WL 3776692 (E.D. Pa. Aug. 30, 2012) (citing *Matrixx,* 131 S.Ct.
     at 1320; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). . . . . . . . . . . . . . .

*In re Meridia Prods. Liab. Litig.*,
     328 F.Supp.2d 791, 800-01 (N.D. Ohio 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*In re Neurontin Mktg., Sales Practices, & Products Liab. Litig.*,
     MDL 1629, 2009 WL 3756328, 7 (D. Mass. Aug. 14, 2009). . . . . . . . . . . . . . . . . . . . . . .

*In re Neurontin Mktg., Sales Practices, & Products Liab. Litig.*,
     612 F. Supp. 2d 116, 132 (D. Mass. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*In re Neurontin Mktg. & Sales Practices & Products Litig.*,
     2010 WL 3169485, 2 (D. Mass Aug. 10, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*In re Prempro Products Liab. Litig.*,
     586 F.3d 547, 557 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Products Liab. Litig.*,
    2011 WL 6740391 (S.D. Ill. Dec. 22, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*,
    851 F.2d 540, 544-45 (1st Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Kelly v. Wyeth*,
    20033314F, 2007 WL 1302589 (Mass. Super. Apr. 12, 2007). . . . . . . . . . . . . . . . . . . . . .

*Kerlinsky v. Sandoz Inc.*,
    783 F. Supp. 2d 236, 241 (D. Mass. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Knowlton v. Deseret Med., Inc.*,
    930 F.2d 116, 121 (1st Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Marshall v. Nugent*,
    222 F.2d 604, 616 (1st Cir. 1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Mason v. SmithKline Beecham Corp.*,
    596 F.3d 387, 393 (7th Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309, 1319 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Matrixx Initiatives, Inc. v. Siracsano*,
    —— U.S. ——, ——, 131 S.Ct. 1309, 1319, 179 L.Ed.2d 398 (2011).. . . . . . . . . . . . . . . .

*Matsuyama v. Birnbaum*,
    452 Mass. 1, 30–31, 890 N.E.2d 819 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*McCue v. Norwich Pharmacal Co.*,
    453 F.2d 1033, 1035 (1st Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*McGovern ex rel. McGovern v. Brigham & Women's Hosp.*,
    584 F. Supp. 2d 418, 425 (D. Mass. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
    649 F.3d 5, 21 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*O'Connor v. Raymark Indus.*,
    401 Mass. 586, 587, 518 N.E.2d 510 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*PLIVA, Inc. v. Mensing*,
    131 S.Ct. 2567 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Rice v. Norman Williams Co.*,
     458 U.S. 654, 659 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Rider v. Sandoz Pharmaceuticals Corp.*,
     295 F.3d 1194, 1198-99 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Schedin v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*,
     776 F. Supp. 2d 907, 914-15(D. Minn. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Schedin v. Ortho-McNeil-Janssen Pharms., Inc.*,
     808 F. Supp.2d 1125, 1132 (D.Minn. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Seley v. G.D. Searle & Co.*,
     423 N.E.2d 831, 839 (1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sprietsma v. Mercury Marine*,
     537 U.S. 51, 67 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sterling Drug, Inc. v. Yarrow*,
     408 F.2d  992, 993 (8th Cir. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Thom v. Bristol-Myers Squibb Co.*,
     353 F.3d 848, 855 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Violette v. Smith & Nephew Dyonics, Inc.*,
     62 F.3d 8, 13 (1st Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wells v. Ortho Pharmaceutical Corp.*,
     788 F.2d 741, 744–745 (11th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Westberry v. Gislaved Gummi AB*,
     178 F.3d 257, 263–264 (C.A.4 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wyeth v. Levine*,
     555 U.S. 555 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## **Regulations**

21 C.F.R. § 201.57(e) (1999) (recodified as 21 C.F.R. § 201.80(e) (2006)). . . . . . . . . . . . . . . . . . .

21 C.F.R. § 314.70(c)(6)(iii)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Other**

A. Bradford-Hill, *The Environment and Disease:  Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

FEDERAL REFERENCE MANUAL OF SCIENTIFIC EVIDENCE, *Reference Guide on Epidemiology*, (3rd Edition, 2009).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lopez-Olivo* MA et al., *Risk of Malignancies in Patients With Rheumatoid Arthritis Treated With Biologic Therapy: A Meta-analysis*. JAMA. 2012;308(9):898-908. . . . . . . . . . . . . . . . . . . . . . . . .

Massachusetts' Pattern Jury Instructions.  Product Liability, § 11.3.4 Defect–Causation.. . . . . . . .

Natasha Singer, *Medical Papers By Ghostwriters Pushed Therapy,* N.Y. Times, Aug. 5, 2009. . .

RESTATEMENT (SECOND) OF TORTS, § 402A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

RESTATEMENT (THIRD) OF TORTS § 323 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

http://www.nytimes.com/2009/08/05/health/research/05ghost.html?pagewanted=all. . . . . . . . . . .

**INTRODUCTION**

This is a case about Humira-induced lymphoma.  As the pleadings reflect from 2003 to February 2008, Plaintiff Maureen Calisi was prescribed Abbott's blockbuster arthritis drug "Humira" by her rheumatologist, Dr. Robert Pastan.  During this same period of time, Dr. Pastan was being visited repeatedly by Abbott's sales representatives and paid significant amounts of money by Abbott to act as its "consultant."  In February 2008, Maureen learned that she had a mass in her left breast. Dr. Pastan immediately instructed her to "hold HUMIRA."  But this did not stop him from signing a contract with Abbott the very next day to be paid $1,500 to "play doctor" in a Humira sales training meeting.

Maureen's cancer went into remission in 2009.  But, in 2012, it came back – only this time in her *brain,* and despite Abbott's attempts to minimize the current state of her health, Maureen is fighting for her very life.[1]  According to the testimony of Dr. Robert Soiffer, head of blood borne cancers at the prestigious Dana Farber Institute at Harvard University Medical School, the most probable cause of Maureen's lymphoma was her use of Humira.

Throughout its briefing, Abbott trumpets the language of its label.  It goes to great lengths to persuade this Court that the FDA examined this issue and, in some manner, conclusively established what an adequate label must say and dictated such contents to Abbott.  Setting aside that such a notion is utterly contrary to the law and the factual record,[2] what Abbott ignores is that even assuming *arguendo* that the warning language in its label was adequate, which Plaintiff wholeheartedly disputes, Abbott's marketing efforts and manipulation of the scientific literature

---

[1] *See* Plaintiff's Response to Defendant's Statement of Material Facts and exhibits thereto [hereinafter "Response SUMF's"] at ¶ 12.  There is a 40-50% chance Plaintiff's lymphoma will return.  *Id*.  If it should, her mortality rate is 80-85%.  *Id*.

[2] Response SUMF's at ¶ 15 and Section IV, *infra*.

completely eviscerated any meaningful understanding in the medical community that the use of the drug posed a real risk of causing lymphoma.  And that this risk was separate and apart from whatever risk may be associated with rheumatoid arthritis [hereinafter "RA"].  Abbott's efforts included 1) substantial direct monetary payments to prescribing physicians,[3] 2) directives to sales representatives to not mention this risk with doctors and then to limit any discussions to 30 seconds but "only when asked,"[4] 3) emphasizing with doctors that any risk of lymphoma in an RA patient was a result of RA *not* Humira,[5] and 4) canvassing the peer-reviewed literature with scientific articles favorable to Humira that were written within or by Abbott but headlined by medical Key Opinion Leaders [hereinafter "KOL"][6] that Abbott internally acknowledges as "not independent" without such disclosure to the at large medical community.[7]

All of these factors came to bear on Plaintiff's prescribing physician. SUMFs at ¶¶ 74-75; Response SUMFs at ¶¶ 77-79, 83, 93, 95; PMSJ SUMFs at ¶¶ 7, 15, 17, 33. Thus, while the labeling language may have been "FDA approved,"Abbott was actively undercutting it in its marketing efforts.  Plainly stated, Abbott's conduct that intentionally contradicted, diminished and/or otherwise minimized the "FDA approved" labeling language render any label analysis irrelevant.

---

[3]  Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment on Abbott's Learned Intermediary Defense [Dkt. # 52] and exhibits thereto [hereinafter "PMSJ SUMFs"] at ¶¶ 15, 17.

[4]  Plaintiff's Statement of Material Facts in Support of Opposition to Abbott's Motion for Summary Judgment  [hereinafter "SUMFs"] at ¶ 73; Response SUMFs at ¶ 22; PMSJ SUMFs at ¶ 35.

[5]  SUMFs at ¶¶ 74-75; Response SUMFs at ¶ 22, 87; PMSJ SUMFs at ¶ 7.

[6]  Key Opinion Leaders are influential "physician peers," *i.e.*,doctors,  "who are paid by drug manufacturers to educate their colleagues about the manufacturer's products." SUMFs at ¶ 3.

[7]  SUMFs at ¶¶ 3-9; 14; Response SUMFs at ¶¶ 7, 31, 32, 101, 106, 107, 110.

Within that factual framework, Abbott seeks summary judgment on three grounds, none of which is justified on the record before the Court. Its first argument is that there is "no evidence" to establish general and specific causation. The central plank upon which Abbott's causation argument is built is epidemiologic statistical significance. Although Abbott continues to worship at the alter of statistical significance, the law has long since disavowed any notion that such studies and levels of statistical significance are required to prove causation in a pharmaceutical case. Nevertheless, Plaintiff does indeed offer statistically significant results to support her causation arguments. In addition, there is a multitude of additional epidemiologic evidence of a strong "association" between Humira and lymphoma in the record before the Court. Much of it is based on Abbott's own 30(b)(6) witness admissions and internal documents. Further evidence contradicting Abbott's causation arguments is found in the testimony of Dr. Soiffer as well as by Plaintiff's other two experts–Drs. Eric Gershwin and David Goldsmith. Taken together, it is evidence that, under the standards set forth in case law and in the FEDERAL REFERENCE MANUAL ON SCIENTIFIC EVIDENCE,[8] gives rise to a legitimate and permissible *inference* of causation.

Abbott's next argument is that Maureen loses because she can prove neither an inadequate warning nor proximate cause from same. There is, quite obviously, a certain *chutzpah* involved in making that argument in tandem with the causality argument. In essence, Abbott is arguing

> YOUR HONOR – (a) there is no evidence whatsoever that Humira causes lymphoma, BUT (b) we have been warning about that very risk for nearly a decade.

In spite of the incongruity, both the law and evidence defeat this asserted basis for summary judgment. The law defeats the motion because, to get summary judgment under either its comment *k* or "learned intermediary" affirmative defenses, Abbott bears the burden of proving that it provided

---

[8] FEDERAL REFERENCE MANUAL OF SCIENTIFIC EVIDENCE (3rd Edition, 2009).

adequate warnings, as a matter of law.  Although Abbott trumpets language contained in the Humira

label as dispositive, it completely ignores the confusing nature of the language, the activities of its

sales personnel in downplaying the language with the treating physician (to include direct monetary

payments as well as verbal statements), its pervasive "ghostwriting," and that Abbott, not FDA, is

*always* responsible for the content of its labeling.  SUMFs at ¶¶ 3-9; 85; PMSJ SUMFs at ¶¶ 3, 4,

7, 15, 17, 19-21, 26, 29, 30-35; Response to SUMFs at ¶¶ 15, 68, 69.  Additionally, the law provides

a "heeding presumption" on the corollary question of proximate cause, as Abbott itself admits in ¶¶

33, 36 of its Answer in this case.  [Dkt. # 42].  The evidence defeats this part of Abbott's motion

because, even today, despite his repeated efforts to find out from the Abbott sales people who visit

him so frequently and pay him so well, prescribing physician Dr. Pastan cannot tell whether Humira

does or does not cause or contribute to lymphomas like Maureen's.  More fundamentally towards

proximate cause, Dr. Pastan makes clear that Maureen was the ultimate decision maker in whether

to take Humira, not him.  As  a result, evidence that she would have declined to take the medication

if adequately warned equally breaks the proximate cause chain.

      Finally, Abbott's tertiary argument that Maureen Calisi's common law claims are preempted

by federal law are downright spurious in the wake of *Wyeth v. Levine*, 555 U.S. 555 (2009), and the

recent discussion of the presumption against preemption in *Bartlett v. Mut. Pharm. Co., Inc.*, 678

F.3d 30, 39 (1st Cir. 2012).

## Argument and Authorities

## I.  PLAINTIFF HAS AMPLE ADMISSIBLE EVIDENCE OF CAUSATION.

      **A.  Abbott's Admissions and Plaintiff's Expert Testimony Provide Ample Evidence
of Causation.**  The first focus of summary judgment motions is on the pleadings in a case.  Because

of *Twiqball*[9] and Abbott's litigation strategy, Plaintiff has laid out the "notice" evidence of an association between Humira and other biologic drugs and lymphomas and other forms of cancer in her live Complaint.  [Plaintiff's Second Amended Complaint, Dkt. # 39].

In its Answer, [Dkt. #42], Abbott has admitted many of these facts, including that "48 malignancies of various types were observed" in its clinical trials for RA, "including 10 patients with lymphoma" at ¶ 31, and that the "Standardized Incidence Ratio (SIR) . . . for lymphomas was **[a statistically significant] 5.4** (95% CI, 2.6, 10.0); ¶ 31.  Also, Abbott's Answer quotes extensively from the various iterations of the Humira labels through the years and demonstrates that the exculpatory phrase "the role of TNF blockers in the development of malignancy is not known" disappears by the 2012 label after being there since the first day Humira went on the market.  ¶¶ 42, 50-54.  The disappearance of this qualifying phrase  is a strong indication that causality has, in Abbott's own mind, now become "known."

Finally, Abbott's Answer even quotes from its labeling in a way that shows that it agrees with Drs. Soiffer and Gershwin on the "indirect" process in which Humira can lead to the development of cancer:

> **5.11 Immunosuppression**
>
> The possibility exists for TNF blocking agents, including HUMIRA, to affect host defenses against infections and malignancies since TNF mediates inflammation and modulates cellular immune responses.

Dkt. # 42 at 5/46, quoting Humira label.  SUMFs at ¶¶ 40-43; 61-67.

But there are much more extensive admissions to be found beyond the pleadings.  Although Abbott tellingly makes no mention of the sworn testimony of its own officials and Rule 30(b)(6)

---

[9]  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

designees, the evidentiary record is replete with Abbott admissions that further evidence causation. Although ignored by Abbott, here are other company admissions regarding the causative link between Humira and lymphoma:

1)      Admitted that it is biologically plausible that Humira causes lymphoma.  SUMFs at ¶¶ 26-27.

2)      Admitted that there is a reasonable association between Humira and lymphoma SUMFs at ¶¶ 28-29; 72.

3)      Admitted that Humira suppresses the immune system, and therefore may well increase the risk of lymphoma. SUMFs at ¶ 29.

4)      Admitted that it _ex_cludes patients in clinical trials who have a previous history of cancer because of the potential risk of malignancy Humira poses.  SUMFs at ¶ 30.

5)      Admitted that in Humira clinical trials that their own clinical trial investigators have found cases of lymphoma they have deemed "probably" related to Humira. SUMFs at ¶ 31.  For an Abbott clinical investigator to determine that the lymphoma was "probably" related to Humira, he or she would have to find a temporal relationship between Humira and lymphoma, as well as rule out other causes.  SUMFs at ¶ 32.[10]

6)      Admitted that Humira clinical trial data reflects an increased rate of malignancies compared to placebo patients.  SUMFs at ¶¶ 34-35.

7)      Admitted there is a risk difference present between the incidence rate of lymphoma found in the general population and that found in Humira RA clinical trial patients that is not explained by the label.  SUMFs at ¶¶ 79-81.

---

[10] Abbott clinical investigators are specifically retained by Abbott because of their expertise, judgment, and knowledge.  SUMFs at ¶ 33.

8) Admitted "that the causes of cancer are not well understood and that multiple "risk factors increase the chance that a person will develop cancer." Dkt. # 42 at ¶ 32.

9) A statistically significant increased rate of lymphomas was seen in the Humira clinical trials. SUMFs at ¶ 35.

Abbott's causation arguments rely almost entirely upon statistical significance in the epidemiologic context. Epidemiology will be addressed in I.B., *infra*. However, it is worth noting at this juncture that Abbott's head of clinical trials and 30(b)(6) designee acknowledges there is a statistically significant difference in patients taking Humira and those taking placebo that go on to develop lymphoma in Humira clinical trials. SUMFs at ¶ 35.

To avoid duplication, the entire breadth of evidence that supports the ultimate opinion testimony of all three of Plaintiff's experts on general causation, and of Dr. Soiffer on specific causation, is detailed and discussed in the separate Response to Abbott's separate Motion to Exclude Causation Testimony Under Federal Rule of Evidence 702 [Dkt. # 62]. Obviously, if the Court finds Plaintiff's experts pass *Daubert* muster, then Plaintiff has ample evidence of causation. Thus, out of consideration of the Court's time and resources, we will not repeat those arguments at length herein.

But one point should be made here.  Plaintiff's experts all utilize either the "Bradford Hill"[11] criteria for general causation,[12]  a methodology that has stood the test of time and justified admission of expert testimony in numerous cases, *see* FN 9, *supra*, or the medical standard "differential diagnosis"[13] to opine that Humira was most probably a significant contributing cause of Plaintiff's cancer.

---

[11]  The Bradford Hill criteria are:

(1)  strength of the association;
(2)  consistency;
(3)  specificity of the association;
(4)  temporality;
(5)  dose-response curve;
(6)  biological plausibility;
(7)  coherence (with other knowledge);
(8)  experiment; and
(9)  analogy.

*See In re Neurontin Mktg., Sales Practices, & Products Liab. Litig.*, 612 F. Supp. 2d 116, 132 (D. Mass. 2009)(Recognizing, discussing, and applying Bradford Hill criteria in *Daubert* inquiry.).  "These factors are viewed as guidelines, and it is acknowledged that each factor need not be fulfilled in order for a researcher to proclaim causation."  *Id*.

[12]  Q:  So, Dr. Gershwin, I -- could you spend some time talking about the methodology you used in this case to determine that Humira can cause lymphoma?

   A:  I can if I can find my notes.  So I used  Bradford Hill criteria of causality.

SUMFs at ¶¶ 58-67; Response SUMFs at ¶ 129. "I would only testify if I was certain I could fulfill Bradford Hill criteria with appropriate methodology to address that issue....I left no stone unturned particularly with respect to methodology in Bradford Hill...the basis of my opinions contains additional material that will fulfill Bradford Hill criteria and reflect the methodology I used, and in addition will discuss experimental evidence, which is Number 8 of the Bradford Hill criteria."  *Id*.

So, too, Dr. Goldsmith: "I just want you to know that I think about [Bradford Hill] almost all of the time I am...working on these issues."  SUMFs at ¶¶ 50-55.

[13] SUMFs at ¶¶ 42, 47 (Discussing Maureen's risk factors, stratifying them according to risk, and opining that Humira was greatest and most likely causative factor).

The Bradford Hill factors [hereinafter "BH"] are typically utilized by medical experts to examine the causative relationship between a drug and a specific side effect. Obviously, a reasonable temporal relationship is key. It has been admitted by Abbott. SUMFs at ¶¶ 31-32. The temporal relationship has also been found in the peer-reviewed literature, and recognized by, Plaintiff's experts. SUMFs at ¶¶ 20, 46, 53, 60. But after that, an expert examining this issue would ask "is it biologically plausible that this drug inhibiting a tumor necrosis factor could cause tumors?" This BH factor, too, has been admitted by Abbott. SUMFs at ¶¶ 26-27. It has also been found in the peer-reviewed literature, and recognized by Plaintiff's experts as well as being admitted by Abbott. SUMFs at ¶¶ 52, 62. Next, "does the data show a dose response relationship, *i.e.,* if there is more drug, are there more, or worse, side effects?" There is data and peer-reviewed literature that so reflects this. Plaintiff's experts have recognized this BH Factor and applied it arriving at their opinions. SUMFs at ¶¶ 45, 54, 65. "And what happens if the drug is stopped or started again, *i.e.,* "dechallenge" or "rechallenge". Data reflects dechallenge as well. Plaintiff's experts have recognized this BH Factor and applied it arriving at their opinions. SUMFs at ¶¶ 46, 53, 60.

In addition to these factors, Dr. Gershwin additionally found peer-reviewed animal studies involving TNF inhibitors and lymphoma that directly support his opinions under a BH analysis. SUMFs at ¶¶ 62, 66. While any of these factors standing alone may not be supportive of causation, taken together, they do.[14] While any of these factors standing alone may not be supportive of

---

[14] Sir Austin Bradford-Hill was careful, himself, way back in 1965 to acknowledge that "none of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*." A. Bradford-Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965), quoted in *Reference Manual* at p. 376n.113. The federal *Reference Guide* is also very careful to point out that it is not necessary to show that meet all of the Bradford-Hill factors in order to find an inference of causation. FEDERAL REFERENCE MANUAL OF SCIENTIFIC EVIDENCE, *Reference Guide on Epidemiology*, (3rd Edition, 2009): "One or more factors may be absent, even when a true causal relationship exists." *Id*. at 375. Moreover, the Manual further cautions that "the

causation, taken together, they do.  Bradford Hill factors are compelling evidence of causation.  They are present in this case and relied upon by Plaintiff's experts.

Furthermore, the summary judgment record also includes extensive documentation from depositions and documents produced in discovery.  These are chronicled in the SUMFs and incorporated by reference herein.[15]  As they show, in its formal labeling, and in its marketing and other promotional efforts, Abbott downplayed the risk, attempting to blame the "disease" of RA for the high incidence of cancer, rather than its blockbuster "drug" Humira.[16]  These arguments are further addressed, in Section II.B.2, *infra*.

Many of Abbott's arguments in this case echo similar arguments rejected by both the district court and the First Circuit in the recent case of *Bartlett, supra*, 678 F.3d at 39, which, curiously, Abbott neglects to cite for any proposition (including preemption which was squarely rejected only six months ago in that opinion).  As the First Circuit pointed out, in affirming the $21.06 million award for plaintiff, most of the scientific criticisms are matters for cross examination that effect weight, not admissibility of the evidence.  *Id*. at 39.  So, too, in this case.  Plaintiff has presented abundant evidence, both scientific and by admissions, that create a triable fact issue on causation.

---

drawing of causal inferences is informed by scientific expertise, it is *not* a determination that is made using scientific methodology."  *Id*.

[15]  They are likewise chronicled in Plaintiff's Motion for Partial Summary Judgment [Dkt. # 51] and the accompanying Memorandum, Statement of Undisputed Material Facts and exhibits thereto.  All arguments and authorities contained therein are expressly incorporated here.

[16]  For specific example in this case, Dr. Pastan was consistently left with the impression by Abbott sales representatives that whatever risk of lymphoma was present was tied to RA, not the use of Humira.  SUMFs at ¶¶ 74-75; Response SUMFs at ¶ 22; PMSJ SUMFs at ¶ 7.  Even as late as 2007, Abbott sales materials directed sales representatives to tell rheumatologists and Dr. Pastan that RA, "not its treatment" put the patient at risk of lymphoma.  SUMFs at ¶ 22; PMSJ SUMFs at ¶ 7.

**B.      Epidemiological Evidence Is Not Required, But It is Present in this Case.**  The separate Response to Abbott's *Daubert* motion addresses the medicine and the science more fully, and discusses the procedural body of law under *Daubert* and its progeny.  However, in this pleading we pause briefly to address the "red herring" arguments Abbott makes about epidemiological evidence, and the law concerning it.  Abbott frames its causation arguments around concepts of scientific orthodoxy that were specifically rejected in *Daubert* itself in favor of more reasonable and rational truth-seeking.  The lynchpin of Abbott's causation argument is that Plaintiff has no evidence because her experts "ignore" a number of articles that Abbott's lawyers cited to them during their depositions.  But Abbott argues from the flawed premise that experts need to rely on epidemiological evidence.  But Abbott argues from the flawed premise that experts *must* rely on epidemiological evidence in order to prove causation.  In fact, the courts, and Abbott executives and expert have said exactly the opposite.

Federal courts around the country, including Massachusetts have clearly held  that "[e]pidemiologic studies, while considered to be powerful evidence of causation, are not required to prove causation in a pharmaceutical personal injury case."  *Neurontin, supra* FN 9, 612 F. Supp. 2d 116 at 132 (internal quotes omitted); *see also Rider v. Sandoz Pharmaceuticals Corp*., 295 F.3d 1194, 1198-99 (11th Cir. 2002) (Eighth, Tenth, and Eleventh Circuit decisions holding that epidemiology is not necessary to prove causation); *In re Meridia Prods. Liab. Litig.,* 328 F.Supp.2d 791, 800-01 (N.D. Ohio 2004) (finding that "no court has held that epidemiological evidence is necessary to establish general causation when other methods of proof are available"), *aff'd,* 447 F.3d 861 (6th Cir. 2006).  One such opinion is Judge Young's 2008 ruling in *McGovern ex rel. McGovern v. Brigham & Women's Hosp*., 584 F. Supp. 2d 418, 425 (D. Mass. 2008), cited by Abbott.  The court there observed that the medical expert "was not required to point to epidemiological data or peer-

reviewed publications supporting his opinion," but excluded the testimony based on an analytical gap in logic.  *Id*. at 425.

Even those close to Abbott admit that one must look at more than epidemiology in determining if a drug causes an adverse event.  Dr. Ory, Defendant's paid epidemiological expert agrees with this fact.  SUMFs at ¶ 22.  As does the 30(b)(6) head of pharmacovigilance for Abbott, Dr. James Embrescia.  SUMFs at ¶ 23.

Although not required, even when contrary epidemiological studies are present, the Supreme Court has plainly stated that "[a] lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1319 (2011); *see, e.g., Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 21 (1st Cir. 2011) (holding that "the Court rejected the use of a bright line rule that reports of adverse events associated with a pharmaceutical company's products cannot be material absent a sufficient number of such reports to establish a statistically significant risk that the product is in fact causing the events."); *In re Credit Suisse-AOL Sec. Litig.*, 02CV12146-NG, 2011 WL 3813204 (D. Mass. Aug. 26, 2011) (holding that "the Supreme Court in *Matrixx* was unwilling to impose a requirement that adverse event reports of a pharmaceutical company had to be statistically significant.").

In *Matrixx*, a securities class action, the defendant (pharmaceutical company) asked the Court "to adopt a bright-line rule that reports of adverse events associated with a pharmaceutical company's products cannot be material absent a sufficient number of such reports to establish a statistically significant risk..." because "statistical significance is the only reliable indication of causation."  *Id*. The Court disagreed, stating that "[s]tatistically significant data are not always available....when an adverse event is subtle or rare....".  *Id*.  The Court found that "courts frequently permit expert

testimony on causation based on evidence other than statistical significance". *Id*; *see, e.g., Best v. Lowe's Home Centers, Inc.,* 563 F.3d 171, 178 (C.A.6 2009); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 263–264 (C.A.4 1999) (citing cases); *Wells v. Ortho Pharmaceutical Corp.,* 788 F.2d 741, 744–745 (C.A.11 1986).  Instead of requiring statistically significant epidemiological studies, the Supreme Court listed the Bradford Hill criteria as alternative evidence used to infer causation. *Matrixx*, 131 S. Ct. at 1319-20, FN7.  This is likewise criteria that defendant's expert cited as important in determining causation.  SUMFs at ¶¶ 24-25.  As noted above, these are the very factors that established the matrix of analysis used by Plaintiff's experts.  SUMFs at ¶¶ 44-46; 50-55; 58-67.

Federal courts around the country overseeing pharmaceutical MDLs have recently adopted *Matrixx* when performing *Daubert* analysis of expert witnesses.  For example, in the Chantix MDL the court stated:

> "While the defendant repeatedly harps on the importance of statistically significant data, the United States Supreme Court recently stated that [a] lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events .... medical experts rely on other evidence to establish an inference of causation. *Matrixx Initiatives, Inc. v. Siracsano*, ⸺ U.S. ⸺, ⸺, 131 S.Ct. 1309, 1319, 179 L.Ed.2d 398 (2011).  The Court further recognized that courts "frequently permit expert testimony on causation based on evidence other than statistical significance.  *Id*; citing *Wells v. Ortho Pharmaceutical Corp.,* 788 F.2d 741, 744–745 (11th Cir. 1986). Hence, the court does not find the defendant's argument that Dr. Furberg "cannot establish a valid statistical association between Chantix and serious neuropsychiatric events" to be a persuasive reason to exclude his opinion, even if the court found the same to be true.  *See* Defendant's Memorandum (Doc. 584) at 13."

*In re Chantix (Varenicline) Products Liab. Litig.*, 2:09-CV-2039-IPJ, 2012 WL 3871562 (N.D. Ala. Aug. 21, 2012)(quoting *Matrixx* at 319)(internal quotes omitted).  The court overseeing the Phen Fen MDL had a similar holding in its *Daubert* analysis of plaintiff's expert witnesses:

> "*Daubert* does not require that an expert opinion regarding causation
> be based on statistical evidence in order to be reliable.  *Matrixx
> Initiatives, Inc. v. Siracusano*, —— U.S. ——, ——, 131 S.Ct. 1309,
> 1319, 179 L.Ed.2d 398 (2011). In fact, many courts have recognized
> that medical professionals often base their opinions on data other than
> statistical evidence from controlled clinical trials or epidemiological
> studies.  *Id.* at 1320.  Our Court of Appeals has stated, "we do not
> believe that a medical expert must always cite published studies on
> general causation in order to reliably conclude that a particular object
> caused a particular illness."  *Heller,* 167 F.3d at 155."

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liab. Litig.*, MDL 1203,

2012 WL 3776692 (E.D. Pa. Aug. 30, 2012) (citing *Matrixx,* 131 S.Ct. at 1320; *Heller v. Shaw

Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999).

In spite of the fact that there is no *requirement* for epidemiological evidence, and in spite of

the fact that due to both the rarity and lag time in development of lymphoma one would not

necessarily expect to find any, Plaintiff's experts *have* cited epidemiological evidence to support

their opinions.  SUMFs at ¶¶ 44-45; 51, 54-55; 59; PMSJ SUMFs at ¶¶ 48, 103, 129, 135.  First, as

Abbott's Answer reflects, its very first label for Humira contains data from clinical trials that show

an elevated, statistically significant risk of lymphoma at 5.4.  Dkt. # 42 at ¶ 31.  This should satisfy

even those orthodox scientists who insist on an RR of 2.0+.  Additionally, there is also statistically

significant peer-reviewed literature–including the Bongartz study published in 2006 in Journal of

the American Medical Association [JAMA]– that shows both a statistically significant increased risk

of cancer in patients taking TNF-blockers, including a dose response relationship.  SUMFs at ¶¶ 13,

44-45, 54; Response SUMFs at ¶¶ 48, 135.  (Soiffer and Goldsmith).  Moreover, Abbott's own paid

Key Opinion Leaders found this study to be "sound" and "a true safety signal..that should be taken

seriously."[17] SUMFs at ¶ 15.

---

[17]  However, in spite of this direction from one of its own KOL's, Abbott did just the
opposite.  It orchestrated a widespread attack of the Bongartz paper in the scientific community

Plaintiff's expert have considered, and are open to further considering, a wide variety of the available scientific literature. One of the most recent published studies on this issue is a comprehensive meta-analysis of 63 clinical trials with Humira and other biologic drugs. SUMFs at ¶ 17.[18] It was published after the expert reports were prepared in this case, *i.e.*, in the September 2012 issue of JAMA. *Id.* Curiously, Abbott does not cite or attach it. The study shows an odds ratio of 2.1 with regard to lymphomas, although it does not achieve statistical significance at the .05 level. *Id.* This "point estimate" number represents the *most likely estimate of risk*, as stated by Abbott's epidemiological expert, Dr. Ory. SUMFs at ¶ 18. However, risks regarding side effects are always also stated in terms of a range of possible risks. Admittedly, because the "confidence interval" which lays out this range includes the integer "1.0" the data is not "statistically significant." *Id.* However, the confidence interval shows that the "real risk" could be as low as 0.55 (which would not be surprising if the drug was reducing inflammation in some patients). *Id.* But it also shows that it could be as high as 8.4. *Id.* Any intellectually honest scientist would have to acknowledge this. That is why courts depend on juries to listen to experts from both sides and decide what to believe. That is also why the Supreme Court admonished in *Daubert* itself that, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, are the traditional and appropriate means of attacking shaky but admissible evidence."[19]

Interestingly enough, Abbott's own experts seem confused about the state of the epidemiological literature regarding Humira and lymphoma. Abbott's retained oncologist, Dr.

---

and went to great lengths to both minimize and discredit the results. SUMFs at ¶¶ 16, 85.

[18] *Lopez-Olivo* MA et al., *Risk of Malignancies in Patients With Rheumatoid Arthritis Treated With Biologic Therapy: A Meta-analysis*. JAMA. 2012;308(9):898-908.

[19] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). Both sides have qualified experts. It will be up to the jury to decide which are "shaky" and which are not.

Richard Stein believes that the data we have right now from the scientific literature "cannot prove there is a relationship nor that there isn't....".  SUMFs at ¶ 1; Response SUMFs at ¶ 7.[20]  On the other hand, Abbot's other retained expert, Dr. Ory, states that the science clearly shows Humira does not cause lymphoma.  SUMFs at ¶ 2.  Dr. Ory's opinion relies heavily on his interpretation that the epidemiological studies have shown over time that the risk "keep falling toward one."  SUMFs at ¶ 12.  Not only does this obviously ignore all the Bradford Hill indice that support a causative link between Humira and lymphoma, it is in obvious conflict with the 2.11 point estimate found in the recent 2012 JAMA meta-analysis that encompasses an even larger data set.  SUMFs at ¶ 17.

One of the most pernicious behaviors of pharmaceutical companies is the "ghostwriting"of papers for publication in peer-reviewed literature.  Ghostwriting is the process by which a drug company (or related marketing firm on behalf of the company) will prepare a manuscript for publication with favorable results, "assign" it to a KOL, and then seek publication without disclosing that the entire article was actually written by the drug company. Although not unlawful, the Eighth Circuit has found the practice to be "questionable."  *In re Prempro Products Liab. Litig.*, 586 F.3d 547, 557 (8th Cir. 2009)(citing Natasha Singer, *Medical Papers By Ghostwriters Pushed Therapy,* N.Y. Times, Aug. 5, 2009, at A1 for further exploration of the topic).[21]  In denying a drug maker's motion *in limine* to exclude any reference to, or mention of, "ghostwriting" in front of a jury, a U.S. District Court in Illinois had the following to say in response to the pharmaceutical company's

---

[20]  Nor does he disagree with the qualifications or methodology of Plaintiff's specific causation expert, Dr. Robert Soiffer.  SUMFs at ¶ 48.  Dr. Stein states Dr. Soiffer is "basically, I think someone who looked at the data and reach a different conclusion, that's basically the way I see the situation."  *Id*.  Not to mention that the "data" upon which Dr. Stein relies was entirely provided to him by Abbott's counsel.  *Id*.

[21]  Available at http://www.nytimes.com/2009/08/05/health/research/05ghost.html?pagewanted=all and attached as Exhibit V to SUMF.

arguments that it was a "well accepted practice" both in industry, by the president, and by federal judges:

> This argument is not well taken. Neither the President nor any federal judge to this judge's knowledge, to the extent speech writers or law clerks are used for drafts of speeches or orders, are trying to deceive the target audience for the purpose of influencing that audiences interpretation of the subject matter of the content of the speech or order. In this instance, it is just that which is occurring. Bayer wants the target audience to believe the words are those of a particular doctor or academic for the sake of influencing that audience with the name of the supposed author. Even though the supposed author may agree generally with the concepts and conclusions that is not the same as saying it exactly in the same tone and demeanor as the substitute writer. It would be more honest if the consultant wrote the article and the "name" doctor or academic wrote a forward or executive summary endorsing the concepts contained therein rather than trying to make the audience believe he or she actually wrote the entire article. In the context of this case and the issue of adequate warning, in particular, this kind of evidence is particularly relevant for the fact finder to consider with all the other evidence in the case.

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Products Liab. Litig.*, 2011 WL 6740391 (S.D. Ill. Dec. 22, 2011).

To that end, Abbot has extensively employed ghostwriting to further its Humira marketing and sales objectives. They internally reference the practice as "ghost writing." SUMFs at ¶¶ 5-8; 14. They draft manuscripts for publication and internally discuss who would be the best KOL to "headline" the publication. SUMFs at ¶ 7. They utilize the KOL and associated ghostwritten articles to substantiate their Humira sales messages to doctors. SUMFs at ¶¶ 8-9; 74-75; Response SUMFs at ¶¶ 7, 31, 32, 101, 106, 107, 110.

This practice is so pervasive and common for Abbott and humira that Abbott has an internal stratification of its KOL's. Some are considered "independent." SUMFs at ¶¶ 4; 74; Response SUMFs at ¶¶ 7, 32, 106, 107. However, others are considered "true partners," "advocates," and "supporters." *Id*. The publications that Abbott relies upon to justify its "disease not drug" sales

message typically utilizes a publication "authored" by one of the non-independent KOL's. *Id.*. This specifically includes the "disease not drug" sales message applied to Dr. Pastan *in this case*. SUMFs at ¶¶ 74-75; PMSJ SUMFs at ¶¶ 7, 33; Response SUMFs ¶¶ 69, 87. To the best of counsel's searching ability, we were unable to locate any publication for dissemination outside the company in which Abbott divulged how it classifies its relationships with its various KOL's that headline its Humira literature.

Yet despite this seeding of scientific literature, both Dr. Gershwin and Dr. Goldsmith --- as well as Defendant's own experts – found that published studies *do exist* that consistently show an increased risk of lymphoma with a point estimate of more than 1.00 for those patients taking TNF-blockers. SUMFs at ¶¶ 10-11; 21; 55; 59; PMSJ SUMFs at ¶¶ 7, 48, 100, 102, 103, 107, 110, 125, 129. While many of the studies, were not *statistically* significant, the Supreme Court and the First Circuit have held they do not have to be, and, internally, Abbott recognizes that some things are *clinically* significant, even if the numbers do not reach *statistical* significance. SUMFs at ¶ 19.

Thus, both the admissions by Abbott, and the Bradford Hill factors–including epidemiological evidence–supports causation is this case; Abbott's calculated and hidden efforts to manipulate the risks in the medical community not withstanding. And while Abbott's experts are trying to come to some consensus as to what the epidemiological evidence shows, the law cited above clearly supports the premise that Plaintiff has offered sufficient causation evidence that should be "developed on cross-examination and go to the weight of the evidence." *Bartlett*, 678 F.3d at 39.

C.    **Dr. Soiffer Reliably Carries Specific Causation.** Dr. Robert Soiffer is the Chief of the Division of Hematologic Malignancies at Dana Farber and a Professor of Medicine at the Harvard Medical School. SUMFs at ¶ 37. This medical doctor is at the pinnacle of medical science in diagnosing and treating hematologic cancers (*i.e.,* lymphoma). He has also prescribed TNF

inhibitors as part of his practice.  SUMFs at ¶ 38.  Abbott does not attack his qualifications, for they know they cannot do so with a straight face.[22]  Rather, in their summary judgment papers they resort to *legal* attacks based on isolated snippets of his deposition testimony that provide the Court neither a fair understanding nor picture of the substance of Dr. Soiffer's opinions.  Nevertheless, Abbott's attacks on Dr. Soiffer are as ill-founded as the remainder of its causation arguments.

Abbott's opens their specific causation arguments parroting their standard "statistical significance" causation diatribe.  Plaintiff has already addressed the fallacy of arguing that statistical significance is the *sine qua non* of causation and need not repeat those arguments here.  Simply stated, there is no such requirement imposed on any medical causation expert.

Abbott then spends a couple of pages quoting isolated snippets of testimony that purportedly support its arguments.  As the Court will soon see, if anyone is guilty of using "carefully chosen words" it is Abbott's lawyers with respect to unfairly portraying Dr. Soiffer's testimony.

Dr. Soiffer employed a differential diagnosis in reaching his opinions in this case.  SUMFs at ¶ 47; Response SUMFs at ¶¶ 39, 137.  This methodology is well recognized in this circuit as reliable.  *Allen v. Martin Surfacing*, 263 F.R.D. 47, 65 (D. Mass. 2009) citing *Baker v. Dalkon Shield Claimants Trust,* 156 F.3d 248, 253 (1st Cir. 1998) and *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.,* 851 F.2d 540, 544-45 (1st Cir. 1988)("Differential diagnosis is "a standard medical technique.").  *See also Feliciano-Hill v. Principi*, 439 F.3d 18, 25 (1st Cir. 2006)(" Indeed, even in more complicated cases when an examining physician calls upon training and experience to offer a differential diagnosis (a determination of which of two or more diseases, presenting with similar symptoms, has caused a patient's ailments), most courts have found no *Daubert* problem.").

---

[22]  Plaintiff responds in more detail to Abbott's attacks on Dr. Soiffer's methodology in her Response to Abbott's *Daubert* motion concurrently filed herewith.

Further, "[t]hough an expert should consider and analyze alternative causes of a disease or side-effect, he or she is not required to rule out each and every other possible cause before offering a causation opinion." *In re Neurontin Mktg., Sales Practices, & Products Liab. Litig.*, MDL 1629, 2009 WL 3756328, 7 (D. Mass. Aug. 14, 2009).[23]   Plaintiff need only prove the drug was a "substantial factor in bringing about the harm." *Neurontin,* 2009 WL 3756328, 7.[24]   "As explained in the Federal Judicial Center's *Reference Manual on Scientific Evidence,* "the common statement that 'alternative causes of disease must be ruled out' before causation is attributed can be more accurately refined to say that 'the role of other causes must be adequately considered.'" *Id.*

The reason for this is obvious in the context of an injury or disease that is almost always, by definition, multifactorial.  Abbott admits that cancer has multiple risk factors.  Dkt. #42 at ¶ 32.  A hypothetical will illustrate.  No reasonable person could dispute that Maureen Calisi had at least three, risk factors for lymphoma: (1) RA itself, (2) Humira, and (3) her age.  If an expert had to absolutely "rule out" a possible role for any of the three, then a tortfeasor would have *de facto* immunity, and a citizen of Massachusetts would have no redress in Massachusetts courts.  It would also run afoul of black letter law in Massachusetts, and elsewhere, typically embodied in a jury instruction that "in negligence cases, the law recognizes that there may be **more than one proximate cause** of the same injury." *Marshall v. Nugent*, 222 F.2d 604, 616 (1st Cir. 1955)(emphasis added). *Accord Neurontin, supra,* 2009 WL 3756328, 7.  Plaintiff's experts in this case have done precisely what the *Reference Guide* suggests, *i.e.,* "adequately considered" the potential role of other risk

---

[23]  *Accord Best.,* 563 F.3d at 181; *Westberry,* 178 F.3d at 265; *Heller*, 167 F.3d at 156.

[24]  Although the *Neurontin* court examined the issue under Tennessee law, it held the principle to be "hornbook torts law." *Id.*  The *Neurontin* court continued:  " Though an expert should consider and analyze alternative causes of a disease or side-effect, he or she is not required to rule out each and every other possible cause before offering a causation opinion." *Id.*

factors, and "ruled them out" as the <u>most probable</u> culprit in the development of Maureen's lymphoma.  The law simply cannot require more than that.

Dr. Soifer's opinions were that it is "more likely than not" that Humira contributed to Plaintiff's lymphoma to "a reasonable degree of medical certainty"or "probability."  SUMFs at ¶¶ 39, 41, 43, 47; Response SUMFs at ¶¶ 37, 39, 136, 137.  Further, although he did not use the phrase "rule out," he fully considered other potential risk factors for Maureen and stratified the various risk factors before reaching his conclusions.  SUMFs at ¶ 47; Response SUMFs at ¶1 37.  The factors he considered were Plaintiff's age, her RA, and her use of Humira.  *Id*.  He rank ordered them in terms of most likely to contribute or "cause"[25] lymphoma.  *Id*.  The order from most likely to least likely was Humira, RA, and age.  *Id*.

Dr. Soiffer further clarified that TNF inhibitors act with the underlying disease to increase the risk "more than it would be if [Humira] weren't there."  SUMFs at ¶¶ 40-42; Response SUMFs at ¶ 141.  He opined that in his "oncologic opinion," that in a patient with RA, the use of Humira was a *"greater than 50 percent contributor to that patient developing lymphoma*."  SUMFs at ¶ 43; Response SUMFs at ¶¶ 37, 39, 136, 137.  Thus, the use of Humira by Maureen, to a reasonable degree of medical certainty, increased her risk by greater than 50 percent for lymphoma.  SUMFs

---

[25]  Dr. Soiffer clarified that from an oncology stand point, Humira does not directly "cause" lymphoma, *i.e.,* "some transformation of cells that are [a] direct effect on the cells that cause cancer."  SUMFs at ¶ 41; Response SUMFs at ¶¶ 39, 141.  Rather, "cause" or "contribute" means to him that Humira "altered something in the environment of the host, of the patient, to make them more susceptible to the development of a lymphoma..."  *Id*.  This is exactly the same causation concept that this Court cited in *Donovan* when it stated that under Massachusetts state law, the key question is whether there has been "physiological changes" or "subcellular changes that substantially increased the risk of serious disease, illness, or injury..."  *Donovan v. Philip Morris USA, Inc.*, 2012 WL 957633 (D. Mass. Mar. 21, 2012) (citing *Donovan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 903 (2009)).

at ¶¶ 41, 43; Response SUMFs at ¶¶ 37, 39, 136, 137.  Further, Abbott's own oncology expert had

no criticisms of Dr. Soiffers' methodology.  SUMFs at ¶ 48.[26]

Abbott's criticisms that Dr. Soiffer did not opine to the appropriate legal standard are utterly

unfair.  He was abundantly clear with respect to his opinions and the degree of medical certainty to

which he held them:

> Q:   Did you reach [the opinion that Humira is capable of contributing to the development of lymphoma] to a reasonable degree of medical certainty?
>
> A:   Yes.

SUMFs at ¶¶ 36, 47; Response SUMFs at ¶ 137.

> Q:   Do you have an opinion whether the Humira in Ms. Calisi's case was a substantial contributing factor or cause in her development of lymphoma?
>
> A:   I could say it was a substantial contributing factor.
>
> Q:   Is that opinion based on reasonable medical probability?
>
> A:   It's based on reasonable medical probability, my practice as an oncologist and my experience with immune-compromised patients at risk for immune suppression-related lymphomas.
>
> Q:   Is -- is that experience that you brought to bear in this particular case experience and training you use in a setting in the practice of medicine that is outside of a courtroom?
>
> A:   Yes.
>
> Q:   Is that the same method that you have tried to apply to developing your opinions in this case?
>
> A:   Yes.

SUMFs at ¶ 42; Response SUMFs at ¶ 35.

---

[26]   Unlike Dr. Soiffer, Dr. Stein's "research" was entirely provided to him by Abbott's counsel.  SUMFs at ¶ 49.

Nowhere in his deposition does Dr. Soiffer rely upon "mere possibility." There is nothing speculative about his opinions or the manner in which he reached them. He weighed the various risk factors, applied his expertise and experience "from the real world," opined to the appropriate medical certainty and concluded that Humira legally caused Plaintiff's lymphoma.

In footnote 55, Abbott cites this Court's opinion in the class action decertification case of *Donovan v. Philip Morris USA, Inc.*, 2012 WL 957633 for the notion that the "but-for" test is the only legal standard this court may apply on specific causation. Abbott confuses the law and misreads this Court's opinion, which clearly rejected "but-for causation tests applicable under New York law and Florida law with the observation that "Massachusetts law is notably different." Under Massachusetts law, an increased risk itself is compensable and the standard of proof for actual causation is the "substantial factor" test. What this Court actually stated in a footnote in *Donovan* was that "[a]ctual causation, on the other hand, turns on a substantial factor test in cases that involve two or more *causal events* allegedly sufficient to bring about plaintiffs' harm." *Id*. at FN11. (Emphasis added). This holding is in accord with the Massachusetts Supreme Court opinion upon which this Court based its *Donovan* opinion:

> The "substantial contributing factor" test is useful in cases in which *damage has multiple causes, including but not limited to* cases with multiple tortfeasors in which it may be impossible to say for certain that any *individual* defendant's conduct was a but-for cause of the harm, even though it can be shown that the defendants, in the aggregate, caused the harm. The substantial contributing factor test is less appropriate, however, as an instruction as to cause in a loss of chance case *in which one defendant's malpractice alone is alleged to have caused the victim's diminished likelihood of a more favorable outcome.* The proper test in a loss of chance case concerning the conduct of a single defendant is whether that conduct was the but-for cause of the loss of chance.

*Matsuyama v. Birnbaum*, 452 Mass. 1, 30-31, 890 N.E.2d 819, 842 (2008)(emphasis in the original

on "individual;" other emphasis added).  Notwithstanding this language, the *Matsuyama* court

affirmed the verdict of a jury that was actually given a "substantial factor" instruction.

The court in *In re Neurontin Mktg. & Sales Practices & Products Litig.,* 2010 WL 3169485,

2 (D. Mass Aug. 10, 2010) also correctly applied Massachusetts' substantial factor law in a

prescription drug case with similar facts to the case bar in which their existed *multiple potential*

*causes of injury but a single drug product*:

> "Under Massachusetts law, a plaintiff seeking to establish causation
> in a case where an injury may be attributable to multiple causes must
> show that the defendant's conduct was a "substantial contributing
> factor" to the plaintiff's injury.  *See Matsuyama v. Birnbaum*, 452
> Mass. 1, 30–31, 890 N.E.2d 819 (2008) (approving the use of the
> "substantial contributing factor" test for causation "in cases in which
> damage has multiple causes") (citing *O'Connor v. Raymark Indus.*,
> 401 Mass. 586, 587, 518 N.E.2d 510 (1988))."

Additionally guidance may be found in the Massachusetts' Pattern Jury Instructions.  Product

Liability, § 11.3.4 Defect–Causation under subsection (b) provides the following:

> There may be more than one cause present to produce an injury, and
> more than one person legally responsible for an injury.  The plaintiff
> does not have to prove that the defendant's breach of warranty was the
> only or predominant cause of the injury.  If two or more causes
> operating together contributed to the plaintiff's injury so that, in
> effect, the damages suffered were inseparable, then it is enough for
> the plaintiff to prove that the defendant's breach of warranty was a
> substantial contributing factor in causing the injury.

The practice notes accompanying this instruction make clear that the highest court in Massachusetts

has noted the usefulness of the substantial factor test in cases in which the damage has "multiple

causes."  *Id*.  It is not limited to only those cases involving multiple defendants.

Abbott's contention that the RESTATEMENT (THIRD) OF TORTS dismisses the substantial factor

test in its entirety is puzzling the say the least.  To the contrary, § 16 plainly states the a company is

-24-

liable if a "defect" in its product "is a *substantial factor* in increasing the plaintiff's harm <u>beyond that</u> which would have resulted from other causes."[27]

Dr. Soiffer indisputably testified that Humira was a substantial factor in Maureen developing lymphoma. Any concession that Dr. Soiffer may have offered regarding Maureen's ultimate risk of lymphoma stemming from her RA and "but for" Humira, centered on just that, a risk. He did not concede she *would have* developed lymphoma irrespective of Humira use. To the contrary, he expressly found Humira to be the most likely cause of her current lymphoma despite her other risk factors. It is not Dr. Soiffer's burden to opine, nor Maureen Calisi's burden to prove, that she would never get cancer. Rather, the record provides reliable evidence proving to a reasonable degree of medical certainty, answering whether Maureen developed lymphoma as a result of taking Humira. She did.

The law in Massachusetts takes a broad view of specific causation and seeks to minimize the role of impossibility when juggling multiple causes and/or tortfeasors. It clearly provides, both in the Massachusetts pattern jury instructions and Supreme Judicial Court opinions, that when multiple causes may be responsible for harm, the substantial factor test is appropriate. This is certainly reasonable, otherwise no pharmaceutical company could ever be held responsible for causing cancer because factors like age or 'unknown' causes of cancer could never completely be ruled out. In this case, there are no multiple defendants with which to grapple, but there are multiple possible risk

---

[27] Subsections (b) and (c) deal with the question of whether the product manufacturer is liable for all of the harm, jointly and severally, or only the "increased harm." It depends on the jury's assessment of the totality of evidence.

RESTATEMENT Section 3, dealing with "circumstantial evidence supporting inference of product defect" also permits this kind of inference unless the harm was "*solely* the result of causes other than the product defect." Applied to this case, if Maureen's lymphoma was actually caused by *both* RA and Humira, then Abbott is liable; but if the harm was "solely" the result of RA, then it is not.

factors.  The substantial factor test is the appropriate test and Dr. Soiffers' testimony amply provides specific causation under that test.

## II.  SUMMARY JUDGMENT IS INAPPROPRIATE WITH REGARD TO CALISI'S FAILURE TO WARN THEORY.

**A.    Abbott Has Voluntarily Assumed a Duty to Warn Maureen Calisi.**  As the Court knows from Plaintiff's own separately pending Motion for Partial Summary Judgment, it is Plaintiff's belief that the "learned intermediary" doctrine, as construed by Massachusetts' courts, does not shield Abbott from liability in this case.   On the facts before the Court, we believe Massachusett's "learned intermediary" law would require a warning to Maureen Calisi herself.  We will not belabor that point as it has been addressed elsewhere.   However, a recent Supreme Judicial Court case cited by Abbott on page 32 of its Memorandum cannot be neglected.  The case is *Cottam v. CVS Pharmacy*, 436 Mass. 316, 326, 764 N.E.2d 814, 822-24 (2002) and it is cited by Abbott in support of the proposition that "a prescription drug manufacturer's duty to warn of dangers associated with its product runs ***only*** to the physician."  That is half the holding.  The other half is that:

> A pharmacy, **like any other person or entity**, may voluntarily assume a duty that would not otherwise be imposed on it, and thus may voluntarily assume a duty to provide information, advice or warnings to its customers. Massachusetts recognizes that "a duty voluntarily assumed must be performed with due care," and we have approved the principles pertaining to voluntary assumption of a duty as set forth in the Restatement (Second) of Torts § 323 (1965). . . . "If a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as necessary for her protection, that person may be liable for harm caused because of the negligent performance of his undertaking."

764 N.E.2d at 821-22 (emphasis added).  Even though the issue had been waived by CVS, the Massachusetts High Court chose to write on it, affirming the lower court's judgment that CVS had, indeed, assumed the duty to warn plaintiff about the full range of potential side effects of a

-26-

medication.  *Id.* at 823.  The *Cottam* court also addressed the corollary contention, parroted by

Abbott in its Memorandum, that only *expert* opinion testimony regarding the adequacy of such a

warning would suffice.  It rejected it with the following observations:

> The common-law duty to warn "necessitates a warning
> 'comprehensible to the average user and ... [one] convey[ing] a fair
> indication of the nature and extent of the danger to the mind of a
> reasonably prudent person.' " . . . At issue is the adequacy of the
> warning, not the technical performance of the pharmacist. The crucial
> issues in this aspect of the case were the extent of CVS's undertaking
> to warn and whether a reasonable person would have been misled by
> the warning. In this case, the determination did not involve
> professional or technical knowledge for which a jury need expert aid.
> Rather, it involved a commonsense determination regarding the
> understanding of an ordinary, reasonably prudent person, a
> determination properly left to the jury without expert testimony.

764 N.E.2d at 823.  Nor, is expert testimony necessarily required with regard to the inadequacy of

the warning to the prescribing physician.  *Knowlton v. Deseret Med., Inc.*, 930 F.2d 116, 121 (1st

Cir. 1991).

Turning to the facts of this case, Abbott clearly chose to provide information directly to

consumers like Maureen Calisi about the risks and benefits of Humira.  It ran TV ads.  PMSJ SUMFs

at ¶ 26.  It maintained a website.  *Id*. at 24.  It prepared a patient handout.  *Id*. at 22.  And, most

importantly, it produced a video designed to be given directly to patients by the prescribing

physician.  *Id*. at 19.  It, in fact, gave such a video to Dr. Pastan to disseminate to his patients.  *Id*.

Dr. Pastan gave the video to Maureen prior to taking Humira to assist her in her treatment decision.

*Id*.  Maureen watched it.  *Id*. at 20.  And it said absolutely nothing about any risk of cancer.  *Id*. at

21.  Maureen Calisi is the "ordinary, reasonably prudent" person of whom the *Cottam* court spoke,

and her "common sense" testimony is unequivocal:

Q:      If during the period of time from 2003, when you started taking
        Humira, until 2008, when you discovered this lump in your breast, if
        you had received a warning from Abbott, whether on TV or video or
        in any way that was calculated to get your attentions, and they said to
        you, "hey Maureen, this drug, you know, could cause you to have
        cancer, what would you have done?

A:      Well, as I -- as I responded before, if you see the word "cancer" in
        something, you're not going to take it, and I would not have taken it.
        I would have called Dr. Pastan immediately.

SUMFs at ¶ 82.

This alone defeats summary judgment in the case.

**B.      Abbott Has Failed to Provide Dr. Pastan with Legally Adequate Warnings – and
the *Garside* Presumption and Prediction Preclude Summary Judgment on this Theory as Well.**

Any discussion of summary judgment with regard to a pharmaceutical failure to warn case should

begin with the First Circuit's 199**2** opinion in *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir.

1992).[28]  The case bears careful study.  It militates against summary judgment in three different ways,

*i.e.,* (a) through its holding, (b) through its precedent setting presumption of proximate causation,

and (c) through an oft-overlooked but critical *Erie* presumption.  In the interest of perspective, we

start with the latter.

**1.      The Supreme Judicial Court of Massachusetts has never sanctioned

summary judgment based on the testimony of a prescribing physician.**  It is axiomatic that

Massachusetts' substantive law governs this diversity case.  The First Circuit reversed the drug

-----

[28]  Although Abbott provides jump sites to this opinion on pages 41/55 of its
Memorandum, Dkt. # 66, the cite does not appear in its Table of Cases.  What does appear is the
1990 opinion which affirmed a summary judgment in the same case, but regarding a different
drug made by a different defendant, on the rather unremarkable basis that plaintiff's interrogatory
answer predicting what he thought his expert might say under oath was not competent summary
judgment proof.  *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)("A third party's
description of an expert's supposed testimony is not suitable grist for the summary judgment
mill.").

company's summary judgment in *Garside* because there, like here, there was no legally adequate

warning about the risks of the side effect in issue, and the prescribing physician's testimony was

equivocal at best.  *Id.*  It string cited a series of cases from Mississippi, California, and Virginia, and

observed that in this "line of cases" the "courts have required that the physician's testimony show

unequivocally that s/he knew at the relevant time all the information which would have been

included in a proper warning."  *Id.* at 82.  Reliance on that line of cases provided an ample basis for

reversing the summary judgment.  And, yet, despite that fact, and realizing that Massachusetts law

governed the case before it, it made the following, very telling *Erie* prediction:

> We have grave reservations about whether the Massachusetts
> Supreme Judicial Court would even follow the above-cited line of
> cases. In light of both the presumption afforded a plaintiff under
> Massachusetts law that a proper warning would be heeded, . . . [T]he
> Massachusetts Supreme Judicial Court would likely be reluctant to
> allow a physician's pre-trial testimony about what s/he would have
> done had s/he been warned to insulate a defendant manufacturer from
> liability. Such reluctance would find support in a line of cases holding
> that a physician's statement about what s/he would have done in the
> face of an adequate warning raises a credibility issue which must be
> decided by a jury.  "What [the physician] might or might not have
> done involves to some degree his credibility. Thus, we conclude that
> it is for the jury to determine whether the presence of an adequate
> warning would have made no difference in [the physician's]
> decision.").  . . . "A well-prepared advocate may be able to erode at
> trial the physicians' testimony [that they would have prescribed the
> drug in the face of a proper warning]".

*Id.* at FN9.  Twenty years' worth of Massachusetts' jurisprudence has confirmed the First Circuit's

prediction.  Abbott cites no case, and counsel for Plaintiff has been able to find none, in which the

Massachusetts Supreme Judicial Court has sanctioned a summary judgment based on the pretrial

deposition testimony or statements from a prescribing physician.  Indeed, the Massachusetts' High

Court has not cited *Garside II* at all.  Nor, indeed, has the First Circuit had occasion to revisit this

prediction.[29]   Nor do the cases cited by Abbott deal with either the *Garside II* presumption or

prediction.  The most recent case is *Kerlinsky v. Sandoz Inc.*, 783 F. Supp. 2d 236, 241 (D. Mass.

2011).  It is hardly earth-shaking authority.  In that case, the *pro se* plaintiff tendered a clearly

inadequate "expert report" from his own daughter.  *Id*. at 238, 240.  Even though Judge Ponsor gave

her a chance to supplement, she still failed to provide a report meeting the criteria of Rule 26.  *Id*.

at 239-40.  It is no surprise in such circumstances that summary judgment was granted.

We urge this Court to follow the First Circuit's *Erie* prediction in *Garside* and to hold that

"that it is for the jury to determine whether the presence of an adequate warning would have made

no difference in [the physician's] decision." *Garside*, 976 F.2d at FN9. (1st Cir. 1992).  That decision

would also be consistent with the actual holding of *Garside II*, which reversed a summary judgment

on extremely analogous facts, and with plaintiff's *constitutional* right to a trial before a jury of her

peers.

Moreover, it is clear that under the present set of facts, namely that a prescribing physician

had a financial relationship whereby he was directly paid substantial sums of money by Abbott,

PMSJ SUMFs ¶¶ 15, 17, the First Circuit would find the jury the best party to determine the

reliability of Dr. Pastan's testimony.

---

[29]   The First Circuit has cited its own prior opinion only four times and none are directly on point.  It provided a "cf" cite regarding the learned intermediary portion of the opinion  in a Maine-diversity pharmaceutical case in 1995 that affirmed a jury verdict and judgment for a plaintiff.  *Violette v. Smith & Nephew Dyonics, Inc.*, 62 F.3d 8, 13 (1st Cir. 1995).  Its most recent cite in *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350 (1st Cir. 2009) is not a pharmaceutical case, but is important because it vacated a summary judgment in an inadequate warnings case because the defendant had failed to rebut the presumption of proximate causation of both *Garside, supra* and *Knowlton*, 930 F.2d at 116.  The Tenth Circuit has also cited the case for the proposition that "[t]he vast majority of jurisdictions hold that where a warning is inadequate, plaintiff is entitled to a rebuttable presumption that an adequate warning would have been heeded if one had been given." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 855 (10th Cir. 2003).

2.      **Dr. Pastan was not adequately warned.**  Massachusetts law requires a warning that is "comprehensible to the average user, which conveys a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person." *Kelly v. Wyeth*, 20033314F, 2007 WL 1302589 (Mass. Super. Apr. 12, 2007)(Not reported in N.E.2d)(Denying summary judgment on adequacy of warnings despite express mention of risk in both warnings and precaution section of label because label did not convey "a fair indication of the nature and extent of the danger."). "An adequate warning is one reasonable under the circumstances. . . . A warning may be inadequate in factual content, in expression of the facts, *or in the method by which it is conveyed*." *Brochu v. Ortho Pharm. Corp.*, 642 F.2d 652, 657 (1st Cir. 1981)(Emphasis added). And the fact that the labeling might have the imprimatur of the FDA is not decisive on the common law inquiry. *Id*. In light of this, the adequacy *vel non* of pharmaceutical warnings is almost invariably a question of fact. *See e.g., Brochu, supra* 642 F.2d at 71; *Garside,* 976 F.2d 77 at 80. Moreover, in Massachusetts, contrary to Abbott's arguments, expert testimony on the validity *vel non* of a warning is <u>not</u> required. "[P]laintiffs often proceed to a jury on inadequate warning claims without expert testimony. As the First Circuit indicated in *Knowlton*, 930 F.2d at 121, '[t]he jury did not need the help of an expert to explain or formulate a warning.'" *Gurski v. Wyeth-Ayerst Div. of Am. Home Products Corp.*, 953 F. Supp. 412, 417 (D. Mass. 1997).

Not surprisingly, Abbott focuses solely on misleading "small print" in its official package insert. But that hardly ends the inquiry regarding adequacy. "[C]ontent is not the sole criterion in determining the adequacy of a warning; the jury may also consider a warning's expression of the facts and the method or form in which it was conveyed. *Brochu*, 642 F.2d at 657; *see also MacDonald v. Ortho Pharm. Corp.*, 475 N.E.2d 65, 71 (1985). Thus, a warning may be found to be unreasonable if it was unduly delayed, reluctant in tone or lacking a sense of urgency." *Gurski,*

*supra,* 953 F. Supp. at 417.  A company is not merely obligated to give out some kind of warning.

Rather, Massachusetts law requires them to take such steps as are reasonably necessary to "bring

home" the warning, regardless of whether it is the patient themselves, or a surrogate "learned

intermediary." *Id.*; *Brochu, supra.*  Dr. Pastan clearly wanted to know whether Humira itself posed

a risk of lymphoma to his patients.  Abbott could have used multiple ways to alert him to that risk,

using "data-driven," scientific information, which is what is appropriate.  SUMFs at ¶ 77.  This

obviously would include label information about the risk difference with respect to lymphoma in the

Humira clinical trials between those RA patients taking Humira and those that did not, which was

confirmed by Abbott's own head of clinical trials, Dr. John Medich .  SUMFs at ¶ 79. This risk

difference was neither explained nor quantitated in the 2002 Humira label.  SUMFs at ¶¶ 79-81;

PMSJ SUMFs at ¶ 4; Response SUMF ¶¶ 21, 69. But Abbott chose to emphasis a marketing message

to impact prescribing practices of doctors like Dr. Pastan, that was " dynamic message-driven (rather

than data-driven), scientific communications strategy."  SUMFs at ¶ 77; PMSJ SUMFs at ¶ 4.  We

agree with the head of Humira's Regulatory Affairs, who stated such a marketing strategy would be

"absolutely inappropriate."  SUMFs at ¶ 68.

When the lymphoma labels changed in 2004 for all TNF-blockers, Abbott could have sent

out a "Dear Doctor" letter to physicians like Dr. Pastan just as its competitor Remicade did.  SUMFs

at ¶¶ 70-71; PMSJ SUMFs at ¶¶ 30-31.  It chose not to communicate this heightened lymphoma

warning to doctors, even though it sent out a Dear Doctor letter only a month later on another matter,

but that was completely silent about the lymphoma label change.  SUMFs at ¶ 71; Response SUMFs

at ¶¶ 62, 65; PMSJ SUMFs at ¶ 32.  Instead, Abbott instructed its sales representatives to only raise

malignancy warning changes with doctors if asked, and then to spend only 30 seconds on it.  SUMFs

at ¶ 73; Response SUMFs at ¶ 62; PMSJ SUMFs at ¶ 35.  Abbott sent an internal letter to its sales

representatives informing them about the Remicade letter, and telling them that all TNF-blocker were "associated with lymphoma." SUMFs at ¶¶ 72; PMSJ SUMFs at ¶ 31. Why? Because reminding doctors about this risk *sua sponte* was clearly contrary to its internal company directives and "dynamic message-driven" marketing efforts. SUMFs at ¶¶ 69, 73, 76-77; PMSJ SUMFs at ¶¶ 34-35.[30]

Abbott could have warned physicians who it called up on, such as Dr. Pastan, by having it sales representatives convey the message. Indeed, in *Brochu, supra*, the First Circuit held that "[t]he jury might also have considered on the question of warning the fact that the salesperson who regularly called on Dr. Campbell did not orally inform him that the 2 mg. drug appeared to present a higher risk of thromboembolism." 642 F.2d at 659, citing *Sterling Drug, Inc. v. Yarrow,* 408 F.2d 992, 993 (8th Cir. 1969)(court may find it unreasonable to fail to instruct sales personnel to warn physicians on whom they call regularly of drug dangers; not clearly erroneous to find such sales personnel present most effective method of warning doctors). The facts in this case show that, like the sales representatives in *Gurski, supra*, Abbott's sales people were trained to "down play any danger" by blaming the "disease not the drug," meaning blaming any increased risk of lymphoma in RA patients on RA, and not Humira. SUMFs at ¶¶ 74-75; 87; PMSJ SUMFs at ¶ 7. This is what the sales representatives who called on Dr. Pastan were instructed to tell him. SUMFs at ¶¶ 74-75; Response SUMFs at ¶¶ 22, 87; PMSJ SUMFs at ¶ 7. Also, they were trained to give short responses

---

[30] Abbott's arguments that there was no need to inform doctors about this label change because malignancy information was already present in its label simply highlights the company's emphasis on distancing itself from the lymphoma issue. *If* safety is your number one priority, there is no harm in telling physicians about a label change. However, if you are more concerned that the risk might negatively influence physician behavior, then it makes perfect sense to convince oneself that since the label already makes some mention of the issue, one need not *remind* doctors about this issue.

"only when asked."  SUMFs at ¶ 73; PMSJ SUMFs at ¶ 35. This evidence is most properly evaluated

by the jury.

The proof in the "inadequacy" pudding, of course, is the effect of all of Abbott's various

means of communication on Dr. Pastan himself.  At Dr. Pastan's deposition, Abbott's counsel made

the statement:

> "Patients taking Humira are at an increased risk of developing
> lymphoma *because the use of Humira itself can cause or otherwise
> contribute to the development of this form of malignancy,*
> irrespective of the underlying disease being treated."

Response SUMFs at ¶ 87; PMSJ SUMFs ¶ 9 (Emphasis added).  Counsel then asked him whether

that was *his* understanding in 2003, Dr. Pastan replied:

> "I just have to say that what I felt was that their rheumatoid arthritis
> increased their risk.  I was not convinced that Humira increase their
> risk above their basic disease."

*Id*. (Emphasis added).

Under *Garside*, *Knowlton*, and other Massachusetts cases, the law presumes[31] that, if this

statement had been made by Abbott's sales people instead of its lawyer, Dr. Pastan would have

---

[31]  "The law permits an inference that a warning, once given, would have been followed..
. . . where no warning is given, or where an inadequate warning is given, a rebuttable
presumption arises, beneficial to plaintiff, that the failure to adequately warn was a proximate
cause of plaintiff's ingestion of the drug."  *Knowlton,* 930 F.2d at 123.  *See also McCue v.
Norwich Pharmacal Co.*, 453 F.2d 1033, 1035 (1st Cir. 1972)("Correspondingly, having put a
dangerous drug on the market without adequate warning defendant cannot be heard to say that
the physician might have disregarded a proper one.").

The *Garside* court relied upon and found particularly compelling the Ohio Supreme
Court's reasoning in *Seley v. G.D. Searle & Co.*, 423 N.E.2d 831, 839 (1981) in the context of
the "heeding presumption" analysis.  *Garside*, 976 F.2d at 81.  *Seley* holds that "only speculation
can support the assumption that an adequate warning, properly communicated, would not have
influenced the course of conduct adopted by a physician, even where the physician had
previously received the information contained therein."  *Seley*, *supra*, 423 N.E.2d at 839.  Thus, a
"heeding presumption" is, in essence, a presumption of causation.

-34-

heeded it.  Far from rebutting that presumption, Dr. Pastan's testimony is that, with *that warning*, "I would have had to have had this discussion with the patient."  *Id*. at 189:12-13.

Like the prescriber in *Garside II*, Dr. Pastan thought that there might be some association between the drug and side effect in issue.  But like that prescriber, he had no idea just how serious the risk was, and, of course, that it was causal.  Equally true, he never could convey that actual knowledge to Maureen despite his testimony that he would have "had to do so."  PMSJ SUMFs ¶10.  Consequently, on the authority of *Garside II* and the record before the Court, Abbott's motion for summary judgment on the warnings theory should be denied.

This discussion, of course, says nothing about the fact that Abbott was providing Dr. Pastan with significant financial incentives to maintain a close relationship with Abbott.  These payments and the facts surrounding them are chronicled in great detail in Plaintiff's Motion for Partial Summary Judgment and the accompanying Statement of Undisputed Material Facts.  PMSJ SUMFs at ¶¶ 15-17.  The direct payments that Abbott was making to Dr. Pastan as well as employing him to speak and roll play at regional sales meetings are clearly factors that the *Garside II* court held would weigh on the credibility of the doctor and are classic jury fodder.  They are ample record facts, in and of themselves, to deny Abbott's learned intermediary arguments.[32]

Turning from the law to a further examination of the record facts of this case, the Court's first inquiry is whether or not Abbott provided a legally adequate warning to Dr. Pastan that the use of Humira can cause malignancies, or more specifically, lymphoma.  Plaintiff has pled, and shown, that a warning was appropriate, and that Abbott failed to give one.  Abbott has *no evidence* that it

---

[32]  In fact on September 9, 2012, in another Humira case in which Abbott was directly paying the prescribing physician, Massachusetts visiting Judge William Young both denied Abbott's motion for summary judgment based on the learned intermediary doctrine and granted Plaintiff's Motion to Certify the learned intermediary question to the Tennessee Supreme Court.  SUMFs at ¶ 84.

provided Dr. Pastan with any warning whatsoever about *Humira*-induced lymphomas. PMSJ SUMFs at ¶¶ 3, 6, 7, 8, 9, 10, 21, 30-33.  The caveated and ambiguous language describing an increased risk of lymphoma in RA patients found in the 2002 label certainly does not describe a risk of *Humira*-*induced* lymphoma.  *Id.* at ¶¶ 3, 4, 7.  Dr. Pastan's deposition makes clear he was "unlearned" about this risk, in spite of the fact that he repeatedly asked Abbott's sales representatives for information on this very point.  *Id.* at ¶¶ 7,9.

Further, Abbott did nothing to reduce Dr. Pastan's confusion about this issue.  *Id.* at ¶¶ 7, 8, 9, 31-33.  In fact, Abbott actually systematically planned and consistently instructed its sales staff to *conceal* the risk within the disease being treated, *i.e.*, RA.  *Id.* at ¶¶ 7, 31-32, 34-35.  Abbott also intentionally set out to avoid discussing this risk with doctors and the scientific community by instructing sales staff to only bring it up when asked and then to only spend 30 seconds on it.  *Id.* at ¶¶ 34-35.  As noted above and illustrated in both *Brochu* and *Gurski, supra*, even otherwise legally valid warnings can be watered down by such promotional activities.  It is disingenuous to state the physician's awareness of the label was sufficient for summary judgment purposes when Abbott was actively downplaying the risks contained therein *and* directly paying the physician.

Additionally, as briefly discussed already,  there was no "Dear Doctor" letter ever sent to Dr. Pastan to apprise him of this risk.  *Id.* at ¶¶ 30-33.  But rather, in the face of competitor "Dear Doctor" letters about this very risk, Abbott instructed its sales staff to focus on the class effect and the confusing language regarding increased risk in untreated RA patients.  *Id.* at ¶¶ 30-31.  More importantly, when Dr. Pastan specifically asked the sales representatives if their product posed this risk, he was assured that it did not.  *Id.* at ¶¶ 6-7.  This was part and parcel of Abbott's strategic marketing efforts to only discuss this risk when asked and to confuse the issue by only placing favorable data in the label.  *Id.* at ¶¶ 34-35.

Finally, contrary to the implication in Abbott's motion papers, there is no legal obligation for Plaintiff to write the adequate warning that Abbott should have given or to adduce expert testimony in support of it.  Abbott's arguments in this regard are answered in the following excerpt from *Knowlton*:

> The jury did not need the help of an expert to explain or formulate a warning. As will be developed in detail below, it had before it all the evidence needed to determine what warning should have been given.

930 F.2d at 121.

    **3.**    **The Failure to warn was a proximate cause.**  Both the presumption, recognized by *Knowlton, Garside* and other cases; and Dr. Pastan's testimony, establish a triable case on the proximate cause component of the failure to warn (the prescriber) theory.  Given Abbott's voluntary undertaking of communicating directly with patients, there also exists a triable issue on whether they adequately warned Maureen.  *See Cottam, supra.*

Regardless, with respect to the chain of proximate causation, an adequate warning would have broken it and changed the outcome of this case.  Dr. Pastan was unequivocally clear that it was Maureen's decision as to whether or not to follow his treatment recommendation and inject herself with Humira.  PMSJ SUMFs at ¶¶ 10, 18. Further, he believes that *if* he had understood that Humira could cause lymphoma he *"had"* to discuss that potential risk with her.  PMSJ SUMFs at ¶ 10. Maureen testified unambiguously that if told this drug could have given her lymphoma or cancer, she in no way would have chosen to accept that risk.  PMSJ SUMFs at ¶ 11.  Further, there were still other treatment options available to her.  SUMFs at ¶ 83.  Despite Abbott's efforts to imply that she had no other options, she, in fact, did.

Thus, with respect to the proximate cause issue, an adequate warning would have changed the decision to use Humira. As such, the chain would have been broken and Plaintiff would have saved herself from needless suffering.

## IV.   THE SUPREME COURT HAS REJECTED ABBOTT'S ARGUMENT FOR FEDERAL PREEMPTION.

Abbott's argument for federal preemption parrots the argument rejected by the Supreme Court in *Wyeth v. Levine*, 555 U.S. 555 (2009), which addressed preemption of failure to warn cases involving brand-name prescription drugs such as Humira. In that case, Wyeth argued that the FDA's careful balancing of a drug's risks and benefits, and its approval of a label reflecting that careful balance, should preclude "second guessing" of the FDA's decision by a jury. Because it was impossible to make a warning adequate under state law without modifying the FDA-approved label, Wyeth asserted that federal law preempted the state law claims. The Supreme Court rejected this argument.

Although it is true that the FDA must approve a drug before it is marketed, it is the drug company – not the FDA – that bears responsibility for the safety of the drug after approval.[33] There are 11,000 prescription drugs on the market, and it is simply impossible for FDA to monitor the adequacy of warnings. *Levine*, 555 U.S. at 578. Both FDA and the public depend on drug companies to drive necessary change. Thus, federal regulations mandate that a drug's label "shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.57(e) (1999)

---

[33] This is exactly the opinion and testimony reflected by Plaintiff's warning expert, Dr. Michael Hamrell. Response SUMFs at ¶ 15.

(recodified as 21 C.F.R. § 201.80(e) (2006))(boldface added).[34] To discharge this duty, the "Changes Being Effected" regulation gives drug companies the power and the duty to change warnings without prior FDA approval. 21 C.F.R. § 314.70(c)(6)(iii)(A) ("the CBE regulation"). As the Court noted in *Levine*, "[t]he CBE regulation permitted Wyeth to unilaterally strengthen its warning, and the mere fact that the FDA approved [the drug's] label does not establish that it would have prohibited such a change." 555 U.S. at 573.

Abbott makes the same substantive argument in this case: that FDA's decisions made it impossible both to comply with Abbott's regulatory duties under federal law and to give an adequate warning under state law. As in *Levine*, this argument misunderstands the inherent nature of federal regulation of prescription drugs.

> Wyeth suggests that the FDA, rather than the manufacturer, bears primary responsibility for drug labeling. Yet through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.

*Id*. at 570-71.[35] Both federal law and state law recognize that drug companies must be proactive in ensuring the adequacy of warnings, and federal regulations give them the express power and duty to do so. Compliance with both federal and state law is both possible and expected.

---

[34] Section 201.57(e) set forth the relevant standard at the time of the prescription in this case. In 2006, this section was recodified as 21 C.F.R. § 201.80(e), which continues to set forth the proper standard for older drugs such as Humira.

[35] For example, Abbott seems to suggest that it could not have used the CBE regulation to change the label that FDA initially approved. Abbott Mem. at 43. *Levine* and the CBE regulation itself contradict this proposition. Drug companies draft and submit a proposed label to the FDA for approval as part of the NDA process. *See* 21 C.F.R. § 314.105 (b). The FDA either approves the label as submitted by the manufacturer, or requests changes in the label, but the actual drafting is done solely by the drug company. The provision of adequate warnings remains the responsibility of the drug company. *Levine,* 555 U.S. at 571 ("It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.").

The Court in *Levine* did leave open the possibility of preemption in a very narrow circumstance. If a drug manufacturer can present "clear evidence" that FDA would have rejected a change added pursuant to the CBE regulation, federal law can preempt state law. *Id.* at 571. Nonetheless, the court must interpret this exception in conjunction with other Supreme Court authority. As the Supreme Court has long recognized, a hypothetical conflict between federal and state law cannot form the basis of preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). Abbott concedes that it never attempted to change the Humira warning with respect to lymphoma, and identifies no other TNF-inhibitor manufacturer that attempted to do so. Thus, there is no evidence of any actual rejection of a relevant warning *added by a drug company*. To establish preemption, therefore, Abbott would have to present evidence that is sufficiently "clear" to transform the hypothetical to the certain. To do so, at least one court has read *Levine* in conjunction with *PLIVA, Inc. v. Mensing*, 131 S.Ct. 2567 (2011)[36] to require that "the brand name manufacturer likely must proffer evidence of the FDA's **rejection of an actual label change**." *Schedin v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F. Supp.2d 1125, 1132 (D.Minn. 2011) (boldface in original).

Subsequent cases support this proposition and demonstrate the narrowness of the exception.[37] To the best of Plaintiff's knowledge, only one court has found preemption in a brand-name drug case

---

[36] The Court in *PLIVA* found that federal law *did* preempt failure to warn claims with respect to generic drugs. Humira is a brand-name drug – not a generic – and *PLIVA* is not relevant, except to underscore the primary responsibility of brand-name manufacturers for the safety of prescription drugs. *See also Bartlett, supra.* 678 F.3d at 37 & n.2.

[37] The Supreme Court itself recognized that this exception would be extremely rare. 555 U.S. at 570 ("the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept—neither Wyeth nor the United States has identified a case in which the FDA has done so.").

since *Levine. Dobbs v. Wyeth Pharms.*, 797 F.Supp.2d 1264, 1270 (W.D. Okla. 2011) (acknowledging that other "decisions have universally found the manufacturer's evidence inadequate to support conflict preemption"). The district court in *Dobbs* did so even though five other courts, including the Seventh Circuit, had refused to find preemption on the same regulatory record. *Id.* at 1277-80. Two involved the same drug, Effexor. *Id.* at 1279. *Dobbs* is on appeal to the Tenth Circuit, and oral argument is current scheduled on January 16, 2013.

Faced with a broad rule, a narrow exception and a single outlier case finding preemption, Abbott attempts to find "clear evidence" in the FDA's awareness of the potential association between TNF-inhibitors and lymphoma and the warning it approved based on that awareness. But the FDA's approval of a class wide, "minimum safety" warning does not equate to a rejection of a different warning added by an individual drug manufacturer. Even where the agency "carefully consider[s]" an issue and consciously refuses to require action under federal law, its decision is not preemptive unless the decision rises to the level of an authoritative federal determination that prohibits action on the state level." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 67 (2002). The Supreme Court applied this holding to prescription drugs in *Levine*, explaining that the "mere fact that the FDA approved [the drug's] label does not establish that it would have prohibited" a different warning, especially because "each time the agency reviewed [the] label" it did so in light of "the FDA's traditional recognition of the co-existence of state-law remedies," 555 U.S. at 573, 581.

Contrary to Abbott's understanding, moreover, Abbott Mem. at 42 n.70, the actual facts of *Levine* presented a much stronger case for conflict preemption than do the facts of this case. Although Wyeth never utilized the CBE to strengthen its drug's label in *Levine*, it at least proposed an added warning to the FDA. 555 U.S. at 561-62. FDA did not respond at once, but eventually instructed Wyeth to "[r]etain verbiage in current label." *Id.* at 562. *See also id.* at 605 n.1 (Alito,

J., dissenting)("'Wyeth proposed language that would have prevented this accident' ... The FDA rejected Wyeth's proposal."). Although the majority disagreed with Justice Alito's characterization of the evidence in this regard, the opinion emphasized that "even the dissent's account does not support the conclusion that the FDA would have prohibited Wyeth from adding a stronger warning pursuant to the CBE regulation." *Id.* at 573 n.6.  In other words, even the rejection of a drug manufacturer's *proposal* to add a warning is not "clear evidence" that the FDA would have rejected the actual *addition* of a warning under the CBE regulation.  *See Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 393 (7th Cir. 2010) ("Taking *Levine* as a whole, it is clear from the ample administrative record that the FDA strongly considered a similar warning to the one the plaintiff proposed and the Court still did not find preemption.").  In this case, Abbott neither added an adequate warning nor proposed one, making preemption even less appropriate than in *Levine*.

Finally, Abbott argues that the FDA's desire to have a class-wide section of TNF-inhibitor labels somehow absolves Abbott of its duty to "ensur[e] that its warnings remain adequate as long as the drug is on the market." *Levine,* 555 U.S. at 571.  This is contrary to *Levine*, as a district court in Minnesota recently observed.

> As a result, the  Court finds that class labeling, at least in practice, creates a floor below which no label in the class can fall, but does not preclude a manufacturer from including more information in its label. This finding is consistent with the central holding of Wyeth that "the manufacturer bears responsibility for the content of its label at all times." *Wyeth*, 129 S.Ct. at 1197–98.

*Schedin v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.,* 776 F. Supp. 2d 907, 914-15 (D. Minn. 2011).[38]  Another district court reached the same conclusion two years earlier:

---

[38]  Additionally, Abbott's acknowledgment of the numerous differences between the Humira label and that of its competitor drugs Enbrel and Remicade, Dkt. # 42 at ... (Answer) belie its "class labeling" arguments.

> In denying the proposed language, the agency did not prohibit all enhanced warnings. Instead, the FDA merely required removal of Paxil-specific language from a particular portion of Paxil's label in favor of uniform class-wide labeling for all SSRI's. The agency's action did not preclude Paxil-specific language changes to other areas of the labeling or prevent GSK from pursuing a label change through submission of a separate supplement.

*Forst v. SmithKline Beecham Corp.*, 639 F. Supp.2d 948, 954 (E.D. Wis. 2009). Each individual drug manufacturer is responsible for the adequacy of its own label under both federal and state law, and the presence of a class-wide portion of a label does not absolve a drug manufacturer of this duty.

There is no "clear evidence" that the FDA would have rejected a changed warning if Abbott (or any other TNF-inhibitor manufacturer) had attempted to add one. In the absence of such evidence, *Levine* directs that federal law does not preempt Plaintiff's failure to warn claims.

## V.   ABBOTT DOES NOT CHALLENGE THE WARRANTY/DESIGN THEORY.

Finally, although not addressed in Abbott's motion, it is worth reiterating that Plaintiff Calisi also have a viable, triable case of breach of warranty based on a defective design. In Massachusetts, as a matter of social policy, liability for "unreasonably dangerous" products is imposed on products manufacturers strictly, *i.e.,* without regard to fault. Most states do so under the aegis of RESTATEMENT (SECOND) OF TORTS, § 402A. Massachusetts does not. Its law still harkens to the origins of strict liability and uses the age old "warranty" theory to the same purpose. *Correia v. Firestone Tire and Rubber Co.*, 388 Mass. 342, 354–355, 446 N.E.2d 1033 (1983). Warranty liability is "fully as comprehensive as the strict liability theory of recovery that has been adopted by a great many other jurisdictions," and "congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965)." *Back v. Wickes Corp.*, 375 Mass. 633, 639, 378 N.E.2d 964 (1978). *See Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 15 (1st Cir. 2001).

Abbott's motion ignores this well pled theory of recovery entirely, assuming instead that, because it is a pharmaceutical case, the only basis of recovery for a plaintiff is failure to warn[39]. Not true. "Warranty liability may be premised either on the failure to warn, . . . or, as here, on defective design." *Haglund v. Philip Morris, Inc.*, 446 Mass. 741, 747, 494 N.E.2d 315, 322-23 (2006).

The recent First Circuit case of *Bartlett, supra,* 678 F3d at 39 illustrates the trial and appellate viability of such a theory.  The case was a generic drug claim and was tried on a *design* defect theory (undoubtedly because the failure to warn theory was preempted under *Mensing infra*).  The drug company argued that liability was inappropriate because (a) there was no evidence of a safer alternative design,[40] and (b) plaintiffs' experts did not testify on the ultimate factual issue of whether the drug was "unreasonably dangerous."   Both arguments were rejected, and the strict liability judgment of the district court was affirmed on appeal.  Therefore, even if summary judgment was appropriate on the failure to warn case, it is not appropriate on the warranty/design defect case.

---

[39]  Plaintiff acknowledges, of course, that "failure to warn" is also one way to plead and prove a breach of warranty claim, and that, with regard to that aspect of it, the Massachusetts courts employ the same criteria as they do to assess a negligent failure to warn.  *See e.g., Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 636, 751 N.E.2d 848, 859 &n.19 (2001).

[40]  *Haglund* reiterates the considerations that the jury must weigh and sums it up with the observation that "the balance struck by the jury is ultimately a judgment about the 'social acceptability' of the design."  *Id*.  The Jury in this case may legitimately consider whether it is "socially acceptable" for Abbott to market a biologic that carries the risk of cancer, without adequate warnings about same, when consumers have alternative biologic products available that do not have the same magnitude of carcinogenic risk and that are marketed by companies who choose, instead of blaming the "disease not the drug" to actually send out "Dear Doctor" letters apprising physicians of the risk of lymphoma.  SUMFs at ¶¶ 74-75; 87; PMSJ SUMFs at ¶¶ 7, 29-33.

**Conclusion**

For the reasons set forth herein, Abbott's Motion for Summary Judgment should be denied, and this Court should schedule the case for trial on the merits, as soon as reasonably possible in 2013.

Respectfully submitted,

PERDUE KIDD & VICKERY

*/s/ Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery
Texas Bar No. 20571800
Jim M. Perdue, Jr.
Texas Bar No. 00788180
Fred H. Shepherd
Texas Bar No. 24033056
510 Bering Dr., Suite 550
Houston, TX  77057-1469
Telephone:  713-520-2500
Facsimile:  713-520-2525
Email:  andy@justiceseekers.com
Email:  jperduejr@justiceseekers.com
Email:  fred@justiceseekers.com
*Lead Counsel for Plaintiff*
[Admitted *Pro Hac Vice*]

Christopher C. Trundy
Massachusetts Bar #555622
P. O. Box 1203
New Bedford, MA  02741
Telephone:  508-984-4000
Facsimile:  508-999-1670
Email:  christrundy@trundylaw.com
*Counsel for Plaintiff*

**Certificate of Service**

I certify that on this 21st day of November, 2012, Plaintiff's Memorandum in Opposition to Abbott's Motion for Summary Judgment has been electronically filed with the Clerk using the CM/ECF system, which will automatically send email notifications of such filing to the following attorneys of record:

Richard M. Zielinski, Esq.
Elizabeth K. Levine, Esq.
GOULSTON & STORRS
400 Atlantic Avenue
Boston, MA  02110-2607

Michael P. Foradas, Esq.
Renee D Smith, Esq.
Andrew P. Bautista, Esq.
Whitney L. Becker, Esq.
Brenton Rogers, Esq.
Douglas G. Smith, Esq.
KIRKLAND & ELLIS, LLP
300 North LaSalle Street
Chicago, IL  60654

Traci L. Shafroth, Esq.
KIRKLAND & ELLIS, LLP
555 California Street
San Francisco, CA  94104

*/s/ Arnold Anderson (Andy) Vickery*
Arnold Anderson (Andy) Vickery