**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAUREEN E. CALISI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 1:11-cv-10671-DJC |
| v. | ) |
| | ) Hon. Denise J. Casper |
| ABBOTT LABORATORIES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO ABBOTT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant Abbott Laboratories ("Abbott") submits the following responses to plaintiff's statement of allegedly undisputed material facts (Dkt. 86). As a preliminary matter, many of plaintiff's "undisputed material facts" fail to comply with Local Rule 56.1 because they are arguments framed as factual assertions or are unsupported or contradicted by admissible evidence. Accordingly, the court should disregard them. *See, e.g.*, *FedEx Customer Info. Servs., Inc. v. Fright Catalog*, No. 08-40180-TSH, 2010 WL 3505162, at *1 (D. Mass. Aug. 27, 2010) ("Where a party fails to comply with Rule 56.1, the Court has the discretion to disregard such [party]s' factual assertions/denials."); *Mercier v. Boilermakers Apprenticeship & Training Fund*, No. 07-11307-DPW, 2009 WL 458556, at *9 (D. Mass. Feb. 10, 2009) (noting that the court "will, of course, disregard arguments framed as factual assertions, and . . . will consider the 'facts' asserted by each party only to the extent that they are supported by the record"); *Aulisio v. Baystate Health Sys., Inc.*, Civil Action No. 11-30027-KPN, 2012 WL 3957985, at *5 (D. Mass. Sept. 7, 2012) (repeating the "admonition" that "Local Rule 56.1 . . . requires *concise* statements of material *facts*, not arguments") (emphases in original);

*Powell v. City of Pittsfield*, 143 F. Supp. 2d 94, 100-101 n.1 (D. Mass. 2001) (disregarding a party's inaccurate description of a document and a purportedly undisputed fact that was unsupported by the affidavit cited); *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) ("The court will disregard any . . . purported statements of 'fact' not properly supported by citations to the record.  Further, the court will disregard any legal arguments contained in [the party's] Statement of Facts.").   Specifically, the following purportedly undisputed facts are unsupported or contradicted by admissible evidence, or are arguments framed as factual assertions, and should be disregarded:  ¶¶ 7-9, 14-16, 22-24, 28, 30, 35, 42-43, 48-50, 58-67, 73-77, 79, 83, 85.

In addition, many of plaintiff's proposed facts are not "material" to any issue in this case. For example, as a matter of law, the adequacy of warnings must be determined in reference to the prescribing physician, and not to the patient.  *See, e.g.*, *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992) ("the [pharmaceutical] manufacturer's duty to warn runs to the physician rather than the patient.").  Subject to these objections, Abbott responds to plaintiff's statement of material facts as follows.

1.      Abbott's own retained oncology expert, Dr. Robert Stein, states that the scientific literature does not allow one to conclude that Humira does, or does not cause lymphoma:

Q:      You would agree that there is an issue within the literature related to the methodology of these studies because of the nature of the time component of developing a malignancy, such as lymphoma, leading to diagnosis?

A:      I think it's a real issue.

Q:      Okay. That real issue exists throughout the literature that you've read?

A:      Yes…..the data is limited. The data is limited because the failure to find a difference does not definitively establish that there is a difference or there isn't a difference....I would agree with you that the literature is limited by the amount of follow-up on the patients to make -- to draw definitive conclusions, and I think this is the problem why we're -- I think we're, in some ways, left with the position that we have -- we don't have definitive data to resolve the issue, and certainly

cannot prove that there is a relationship nor that there isn't a relationship. That's the basic problem of what we have.

Exhibit 1 at 114:17-114:25; 115:1-115:20; 202:24-203:7 (Deposition Excerpts of Dr. Robert Stein).

**RESPONSE:**

Denied.  Abbott does not dispute that plaintiff accurately quotes Dr. Stein's testimony, but disputes plaintiff's characterization of it.  Dr. Stein did not conduct the systematic review of the epidemiological literature that Dr. Howard Ory conducted.  (*See* Response ¶ 2 *infra*.)  Rather, his role was to respond to the specific causation opinions offered by plaintiff's expert, Dr. Soiffer.  (*See* Third Decl. of Renee D. Smith and Omnibus Appendix of Exhibits in Supp. of Def.'s Response to Pl.'s Statement of Material Facts in Supp. of Opp. to Abbott's Mot. for Summary Judgment; Reply in Supp. of Abbott's Mot. for Summary Judgment; and Reply in Supp. of Abbott's Mot. to Exclude Causation Testimony under Fed. R. Evid. 702. (Third App. 76 (Dr. Stein expert report) at 2.)[1]  Additionally, Dr. Stein testified that "there is no solid evidence showing, to a statistically significant degree, that Humira increases the incidence of lymphoma . . . ."  (Third App. 78 (Dr. Stein Dep.) at 115:21-116:12.)

2.      Dr. Howard Ory, Defendant's retained epidemiological expert, opines that the scientific literature is clear that Humira does not cause lymphoma: "As I discuss below, the absence of a significant association means there cannot be a causal association between anti-TNF agents, including Humira, and lymphoma. Accordingly, there is no reliable scientific evidence that anti-TNF agents, including Humira, cause lymphoma. Exhibit 2 at 7 (Expert Report of Dr. Howard M. Ory).

**RESPONSE:**

Admitted for purposes of this motion.

3.      Key Opinion Leaders in the context of medical science are physician peers who are paid by drug manufacturers to educate their colleagues about the manufacturer's products."

---

[1] "Third App." refers to Dec. of Renee Smith and Omnibus Appendix of Exhs. in Supp. of Def.'s Response to Pl.'s Statement of Material Facts in Supp. of Opp. to Def.'s Mot. for SJ, Def.'s Reply Brief in Supp. of Def.'s Mot. for SJ, and Def.'s Combined Reply in Supp. of its *Daubert* Mots. filed concurrently herewith.

Exhibit 3 at 1558 (Mello M et al, *Shifting Terrain in the Regulation of Off-Label Promotion of Pharmaceuticals*, N Engl J Med 2009; 360:1557-1566).

**RESPONSE:**

Abbott admits that plaintiff accurately cites Exhibit 3 (Dkt. 88-3) at 1558 as stating that "Key Opinion Leaders" are "paid by drug manufacturers to educate their colleagues about the manufacturer's products," but denies that plaintiff has produced evidence that Abbott has paid physician peers to educate their colleagues about Abbott's products.

4.     Of the 13 epidemiological studies cited by Defendant, at least seven of them are authored or coauthored by an Abbott Key Opinion Leader who is not an "Independent," but rather is held by Abbott to be either "True Partners," "Advocates," or "Supporters" (Dr. Arthur Kavanaugh, Dr. John Cush, Dr. Michael Schiff, and Dr. Lars Klareskog). Exhibit 4 at 13 (Humira Psoriasis Approval Plan) [CONFIDENTIAL[2]]; Exhibit 5 at 1 (Klareskog KOL Email Dated Sept 2005)[CONFIDENTIAL].

**RESPONSE:**

Admitted in part, denied in part.  Abbott admits that Plaintiff's Exhibit 4 (Dkt. 88-4) [FILED UNDER SEAL] at 13 lists Dr. Cush, Dr. Kavanaugh, and Dr. Schiff as "KOLs," and that Plaintiff's Exhibit 5 (Dkt. 88-5) [FILED UNDER SEAL] at 1 refers to Dr. Klareskog as a KOL.  Abbott denies plaintiff's misleading implication that any of the epidemiological studies at issue (which plaintiff does not specifically identify) were "ghostwritten" by Abbott without disclosure.  Plaintiff has not provided any evidence that Abbott provided Dr. Kavanaugh, Dr. Cush, Dr. Schiff, or Dr. Klareskog with "ghostwritten" materials to be published without attribution to Abbott.  And more generally, plaintiff has not provided any evidence that Abbott "ghostwrote" scientific literature related to the potential risk of lymphoma, that the lymphoma data contained in the literature was falsified or inaccurate, nor evidence that Dr. Robert Pastan's Humira prescription decision for Ms. Calisi was influenced by a "ghostwritten" article.

---

[2]     "CONFIDENTIAL" will designate that this exhibit or record reference has been marked as confidential by Abbott. As such, it will be filed under seal.

5.      Ghostwriting is defined as "a professional medical writer ("ghostwriter") employed by a drug company, CRO, or medical communications company, who is paid to write an article but is not named as an author; and a clinical investigator ("guest author"), who appears as an author but does not analyze the data or write the manuscript. Ghostwriters typically receive a packet of materials from which they write the article; they may be instructed to insert a key paragraph favorable to the company's product."  Exhibit 6 at 1542 (Bodenheimer T, *Uneasy Alliance—Clinical Investigators and the Pharmaceutical Industry*, N Engl J Med 2000; 342:1539-1544.

**RESPONSE:**

Admitted in part, denied in part.  Abbott admits that plaintiff correctly quotes Plaintiff's

Exhibit 6 (Dkt. 88-6) at 1542 for purposes of providing a definition of "ghostwriting," but denies

that it supports plaintiff's contention that "Abbot has extensively employed ghostwriting to

further its Humira marketing and sales objectives. They internally reference the practice as

'ghost writing.'"  (Pl.'s Mem. in Opp. to Abbott's Mot. for Summary Judgment (Dkt. 85) ("Pl.'s

MSJ Opp.") at 24) (citing Pl.'s SUMF ¶¶ 5-8).)  Exhibit 6 does not support either that Abbott

extensively employs ghostwriting to further its Humira marketing and sales objectives, nor that

Abbott internally references the practice as "ghost writing," as plaintiff contends.

6.      A 2004 email to Abbott employee Jeff Kent states: "Attached is a letter we ghost wrote for you in regards to the ACR 2004 and a Rheum News journal we are sending out on the event- please let me know if you have any issues with the letter." Exhibit 7 at 1 (Ghostwritten Email Dated Sept 2004) [CONFIDENTIAL].

**RESPONSE:**

Admitted in part, denied in part.  Abbott admits that plaintiff correctly quotes Plaintiff's

Exhibit 7 (Dkt. 88-7) at 1 [FILED UNDER SEAL].  Abbott denies that Plaintiff's Exhibit 7

supports plaintiff's contention that "Abbot has extensively employed ghostwriting to further its

Humira marketing and sales objectives."  (Pl.'s MSJ Opp. at 24 (citing Pl.'s SUMF ¶¶ 5-8).)

Plaintiff's Exhibit 7 is a 2004 email sent to Abbott employee Jeff Kent regarding a letter that was

written on his behalf.  This letter— printed on Abbott Immunology stationary and signed by Jeff

Kent—is a one-page promotional notice to rheumatologists announcing Abbott's sponsorship of

a special issue of *Rheumatology News*.  (Third App. 72 (ABT 00140453-454).)  This letter is not

an epidemiology study, does not have Key Opinion Leader involvement, and does not address

the potential risks of lymphoma associated with Humira.  (*See id.*)

7.      Abbott strategically chooses which Key Opinion Leaders and doctors it wants to
headline ghostwritten manuscripts to be most effective: "For our long term RA safety abstracts,
we have used Schiff and Burmester as primary authors.  We were planning on including one
KOL from each of the programs as authors of the abstract.  Who would you like for AS? I
thought of John Davis, but since this is a European meeting, would you recommend van der Heij
de instead?"   Exhibit 8 at 2 (Schiff and Burmester Ghostwritten Email Dated Jan. 2006)
[CONFIDENTIAL].

**RESPONSE:**

Denied.  Plaintiff's Exhibit 8 (Dkt. 88-8) [FILED UNDER SEAL] does not support her

characterization that "Abbott strategically chooses which Key Opinion Leaders and doctors it

wants to headline ghostwritten manuscripts to be most effective," nor does it support plaintiff's

contention that "Abbot has extensively employed ghostwriting to further its Humira marketing

and sales objectives."  (Pl.'s MSJ Opp. at 24 (citing Pl.'s SUMF ¶¶ 5-8).)  Plaintiff has provided

no evidence that either the ankylosing spondylitis safety abstract or the long term rheumatoid

arthritis safety abstract referenced in Plaintiff's Exhibit 8 were "ghostwritten" by Abbott before

Abbott's invitation to key opinion leaders to be co-authors of the publication.  Plaintiff has also

provided no evidence that the content of either abstract presents inaccurate data, or affected Dr.

Pastan's decision to prescribe Humira to her.

8.      An example of a ghostwritten scientific article by Abbott is entitled *Biologics in
General Medicine: Adalimumab* with the author byline given as "Authors to be determined."
Exhibit 9 at 1 (Biologics in General Medicine Ghostwriting) [CONFIDENTIAL].

**RESPONSE:**

Denied.  Abbott denies that Plaintiff's Exhibit 9 (Dkt. 88-9) [FILED UNDER SEAL] is

an example of a scientific article "ghostwritten" by Abbott.  This document became, in its final

form, a book chapter titled "Adalimumab" in *Biologics in General Medicine* (2007).  (Third

App. 69 (J. Salfeld & H. Kupper, "Adalimumab," in W.H. Boehncke & H.H. Radeke, eds., *Biologics in General Medicine* (Springer 2007) at 14.)  This book chapter was authored solely by two Abbott employees whose company affiliation was clearly disclosed.  (*Id.* at 14; xvi-xvii.)  No external "Key Opinion Leader" is listed as an author of the publication.  (*Id.* at 14.)

9.      Of the 13 epidemiological studies cited by Defendant, at least four studies are authored or coauthored by a KOL for whom Abbott provides ghostwritten material (Dr. Michael Schiff, Dr. Lars Klareskog, and Dr. Gerd Burmester).  Exhibit 10 at 1 (Klareskog Ghostwritten Article Dated Oct 2006)[CONFIDENTIAL]; Exhibit 11 at 1 (Schiff and Burmester Ghostwritten Article Dated March 2005) [CONFIDENTIAL]; Exhibit 8 at 2 (Schiff and Burmester Ghostwritten Email Dated Jan. 2006) [CONFIDENTIAL].

**RESPONSE:**

Denied.  None of the exhibits cited by plaintiff support her contention that "[o]f the 13 epidemiological studies cited by Defendant, at least four studies are authored or coauthored by a KOL for whom Abbott provides ghostwritten material."

Plaintiff's Exhibit 10 (Dkt. 88-10) [FILED UNDER SEAL] is a draft article titled "TNF Antagonist Mechanisms of Action:  A Comprehensive Review."  This article is not an epidemiological study cited by Abbott.  (*See generally* Dkt. 70-1 (Abbott's Mem. in Support of its Mot. for Summary Judgment) & Dkt. 70-2 (Abbott's Mot. to Exclude Causation Testimony Under Fed. R. Evid. 702.))  Nor was it "ghostwritten."  The draft document in Plaintiff's Exhibit 10 was written by Daniel Tracey, an Abbott employee.  (Third App. 73 at ABT 00555824 (email confirming Dr. Tracey drafted the initial publication and was planning to reach out to Dr. Klareskog for his advice).)  Dr. Tracey was also listed as the lead author on the final publication of this article.  (Third App. 71 (D. Tracey et al., Tumor Necrosis Factor Antagonist Mechanisms of Action: A Comprehensive Review, 117 Pharmacology & Therapeutics 244 (2008) at 244).)  The final published article also disclosed that three of the five authors—Dr. Daniel Tracey, Dr. Eric H. Sasso, and Dr. Jochen G. Salfeld—were Abbott employees.  (*Id.*)

7

Plaintiff's Exhibit 11 (Dkt. 88-11) [FILED UNDER SEAL] is a draft article titled "Safety Analyses of Adalimumab (Humira) in Global Clinical Trials and US Post-Marketing Surveillance of Patients with Rheumatoid Arthritis." (*Id.*) The final version of this article, published in Annals of the Rheumatic Diseases in 2006, shows that Abbott did not "ghostwrite" it. (Third App. 70 (M.H. Schiff et al., Safety Analyses of Adalimumab (HUMIRA) in Global Clinical Trials and U.S. Postmarketing Surveillance of Patients with Rheumatoid Arthritis, 65 Ann. Rheum. Dis. 889 (2006), at 889, 893 (disclosing that five of the seven authors were Abbott employees).)

Plaintiff's Exhibit 8 (Dkt. 88-8) [FILED UNDER SEAL] does not support her contention that Abbott provided ghostwritten materials to Dr. Schiff and Dr. Burmester. (*See* ¶ 7.)

10.    Multiple studies have found an increased risk of lymphoma for persons taking TNF-blocker:

Geborek found a RR for lymphoma of 4.9 (95% CI .9 to 26.2). Exhibit 12 at 699 (Geborek P et al., Tumour necrosis factor blockers do not increase overall tumour risk in patients with rheumatoid arthritis, but may be associated with an increased risk of lymphomas. Ann Rheum Dis. 2005 May;64(5):699-703.)

Leombruno found a OR for lymphoma of 1.26 (95% CI .52 to 3.06). Exhibit 13 at 1136 (Leombruno JP *et al.*, *The safety of anti-tumour necrosis factor treatments in rheumatoid arthritis: meta and exposure-adjusted pooled analyses of serious adverse events.* Ann Rheum Dis. 2009 Jul;68(7):1136-45.)

Wolfe found a statistically significant increased risk of lymphoma when comparing persons with RA taking Humira and methotrexate verse all other treatments (OR=5.6 CI 95% 1.1 to 29.0), and a borderline statistically significant increased risk of lymphoma for those taking Humira verse all other medications (OR=4.5 CI 95% .9 to 23.1. Exhibit 14 at 1437 (Wolfe F *et al.*, *The effect of methotrexate and anti-tumor necrosis factor therapy on the risk of lymphoma in rheumatoid arthritis in 19,562 patients during 89,710 person-years of observation.* Arthritis Rheum. 2007 May;56(5):1433-9.)

Bernatsky found an adjusted RR of 1.92 (95% CI .49-7.5) for hematological cancers. Exhibit 15 at 280 (Bernatsky S *et al.*, *Hematologic malignant neoplasms after drug exposure in rheumatoid arthritis.* Arch Intern Med. 2008 Feb 25;168(4):378-81.)

Askling found a RR for lymphoma of 1.35 (95% CI .82 to 2.11). Exhibit 16 at 648 (Askling J *et al.*, *Anti-tumour necrosis factor therapy in rheumatoid arthritis and risk of*

*malignant lymphomas: relative risks and time trends in the Swedish Biologics Register*. Ann Rheum Dis. 2009 May;68(5):648-53.)

Askling found a hazard ratio of 2.69 (95% CI .91 to 8.21) for all site cancer excluding non-melanoma skin cancer when looking at Outcome C, which Dr. Goldsmith considered the most conservative outcome. Exhibit 17 at 125 (Askling J *et al.*, *Cancer risk with tumor necrosis factor alpha (TNF) inhibitors: meta-analysis of randomized controlled trials of adalimumab, etanercept, and infliximab using patient level data*. Pharmacoepidemiol Drug Saf. 2011 Feb;20(2):119-30.)

**RESPONSE:**

Admitted in part, denied in part.

**Geborek (2005).** Abbott admits that Geborek et al. (2005) (Plaintiff's Exhibit 12 (Dkt. 88-12)) found a relative risk of lymphomas for patients treated with anti-TNFs of 4.9 (95% CI 0.9 to 26.2), with the qualification that the increased risk was not statistically significant because the confidence interval included the relative risk of 1.0, and, as plaintiff's expert Dr. Goldsmith agreed, the authors of the study did not and could not conclude that anti-TNFs cause lymphoma. (App. 30 (Goldsmith Dep.) at 230:6-14.)[3]   Additionally, a subsequent study authored by Jonah Askling and others including Geborek—which included the results of the earlier Geborek study—concluded that "[a]fter adjustment for sex, age, and disease duration, the lymphoma risk after exposure to TNF antagonists was no higher than in the other RA cohorts.  Lymphomas associated with TNF antagonists had characteristics similar to those of other RA lymphomas." (App. 34 (Askling et al. (2005) at 1414; *see also* App. 30 (Goldsmith Dep.) at 235 (agreeing that "the Askling 2005 study concluded that the lymphoma risk was not higher in TNF treated patients than in other patients[.]").

**Leombruno (2009).** Abbott admits that Leombruno et al. (2009) (Plaintiff's Exhibit 13 (Dkt. 88-13)) at 1136 found an odds ratio for risk of lymphoma of 1.26 (95% CI 0.52 to 3.06),

---

[3] "App" Refers to Dec. of Renee Smith and Omnibus Appendix of Exhs. in Support of Def. Mot. for SJ, Mot. to Exclude Causation Test., and Mot. to Exclude Hamrell Test. (Oct. 19, 2012, Dkt. No 65)

with the qualification that this increased risk was not statistically significant because the confidence interval included the relative risk of 1.0, and, as the authors concluded, "[o]ur analysis showed that the risk of death, serious adverse events, serious infection, lymphoma, non-cutaneous cancer/melanoma or non-melanoma skin cancers was not increased with any anti-TNF on recommended doses.") (*Id.* at 1139; *see also* App. 30 (Goldsmith Dep.) at 326:20-327:2 ("Q: Does this study [referring to Leombruno] contradict the conclusion that Humira causes lymphoma? [Objection.] A: This study does not support that position, correct.").

**Wolfe & Michaud (2007).** Abbott denies that Wolfe & Michaud (2007) (Plaintiff's Exhibit 14 (Dkt. 88-14)) supports her contention that it is a study "find[ing] an increased risk of lymphoma for persons taking TNF-blocker[s]." This study found that "[t]he odds ratio (OR) for lymphoma in patients who did not receive anti-TNF therapy was 1.0 (95% CI 0.6-1.8 [$P = 0.875$])." (*Id.* at 1433; *see also id.* at 1439 ("The results of this study provide strong evidence that lymphoma is not increased among RA patients treated with anti-TNF agents in routine clinical practice and is in agreement with the linked cancer registry reports from Sweden by Askling et al."); App. 30 (Goldsmith Dep.) at 206:21-207:2 ("Q. And a 1.0 OR suggests, as a point estimate suggests no relationship between anti-TNF therapy and lymphoma, correct? A. Correct.").)

**Bernatsky (2009).** Abbott denies that Bernatsky (2009) (Plaintiff's Exhibit 15 (Dkt. 88-15)) supports her contention that it is a study "find[ing] an increased risk of lymphoma for persons taking TNF-blocker[s]," as this study found an increase in "hematologic malignant neoplasms" overall—not lymphomas specifically (*see id.* at 380). Further, the results were not statistically significant because the confidence interval included the relative risk of 1.0. (*Id.* (finding "crude" relative risk for anti-TNFs and hematologic malignant neoplasms of 2.46 (95% CI 0.66-9.15) and "adjusted" relative risk of 1.92 (95% CI 0.49-7.50).)

**Askling (2009).**  Abbott admits that Askling et al. (2009) (Plaintiff's Exhibit 16 (Dkt. 88-16) at 648) found a relative risk of lymphomas for patients treated with anti-TNFs of 1.35 (95% CI 0.82 to 2.11), with the qualification that this increased risk was not statistically significant because the confidence interval included the relative risk of 1.0, and, as the authors reported, "[n]o increase [in lymphoma risk] was observed among RA patients first starting anti-TNF therapy in 2002 or later.  [ . . . ]  [W]e noted no increase in lymphoma risk shortly after the start of anti-TNF therapy, nor any increase in lymphoma risk with increasing time since treatment start, accumulated time on active anti-TNF therapy, or by any particular anti-TNF drug."  (*Id.* at 651-52; *see also* App. 30 (Goldsmith Dep.) at 252:13-19 (agreeing that "the authors of this study did not find a statistically significant elevated risk associated with anti-TNF patients.").)

**Askling (2011).**  Abbott denies that Askling et al. (2011) (Plaintiff's Exhibit 17 (Dkt. 88-17)) supports her contention that it is a study "find[ing] an increased risk of lymphoma for persons taking TNF-blocker[s]."   The Askling 2011 study addressed all-cancer risk, not lymphoma risk.  (*Id.* at 119; App. 30 (Goldsmith Dep.) at 119:14-19 (agreeing that "finding an association between anti-TNF drugs and cancer, generally, would not necessarily mean that anti-TNFs cause lymphoma.").)  Moreover, even with the respect to all-cancer risk, the study reported that "the occurrence of cancer diagnoses" was "not higher with anti-TNF treatment than with comparator treatment."  (Dkt. 88-17 at 125.)

11.     Defendant's own paid epidemiological expert, Dr. Howard Ory, admitted that consistently more studies than not have point estimates of risk above 1.00. Exhibit 18 at 148:21-148:23; 149:13-149:18 (Deposition Excerpts of Dr. Howard Ory).

**RESPONSE:**

Denied.  Plaintiff's cited testimony (Plaintiff's Exhibit 18 (Dkt. 88-18) at 148:21-148:23; 149:13-149:18) does not support her characterization of it.   Dr. Ory did not testify that "consistently more studies than not" have point estimates of risk above 1.0.  Dr. Ory's testimony,

reproduced in full below, was that "a lot of [the studies] are very close to 1," "some are below," that "[m]ore are above than below," and that "[t]he results are consistently close to 1" and "not statistically significant":

> A.   Okay, so they're very close.  A lot of them are very close to 1, some are below.

> Q.   But the majority of them are above 1, correct?

> A.   More are above than below.

> Q.   Okay.  Isn't that -- you say there's no consistency, but isn't that some consistency, that you see the majority of results coming in at above 1?

> [Objection]

> Q.   You did say that earlier, that -- as part of Bradford Hill, you look at consistency.

> A.   Yes.

> Q.   And you said there's no consistency of results here.

> A.   I said there is consistency of results.  I write it.

> Q.   There is consistency of results -- well, the -- they're consistently generally above 1, aren't they?

> A.   The results are consistently close to 1, slightly above 1, and not -- not statistically significant.

(*Id.* at 148:19-149:18.)

12.   Defendant's own paid epidemiological expert, Dr. Ory, stated during his deposition: "I mean, what -- what's most striking to me here, is that this issue has been around for a decade, and it started out where people thought the risk was higher, and -- and as time has passed, the relative risk continually fall, and -- and you sound like you know, that means regression to the mean, and so that's what I think is happening here. I mean -- I mean, as we get more and more data, we get closer and closer to what the true -- the true risk is, and that just keeps falling towards 1, as time has passed. That -- that's -- and I see that within the studies and I see it in the studies, one to the other. *Id.* at 235:13-235:25.

**<u>RESPONSE:</u>**

Abbott admits that plaintiff correctly quotes Dr. Ory's deposition testimony, but denies

that this quoted testimony support's plaintiff's contention that "Dr. Ory's opinion relies heavily

on his interpretation that the epidemiological studies have shown over time that the risk 'keep falling toward one.'"  (Pl.'s MSJ Opp. at 23) (citing Pl.'s SUMF ¶ 12).)

In forming his expert opinion, Dr. Ory assessed epidemiological evidence concerning the relationship between Humira and the risk of lymphoma.  (Dkt. 88-2 at 1.)  On the basis of his comprehensive review, Dr. Ory concluded that the large body of the current scientific data "is sufficient to rule out the possibility that anti-TNFs, including Humira, can cause lymphoma." (*Id.* at 14; *see also* Third App. 81 (Dr. Ory Dep.) at 232 (stating that "I think it's [referring to the possibility that Humira causes lymphoma] effectively ruled out in the medical sense."; *id.* at 232-234 (stating that "There's a 95 percent chance there is no causal association" and explaining that in epidemiology, "if you get to 90, 95 percent, you've ruled it out with as much certainty, probably, as you're ever going to rule it out."))

Dr. Ory further testified that what he found significant in forming his opinions are the totality of studies concerning anti-TNFs and lymphoma, and their consistent lack of a finding of a statistically significant increased risk of lymphoma.  (*Id.* at 49:15-50:2 ("A:  And all I can say is that when you look at the totality of the studies, it forms a picture as to what the consistent -- the consistently best estimate of the relative risk is.  With -- with some confidence interval around it.); *id.* at 127:4-11 ("A.  -- and -- and my point was that when you look, for example, as I have concluded, when you're looking at a total body of evidence and, essentially, relying on the Bradford Hill criteria of consistency and strength of association, and saying there are no strong associations and there are consistently no strong associations."); *id.* at 149 ("A.  The results are consistently close to 1, slightly above 1, and not -- not statistically significant."); *id.* at 210 ("there are many studies, they are pretty consistent and this issue has been looked at for a decade.").

Finally, Dr. Ory testified that an epidemiological study must find a relative risk of 2.0 or greater to be considered evidence of general causation:

> Q.   So you're saying if the relative risk is less than 2.0 for every patient, it's more likely than not they did not get the adverse event from the agent?
>
> A.   As a matter of general causation, yes, that's correct.

(Third App. 81 (Dr. Ory dep) at 112:1-6).

> Q.   But once again, just because the relative risk is less than 2 does not mean that the agent didn't cause the adverse event, correct?
>
> [Objection.]
>
> Q.   In that individual.
>
> [Objection.]
>
> A.   I -- I really -- It's -- you can't be certain what causes or contributes to an illness in people if the relative risk is less than 2.

(*Id.* at 124:18-125:4.)

> Q.   So you're saying so -- so -- I just want to make sure I understand, because you keep confusing me.   You're saying that unless you have a risk above 2, the agent can't possibly cause the adverse event?
>
> [Objection.]
>
> A.   From the standpoint of general causation and what I understand to be what we're dealing with in a legal situation, it's got to be more likely than not a causal factor, and for that it has to be above 2.0.

(*Id.* at 178:9-20.)

13.   Bongartz *et al.* (2006) *Anti-TNF antibody therapy in rheumatoid arthritis and the risk of serious infection and malignancies: Systemic review and meta-analysis of rare harmful effects in randomized clinical trials*. Journal of the American Medical Association 295: 2275-2285 (2006) was a meta-analysis of multiple clinical trials of anti-TNF therapy–including Humira– among RA patients. It examined risk of malignancies among the treatment versus placebo arms of a large subset of anti-TNF therapy clinical trials. Exhibit 19 at 2275. The authors found the pooled OR for all malignancies was 3.3 (95% CI, 1.2-9.1). *Id.* Malignancies were significantly more frequent in patients treated with higher doses (OR = 4.3) compared with patients who received lower doses (OR = 1.4) of anti-TNF drugs.   *Id.*   These result were statistically significant. *Id.*

**RESPONSE:**

Admitted in part, denied in part.  Abbott admits that Plaintiff's Exhibit 19 (Dkt. 88-19), Bongartz *et al.* (2006) *Anti-TNF antibody therapy in rheumatoid arthritis and the risk of serious infection and malignancies: Systemic review and meta-analysis of rare harmful effects in randomized clinical trials* ("Bongartz") was a meta-analysis of nine clinical trials of anti-TNFs infliximab and adalimumab, used for twelve weeks or more in patients with rheumatoid arthritis, which included patients who received anti-TNF treatment and a placebo.  (*Id.* at 2275.) Abbott admits that the Bongartz study calculated a pooled odds ratio for all malignancies at 3.3 (95% confidence interval, 1.2-9.1).  (*Id.*)  Abbott admits that the Bongartz study concluded that malignancies were significantly more common in patients treated with higher doses compared with patients who received lower doses of anti-TNFs.  (*Id.*)

Abbott denies that the Bongartz study is evidence of statistically significant increased risk of lymphomas in rheumatoid arthritis patients treated with anti-TNFs.  As plaintiff's experts admitted, the Bongartz study did not reach a conclusion as to the increased risk of **lymphoma** for patients treated with anti-TNFs (instead pooling the risk for all malignancies), and therefore provides no basis for a conclusion as to the increased risk of lymphoma.  (*See* Response ¶¶ 44-45 (Dr. Soiffer); *id.* ¶ 51 (Dr. Goldsmith).)  Moreover, while in his expert report Dr. Goldsmith attempted to calculate "a separate risk for lymphatic cancer" and purported to find that "the elevated OR [odds ratio] was statistically significant," at his deposition, Dr. Goldsmith admitted that his recalculation was incorrect, and that the results of his corrected and revised calculation were "not statistically significant."  (*Id.* ¶ 51.)

Finally, neither Dr. Soiffer (*id.* ¶ 44) nor Dr. Goldsmith (*id.* ¶ 51) nor Dr. Gershwin (Abbott's SUF ¶¶ 121, 126, 128) could identify a single epidemiologic study finding a statistically significant increased risk of lymphoma associated with TNF inhibitors.

15

14.    Lars Klareskog is an Abbott Key Opinion Leader (KOL). Exhibit 5 at 1 [CONFIDENTIAL]. Abbott has ghostwritten scientific articles for publication under his name. Exhibit 10 at 1 [CONFIDENTIAL].

**RESPONSE:**

Admitted in part, denied in part.  Abbott admits that Plaintiff's Exhibit 5 (Dkt. 88-5) [FILED UNDER SEAL] at 1 refers to Dr. Klareskog as a "KOL."  Abbott denies that the draft document cited as Plaintiff's Ex. 10 (Dkt. 88-10) [FILED UNDER SEAL] was "ghostwritten" by Abbott for publication under Dr. Klareskog's name.  Email correspondence associated with the draft shows that the draft document cited as Plaintiff's Exhibit 10 was written by Daniel Tracey, the lead author of the final article.  (Third App. 73 at ABT00555824; *see also* Third App. 71 (Tracey et al., *Tumor necrosis factor antagonist mechanisms of action:  A comprehensive review*, Pharmacology & Therapeutics 117 (2008), 244-279).)  Daniel Tracey's employment with Abbott was fully disclosed in the final published article.  (*Id.* at 244; *see also* Response ¶ 9.)

15.    When Dr. Klareskog reviewed the Bongartz study, ¶ 13, *supra*, he found both a statistically significant increased risk of malignancies in persons taking TNF-blockers and a dose response relationship. Exhibit 20 at 2 (Klareskog Email Dated May 2006)[CONFIDENTIAL]. He further told Abbott that "the methodology [of the study] was OK," that "this is a true safety signal ... that should be taken seriously....", and that he does " believe the dose story." *Id.*

**RESPONSE:**

Denied.  The email cited as Plaintiff's Exhibit 20 is inadmissible hearsay to the extent plaintiff relies on it as evidence of Dr. Klareskog's opinions about the Bongartz study, because the email is authored by Dr. Per Engervall.  (*See* Dkt. 88-20 [FILED UNDER SEAL] at 2; *id.* at 1 ("I had an opportunity to talk to Lars Klareskog this evening about the JAMA article.").)  This document also does not support plaintiff's statement that Dr. Klareskog "found . . . a statistically significant increased risk of malignancies in persons taking TNF-blockers . . . ."  The email states nothing about the statistical significance of malignancies in persons taking TNF-blockers, and instead states that "the level of increased risk at this point not could [sic] be stated - x 3 is

probably to[o] high."  (*Id.* at 2).   Finally, the statement in Plaintiff's Exhibit 20 that "Lars [Klareskog] do[es] believe in the dose story (high vs. low)" does not support plaintiff's statement that Dr. Klareskog "found . . . a dose response relationship."

16.     In the wake of the 2006 Bongartz study, Abbott orchestrated and initiated a broad based plan to distinguish and criticize the study findings. Exhibit 21 at 1 (JAMA Response Strategy) [CONFIDENTIAL]; Exhibit 22 (May 2006 Email Bongartz Publication) [CONFIDENTIAL] .

**RESPONSE:**

Denied.  Plaintiff's characterization of Plaintiff's Exhibits 21 and 22 (Dkt. 88-21 & 88-22) [FILED UNDER SEAL] is inaccurate, as neither exhibit supports plaintiff's contention that "Abbott orchestrated and initiated a broad based plan to distinguish and criticize the study findings."  To the contrary, Plaintiff's Exhibit 21 states that Abbott sought to "[d]rive balanced discussion in scientific community regarding [the] Bongartz, et al. paper," by, among other things, "[s]olicit[ing] opinions of key professional societies and issuance of public statements" by organizations such as the "ACR [American College of Rheumatology]" and "EULAR [The European League Against Rheumatism]" and by "[p]rovid[ing] patient societies with information important for their constituents."  (Plaintiff's Exhibit 21, Dkt. 88-21 [FILED UNDER SEAL] at 1.)  Plaintiff's Exhibit 22 likewise indicates only that Abbott had prepared "proposed messages and action plan for the JAMA safety article."   (Plaintiff's Exhibit 22, Dkt. 88-22 [FILED UNDER SEAL] at 3.)  Abbott denies that this document supports plaintiff's assertion that Abbott planned to "distinguish and criticize the [Bongartz] study findings."  (*See also* Response ¶ 85.)

17.     A very recent and the largest to date meta-analysis related to lymphomas and TNF-blockers found an odds ratio for lymphoma to be 2.1 (95% CI, .55-8.4). Exhibit 23 at 898 (Lopez-Olivo MA *et al.*, *Risk of Malignancies in Patients With Rheumatoid Arthritis Treated With Biologic Therapy: A Meta-analysis*. JAMA. 2012;308(9):898-908.). This article was published in the Journal of the American Medical Association in September 2012 and includes data from 63 randomized , placebo control trials with a total study population of 29,423 patients. *Id.* The authors note that "[m]ost observational studies have found increased risk of malignancies ranging across studies, with relative risks (RRs) of 0.7 to 2.7 for all types of malignancies, 1.1 to

5.0 for lymphoma....". *Id.* at 899. Lastly, the authors state that the "risk of lymphoma with TNF inhibitors was doubled but did not reach statistical significance." *Id.* at 901.

**RESPONSE:**

Admitted for purposes of this motion that plaintiff accurately quotes the findings of the

Lopez-Olivo et al. study, with the qualification that the study concluded that "none of the TNF

inhibitors showed a statistically significant risk" of malignancies (Dkt. 88-23 at 901) and that

"our results show no increased risk of malignancy[.]"  (*Id.* at 905.)

18.    Dr. Ory holds that "a point estimate is the most likely estimate of relative risk comparing the risk of, say, a substance and an outcome, like a disease, and the confidence interval." Exhibit 18 at 25:18-25:23.

**RESPONSE:**

Admitted in part, denied in part.  Abbott admits that plaintiff correctly quotes a portion of

Dr. Ory's testimony, though she omits a portion of Dr. Ory's response:

Q.  Can you explain what a point estimate in confidence interval is in epidemiology?

A.   A point estimate is the most likely estimate of relative risk comparing the risk of, say, a substance and an outcome, like a disease, and the confidence interval, say a 95 percent confidence interval tells you with 95 percent cert -- tells you that if you repeated that study 100 times, that 95 times out of 100, the result would -- would occur within that confidence interval.

(Third App. 81 (Ory dep) at 25:18-26:2.)  Abbott denies plaintiff's implication that because a

point estimate number represents the most likely estimate of relative risk, a point estimate of

above 1.0 has any causal significance.  (*See* Pl.'s MSJ Opp. at 15.)  Dr. Ory testified that a

relative risk above 1.0 but below 2.0 has no causal significance, and explained that a study must

find a relative risk of at least 2.0 to be considered probative of general causation.  (*See* Response

¶ 22.)

19.    Internally, Abbott admits that there is a difference between "statistical significance" and "clinical significance." Exhibit 24 at 3 (Internal Email Dated Oct. 2010) [CONFIDENTIAL].

**RESPONSE:**

Denied.  Abbott denies that Plaintiff's Exhibit 24 (Dkt 88-24) [FILED UNDER SEAL] supports her characterization of it.

Plaintiff bases her contention that "Abbott admits that there is a difference between 'statistical significance' and 'clinical significance'" solely on the following sentence in an email from an Abbott employee:   "The readers can access significance (clinical or statistical) by looking at the data itself."  (Dkt. 88-24 [FILED UNDER SEAL] at 3.)  This document does not support plaintiff's assertion that "Abbott recognizes that some things are *clinically* significant, even if the numbers do not reach *statistical significance*" (Pl.'s MSJ Opp. at 18) (citing Pl.'s SUMF ¶ 19)) because it says nothing about clinical versus statistical significance, beyond mentioning them both in the same sentence.

Moreover, the remainder of the email plaintiff cites makes clear that the reference to clinical and statistical significance was made in discussing "an observational study" with only "interim results at 2 years with a majority of the registry data to be collected (Dkt 88-24 at 3), and that risks of infections, not malignancies, were discussed.  (*Id.* at 3, 7.)  Abbott denies that this document supports plaintiff's implication that "Abbott recognizes that some things are *clinically* significant, even if the numbers do not reach *statistical significance*" in the context of epidemiologic studies evaluating the risks of lymphomas in rheumatoid arthritis patients receiving anti-TNF treatment.  (*See* Pl.'s MSJ Opp. at 18.)

20.     Brown, *et. al.*, *Tumor Necrosis Factor Antagonist Therapy and Lymphoma Development: Twenty-Six Cases Reported to the Food and Drug Administration*, 46 Arthritis & Rheumatism 3151 (2002) (App. 41) is a peer-reviewed publication citing two cases of "dechallange": "In 1 case (patient 17 in Table 1) thymoma was observed to shrink and necrose after the discontinuation of etanercept [Enbrel]. Exhibit 25 at 3154. In a second patient (patient 5 in Table 3) significant reduction in axillary lymphadenopathy was reported after discontinuation of infliximab. Both responses occurred in the absence of standard antilymphoma chemotherapy." *Id.* at 3154. The authors further state that "[t]wo individuals with previously treated lymphoma

that was in remission at the time anti-TNF therapy was initiated very quickly developed recurrent disease and died of fulminant lymphoma." *Id.* at 3157.

**RESPONSE:**

Admitted for purposes of this motion that plaintiff correctly quotes the Brown et al. publication, with the qualification that the authors explicitly stated that no conclusions about a causal relationship could be established by the anecdotal case reports they reviewed.  (First App. 41 at 3156 ("A case series such as this cannot establish a cause-and-effect relationship between drugs, such as etanercept and infliximab, and an adverse outcome, such as lymphoma.").)  The authors also specifically recognized the possibility that, because of "the known predisposition of patients with RA [rheumatoid arthritis] and CD [Crohn's disease] to lymphoma," (*id.* at 3151), the observed lymphomas may have been the result of "the selection of a subpopulation of RA patients with particularly aggressive disease, rather than being related to the treatment being received by such patients":

> Currently available data do not permit us to draw definitive conclusions regarding whether these TNF antagonists were the proximate cause of the reported lymphomas, whether these neoplasms developed as part of the natural history of the underlying medical conditions, or whether they occurred as a complication related to other immunosuppressive medications to which these patients were exposed.  Disentangling the relative contributions of innate lymphoma susceptibility, other immunosuppressive medications, and the anti-TNF agents to the development of lymphomas is impossible with the present data.  A further complication is the suggestion that lymphoma represents a complication that is specific to the subset of RA patients who have severe disease.  Clearly, patients who are currently prescribed etanercept or infliximab are those whose RA has proven refractory to standard therapy.  Thus, ***it is conceivable that the apparent lymphoma cluster observed in this setting reflects the selection of a subpopulation of RA patients with particularly aggressive disease, rather than being related to the treatment received by such patients.***

(*Id.* at 3155) (emphasis added.)  Finally, plaintiff does not dispute that her own experts agreed that the Brown publication does not establish a causal relationship between exposure to anti-TNFs and lymphoma.  (*See* Pl.'s Resp. ¶¶ 47, 49.)

21.     Baecklund, *et al.*, *Association of Chronic Inflammation, Not Its Treatment, With Increased Lymphoma Risk in Rheumatoid Arthritis*, 54 Arthritis & Rheumatism 692 (2006) found a <u>statistically significant</u> increased risk for lymphoma in rheumatoid arthritis patients taking the immunosuppressive drug azathioprine verses controls. Exhibit 26 at 697 (Baecklund 2006). TNF-blockers were not analyzed in the study. *Id.*

**RESPONSE:**

Abbott admits for purposes of this motion that the Baecklund study attached as Plaintiff's

Exhibit 26 (Dkt. 88-26) found a statistically significant increased risk for lymphoma in

rheumatoid arthritis patients treated with azathioprine. Because plaintiff concedes that "TNF-

blockers were not analyzed in the study," however, Plaintiff's Exhibit 26 does not support her

assertion that "published studies *do exist* that consistently show an increased risk of lymphoma

with a point estimate of more than 1.00 for those patients taking TNF-blockers."  (Pl.'s MSJ

Opp. (Dkt. 85) at 18 (emphasis in original) (citing Pl.'s SUMF ¶ 21, among other things).)

Additionally, plaintiff's expert Dr. Gershwin admitted that azathioprine is associated with a

higher relative risk of lymphoma than anti-TNFs.  (App. 29 at 461:25-462:4 (testifying that "[i]n

fact in studies of lymphoma in rheumatoid arthritis with other drugs, the agent that stands out

with the highest risk is Azathioprine, which is used in rheumatoid arthritis and which produces a

significant relative risk, and which produces lymphoma.").)

22.     Abbott's retained epidemiological expert, Dr. Ory, admits that to assess whether a drug causes an adverse event one must look at more than epidemiology:

Q:      But getting back to what we're saying, are you -- if I hear what you're saying correctly, just beca – epidemiology is not the only consideration when trying to assess whether a drug causes an adverse event in an individual person, correct?

A:      That's correct.

Q:      You have to look to other factors, correct?

A.      You do.

Exhibit 18 at 117:8-117:16.

**RESPONSE:**

Denied.  Abbott disputes plaintiff's characterization of Dr. Ory's testimony to the extent plaintiff implies that Dr. Ory agreed that epidemiological evidence is not necessary to establish general causation.  (*See* Pl.'s MSJ Opp. (Dkt. 85) at 11 (asserting that "Abbott argues from the flawed premise that experts *must* rely on epidemiologic evidence in order to prove causation" and that "Abbott . . . experts have said exactly the opposite.")  Dr. Ory agreed that an epidemiologic study may not be necessary in limited circumstances where causation is obvious, such as a gunshot death, but testified that otherwise, epidemiologic data is needed:

> Q.   How about this, do I need an epidemiology study to tell me that if I inject acid subcutaneously, that I'm going to cause some damage?
>
> [Objection.]
>
> A.   You know, there's -- there's, sort of, two types of causation.  I mean, I think that's what you're driving at.  I mean, if I shoot you with a gun, I -- I don't think anyone would disagree that the bullet killed you.  That's a very different situation than the example that I described with -- with heart disease.

(Third App. 81 (Dr. Ory deposition) at 118:22-119:8.)  Moreover, Dr. Ory testified that even when an epidemiologic study exists, a study finding relative risk above 1.0 but below 2.0 has no causal significance, and that the study must find a relative risk of 2.0 or greater to be considered evidence of general causation:

> Q.   And if there is -- but if the true value is above 1, then there is a causal association, isn't there?
>
> A.   That's absolutely not true.

(Third App. 81 (Dr. Ory dep) at 198:20-23).

> Q.   So you're saying if the relative risk is less than 2.0 for every patient, it's more likely than not they did not get the adverse event from the agent?
>
> A.   As a matter of general causation, yes, that's correct.

(*Id.* at 112:1-6).

Q.   But once again, just because the relative risk is less than 2 does not mean that the agent didn't cause the adverse event, correct?

[Objection.]

Q.   In that individual.

[Objection.]

A.   I -- I really -- It's -- you can't be certain what causes or contributes to an illness in people if the relative risk is less than 2.

(*Id.* at 124:18-125:4.)

Q.   So you're saying so -- so -- I just want to make sure I understand, because you keep confusing me.   You're saying that unless you have a risk above 2, the agent can't possibly cause the adverse event?

[Objection.]

A.   From the standpoint of general causation and what I understand to be what we're dealing with in a legal situation, it's got to be more likely than not a causal factor, and for that it has to be above 2.0.

(*Id.* at 178:9-20.)

23.   The head of Abbott's Pharmacovigilance, Dr. James Embrescia) agrees that epidemiology is but one factor used in assessing whether or not a drug is related to an adverse event:

Q:      So you'd agree that when trying to make an assessment to the relationship between an individual person, the drug, and the adverse event, epidemiology would be one factor to consider in making that determination but not the only factor?

A.      That would be true.

Exhibit 27 at 32:5-32:11 (Deposition Excerpts of Dr. James Embrescia) [CONFIDENTIAL].

**RESPONSE:**

Denied.  Abbott disputes plaintiff's characterization of Dr. Embrescia's testimony to the

extent plaintiff implies that Dr. Embrescia agreed that epidemiological evidence is not necessary

to establish general causation.  (*See* Pl.'s MSJ Opp. (Dkt. 85) at 11 (asserting that "Abbott argues

from the flawed premise that experts *must* rely on epidemiologic evidence in order to prove

causation" and that "Abbott executives . . . have said exactly the opposite.")  The full context of

Dr. Embrescia's deposition testimony makes clear that he was not speaking about whether

epidemiology is required to determine **general** causation; rather, he testified that epidemiology

would be one factor to consider in determining the cause of a particular patient's adverse event—

i.e., **specific** causation:

> Q.   So you would agree that epidemiology doesn't necessarily tell you at the patient level whether that particular patient got the event from that -- the drug; correct?
>
> A.   Epidemiology generally doesn't relate to a specific patient but to a group of patients. It's -- it's about the concept of -- of the event or the issue.
>
> Q.   So you'd agree that when trying to make an assessment to the relationship between an individual person, the drug, and the adverse event, epidemiology would be one factor to consider in making that determination but not the only factor?
>
> A.   That would be true.  You never make a diagnosis based on a single factor.

(Third App. 80 (Dr. Embrescia Bixby Dep.) at 31:22-32:11.)

24.   Dr. Ory also admits the Bradford Hill factors are an additional manner in which to
weigh causation. Exhibit 18 at 10-11.

**RESPONSE:**

Denied.  Plaintiff's Exhibit 18 (Dkt. 88-18) does not include pages 10-11, and pages 10-

11 of Dr. Ory's deposition contain no discussion of the Bradford Hill factors.  (*See* Third

App. 81 (Dr. Ory Dep.) at 10-11.)  To the extent Dr. Ory discussed Bradford Hill, he said that

two of those factors actually weigh against causation because all the studies consistently find no

association.  (*Id.* at 127:4-11 ("my point was that when you look, for example, as I have

concluded, when you're looking at a total body of evidence, you're looking at the total body of

evidence and, essentially, relying on the Bradford Hill criteria of consistency and strength of

association, and saying there are no strong associations and there are consistently no strong associations.").)

25.     *The Reference Manual on Scientific Evidence* list the following Bradford Hill Criteria:

1.  Temporal relationship

2.  Strength of the association.

3.  Dose–response relationship

4.  Replication of the findings,

5.  Biological plausibility (coherence with existing knowledge),

6.  Consideration of alternative explanations,

7.  Cessation of exposure,

8.  Specificity of the association, and

9.  Consistency with other knowledge.

(2011 REFERENCE MANUAL ON SCIENTIFIC EVIDENCE: THIRD EDITION).

**RESPONSE:**

Admitted for purposes of this motion, with the qualification that the Reference Manual on Scientific Evidence recognizes that the Bradford Hill guidelines cannot be used to find existence of causation in the absence of epidemiologic studies finding an association.  (Third App. 85 (Ref Manual on Scientific Evidence 3d Ed., Ref Guide on Epidemiology) at 598-99 ("We emphasize that these guidelines are employed only *after* a study finds an association to determine whether that association reflects a true causal relationship.") (emphasis in original).)

26.     Abbott's Rule 30(b)(6) clinical trial designee and Divisional Vice President for Humira believes it is biologically plausible that Humira can cause lymphoma:

Q:      Okay. Now, and I will read for you the sentence that starts on the -- the last sentence on the column before that: "It is biologically plausible that TNF antagonists, which are novel immunomodulatory agents, might produce

significant adverse effects including an increased risk of malignancy. Do you agree with that sentence?

A:    It is possible.

Q:    Okay. And is it biologically plausible?

A:    It is biologically plausible.

Exhibit 28 at 64:9-18 (Deposition Excerpts of Dr. John Medich)[CONFIDENTIAL].

**<u>RESPONSE:</u>**

Denied.  Abbott denies that plaintiff's quoted testimony (Plaintiff's Exhibit 28 (Dkt. 88-28) [FILED UNDER SEAL] at 64:9-18) establishes that Dr. John Medich "believes it is biologically plausible that Humira can cause lymphoma," as she contends.  Dr. Medich agreed that it is biologically plausible that anti-TNFs may have an "increased risk of ***malignancy***," not lymphoma.  (*Id.* at 64:9-18) (emphasis added).  In addition, Dr. Medich was responding to a question about a sentence in Brown et al., *Tumor Necrosis Factor Antagonist Therapy and Lymphoma Development:  Twenty-Six Cases Reported to the Food and Drug Administration*, Arthritis & Rheumatism Vol. 46, No. 12 (Dec. 2002) 3151-3158.  (Third App. 74 (Dr. Medich Dep., *Jones v. Abbott Labs.*) [FILED UNDER SEAL] at 58:8-14.)  As Dr. Medich testified in his deposition, the authors of that article explicitly concluded that the data they reviewed did not support conclusions as to whether anti-TNFs can lymphoma:

> Currently available data do not permit us to draw definitive conclusions regarding whether these TNF antagonists were the proximate cause of the reported lymphomas, whether these neoplasms developed as part of natural history of the underlying medical condition, or whether they occurred as complication related to other immunosuppressive medications to which these patients were exposed.  Disentangling the relative contributions of innate lymphoma susceptibility, other immunosuppressive medications, and the TNF agents to the development of lymphomas is impossible with the present data.

(*Id.* at 62:15-63:1 (reading from the Brown publication); *see also* Abbott's SUF ¶ 29 (quoting the Brown publication as stating that "[a] case series such as this cannot establish a cause-and-effect

relationship between drugs, such as etanercept and infliximab, and an adverse outcome, such as lymphoma").)

Plaintiff's causation experts have also agreed that the Brown publication cannot establish whether there is any causal relationship between anti-TNFs and lymphoma. (*Id.* ¶ 47 (plaintiff's causation expert Dr. Goldsmith agreeing that "there is no way to tell from the Brown paper" whether any of the lymphomas "they identified were caused by anti-TNFs."); *id.* ¶ 49 (plaintiff's causation expert Dr. Gershwin agreeing that "the Brown paper concluded that it had not been established that there was a causal relationship between exposure to anti-TNFs and lymphoma").)

Finally, plaintiff's causation experts have admitted that biologic plausibility cannot not prove causation. (Abbott's SUF ¶ 131 (Dr. Gershwin agreeing that "[b]iological plausibility alone does not prove causation[,]" that "biological plausibility is necessary but not sufficient to establish causation[,]" and that "biological plausibility by itself doesn't establish causation[.]"); *id.* ¶ 132 (Dr. Goldsmith agreeing that "[b]iological plausibility on its own doesn't prove causation[.]").)

    27.    Abbott rheumatologist and 30(b)(6) designee also believes it is biologically plausible for Humira to cause lymphoma:

> Q:    Dr. Pangan, I'm going to try to wrap this up. And I apologize if this is a little repetitious of what we've done. I want to make sure we have a clear understanding. Is it fair to say that from the time Humira was launched at the end of 2002 forward, that there was a reasonable biologically plausible relationship or association between Humira and the development of lymphoma?
>
> A:    Yes.

Exhibit 29 at 64:9-64:18 (Deposition Excerpts of Dr. Aileen Pangan) [CONFIDENTIAL].

**RESPONSE:**

Abbott admits that Ms. Pangan agreed that it is biologically plausible that there is an association between Humira and the development of lymphoma, with the qualification that Ms. Pangan testified that such an association did not mean Humira actually causes lymphoma:

> Q.   Dr. Pangan, I'm going to try to wrap this up.   And I apologize if this is a little repetitious of what we've done.  I want to make sure we have a clear understanding.  Is it fair to say that from the time Humira was launched at the end of 2002 forward, that there was a reasonable biologically plausible relationship or association between Humira and the development of lymphoma?
>
> A.  Yes.
>
> ***
>
> Q.  I'll rephrase.  Is the strength of that association such that you would say today, yes, I think that Humira probably does cause some patients to develop lymphoma?
>
> A.   No.  You used the word "cause," which I think is quite strong, and we don't have data to support that.

(Third App. 75 (Pangan Jones Dep.) at 64:9-65:6.)   Ms. Pangan also testified that rheumatoid arthritis increases the risk of lymphoma, and testified that there is no data to support the conclusion that Humira increases the risk of lymphoma:

> Q.  Does RA -- Now, let's talk about RA itself.
>
> A.  Okay.
>
> Q.  Does RA increase the risk of lymphoma?
>
> A.  It has been shown that there is an increased risk of lymphoma in patients with RA.
>
> Q.  Does Humira increase the risk of lymphoma?
>
> A.  We don't have data to support that conclusively.
>
> Q.   Well, I'm not talking conclusively.  I'm just talking about what's probable.  Does Humira increase the risk of lymphoma?
>
> A.  In order for me to be able to answer that or for us to even think of that, we need to be able to compare what is the incidence of lymphoma in Humira RA-treated patients and a parallel group of RA patients that are not treated with Humira that are followed for a long

period of time.  Because this is cancer, and there's a long latency period.  And we don't have that information for us to absolutely say that using Humira increases the risk.

(*Id.* at 60:19-61:13.)  Finally, plaintiff's causation experts have admitted that biologic plausibility alone does not prove causation.  (Abbott's SUF ¶ 131 (Dr. Gershwin agreeing that "[b]iological plausibility alone does not prove causation[,]" that "biological plausibility is necessary but not sufficient to establish causation[,]" and that "biological plausibility by itself doesn't establish causation[.]"); *id.* ¶ 132 (Dr. Goldsmith agreeing that "[b]iological plausibility on its own doesn't prove causation[.]").)

28.    Ms. Pangan also believes that there is in fact an association between lymphoma and Humira:

Q:    Okay. But Humira is reasonably associated with a number of adverse events, is it not?

A:    Yes.

Q:    Lymphoma?

A:    Yes.

*Id.* at 67:11-14.

**RESPONSE:**

Denied.   The quoted testimony does not support plaintiff's characterization of it. Ms. Pangan explained that by saying that Humira was "associated" with a particular adverse event, she meant that "these events have been reported with the use of Humira":

Q.   Okay.  But Humira is reasonably associated with a number of adverse events, is it not?

A.  Yes.

Q.  Lymphoma?

A.  Yes.

Q.  Leukemia?

A.  Yes, to one extent.

Q.  Serious opportunistic infections?

A.  May I clarify.  When you say "associated," my interpretation is these events have been reported with the use of Humira.

(Third App. 75 (Pangan Jones Dep.) at 67:11-21.)   When plaintiff's counsel asked whether Ms. Pangan believed there was "a reasonable association" between Humira and lymphoma, she explained that there may be a potentially increased risk of lymphoma for rheumatoid arthritis patients treated with Humira, but that that risk may be explained by other risk facts in rheumatoid arthritis patients:

A.  May I clarify.  When you say "associated," my interpretation is these events have been reported with the use of Humira.

Q.  Well, I mean more than that.  I mean that they reported where it's biologically plausible, where it's a reasonable temporal relationship, to say that there's a reasonable association.  It's something more than just somebody reported it.  But there's a reasonable association between the drug and this adverse event that's reported.

A.  I would like to make sure that the statement I was going to make is clear.

Q.  Okay.

A.  The thing with these adverse events is that the patient, specifically rheumatoid arthritis patients being given Humira, have many other factors that can potentially be a risk factor for them to see this adverse event, whether it's their age, the disease itself, the other medications they're taking, et cetera.  What I would say right now given the data I have is that based on the events we've seen in our clinical trial, that lymphoma, let's just take for an example, has been seen with the use of Humira and there's a potentially increased risk in patients taking Humira.

(*Id.* at 67:19-68:17.)  In addition, Ms. Pangan testified that rheumatoid arthritis increases the risk of lymphoma, and that there is no data to support the conclusion that Humira increases the risk of lymphoma.  (*See* Response ¶ 27.)

29.  Dr. Medich also admits that Humira suppresses the immune system and could cause cancer:

Q:  Is there an association between inflammation in the human body and cancer?

A.      I am not able to answer that question.

Q.      That is the posited -- the hypothesis, if you will, on how rheumatoid arthritis itself puts people at greater risk for lymphoma, isn't it?

A.      My understanding is that the hypothesis is that the fact that patients have a compromised immune system is what may put them at higher risk for lymphoma.

Q.      Well, but Humira further compromises the immune system, doesn't it?

A.      So Humira does have an impact on the immune system.

Q.      It suppresses the immune system doesn't it?

A.      It suppresses the immune system.

Q.      So if -- If having a compromised immune system contributes to the risk of cancer, than any drug, whether Humira, methotrexate, or any other drug that further suppresses the immune system would increase the risk of cancer, wouldn't it?

A.      A drug that suppresses the immune system may have an impact on the risk of malignancy.

Q.      Impact being increase the risk?

A.      May increase the risk.

Exhibit 28 at 51:5-52:5.

**RESPONSE:**

Denied.  Abbott denies that plaintiff's quoted testimony (Plaintiff's Exhibit 28 (Dkt. 88-28) at 64:9-18) establishes that Dr. John Medich "admits that Humira suppresses the immune system and could cause cancer," as she contends.  When asked "[i]s there an association between inflammation in the human body and cancer?", Dr. Medich testified "I am not able to answer that question."  (*Id.* at 51:5-7.)  And while he agreed that a drug that suppresses the immune system may have an impact on the risk of malignancy, he did so in the context of discussing the "***the hypothesis*** . . . that the fact that patients have a compromised immune system is what may put them at higher risk for lymphoma."  (*Id.* at 51:5-52:5) (emphasis added).

31

30.    When asked in deposition why patients are excluded from Humira clinical trials if they have previous history of malignancy, senior Abbott executive Dr. John Medich said "[t]hey're excluded because there is a potential risk of malignancy. *Id.* at 65:20-65:21.

**RESPONSE:**

Denied.  Plaintiff mischaracterizes Dr. Medich's testimony by omitting his explanation

that the reason patients with a previous history of malignancy are excluded from clinical trials is

because such patients are more susceptible for developing a malignancy—not, as plaintiff

implies, because of  any association between Humira and malignancies.    (Third App. 74

(Dr. Medich *Jones* deposition) at 65:14-66:2 [FILED UNDER SEAL].)  Abbott therefore denies

plaintiff's assertion that Dr. Medich's testimony quoted above is a "company admission[]

regarding the causative link between Humira and lymphoma."  (Pl.'s MSJ Opp. at 6.)

31.    Abbott senior executives have admitted that there have been lymphoma cases in their clinical trials that their own clinical investigators have determined are "probably related" to lymphoma. *Id.* at 29:14-37:21 [CONFIDENTIAL]; Exhibit 30 at 114 (July 2002 BLA) [CONFIDENTIAL]; Exhibit 31 at 1-2 (May 2003 Adverse Event Report) [CONFIDENTIAL].

**RESPONSE:**

Abbott admits for purposes of this motion that Plaintiff's Exhibit 30 (Dkt. 88-30) [FILED

UNDER SEAL] at 114 reflects an instance of a clinical investigator assessing the "relation" as

"probable" for a patient's "Lymphoma like reaction."  Abbott admits for purposes of this motion

that Plaintiff's Exhibit 31 (Dkt. 88-31) [FILED UNDER SEAL] at 2 reflects an instance of a

"Causality as per reporter" as "probable" for a patient's "Angioimmunoblastic T-cell

lymphoma."  Abbott denies plaintiff's assertion that these anecdotal case reports (performed for

regulatory adverse event monitoring purposes by individual reporters on the basis of limited data

and their subjective belief) represent "company admissions regarding the causative link between

Humira and lymphoma."  (Pl.'s MSJ Opp. at 6.)

32.    For an Abbott clinical trial investigator to find the relationship between Humira and lymphoma probably related, they would have to conclude that the lymphoma "followed a

reasonable temporal sequence from administration of the study drug and could not reasonably be explained by the known characteristics of the patient's clinical state or concomitant therapy. Exhibit 32 at 67 (Integrated Safety Summary) [CONFIDENTIAL].

**RESPONSE:**

Abbott admits for purposes of this motion that Plaintiff's Exhibit 32 (Dkt. 88-32) [FILED UNDER SEAL] at 67 defines "Probable" as "AE [adverse event] followed a reasonable temporal sequence from administration of the study drug and could not reasonably be explained by the known characteristics of the patient's clinical state or concomitant therapy." Abbott denies plaintiff's assertion that an internal assessment of "probable" (performed for regulatory adverse event monitoring purposes by individual reporters on the basis of limited data and their subjective belief) represents "company admissions regarding the causative link between Humira and lymphoma." (Pl.'s MSJ Opp. at 6.)

33. Abbott specifically seeks out clinical investigators because of their judgment, expertise, and knowledge. Exhibit 33 at 39:3-40:12 (Deposition Excerpts of Dr. John Medich dated September 14, 2012) [CONFIDENTIAL].

**RESPONSE:**

Denied. The testimony cited by plaintiff does not support her assertion that "Abbott specifically seeks out clinical investigators because of their judgment, expertise, and knowledge." Dr. Medich testified that Abbott applies a variety of criteria to its selection of clinical investigators, including whether the potential investigator treats patients, their eligibility to participate in clinical trials, as well as their expertise, prior clinical trial experience, and familiarity with the agent being studied:

> Q. The appropriateness of including an investigator. Does that mean that you were looking to make sure they were a good fit in terms of running the particular study at issue?

> A. We have -- you know, we have certain criteria that we apply to selection of investigator for clinical trials. They obviously need to treat patients. They need to have clinical trial experience ideally. They need to have familiarity with the agent being

studied. We do automatically a debarment review to make sure that they haven't been debarred from participating in clinical trials. So we have a number of criteria that we look at to insure that physician is appropriate to act as an investigator.

(Third App. 79 (Dr. Medich Dep., *Pletan v. Abbott Labs.*) [FILED UNDER SEAL] at 34:18-

35:7.)

     34.    Abbott found that there was a statistically significant increased rate of malignancies in their Humira clinical trials prior to Humira going on the market:

Q.    And this, so we understand what it is, this is Abbott's summary of all the safety data in the clinical trials that were being provided to the FDA when you asked for permission to sell this drug?

A.    That is correct.

Q.    And over, if you would, on page 00160671.

A.    Okay. I'm there.

Q.    What is the title of this paragraph 6.2.6?

A.    "Malignancies."

Q.    And you want to read the first sentence, or you want me to do it?

A.    I can read the first sentence.

Q.    Okay.

A.    "21 patients 19 (1.4) percent of 1388 adalimumab treated patients and 2 (0.3) percent of 690 placebo treated patients were discovered to have malignancies."

Q.    And the next sentence says: "Shown in Table 31, this difference was statistically significant." Correct?

A.    That is what it says.

Q.    So the -- Roughly speaking, you're talking about a rate of malignancies on people getting Humira is four and a half times higher than patients from the same patient population who were getting placebo?

A.    We're talking about a percentage difference.

Q.    0.3 for placebo, and 1.4 percent for Humira right?

A.    Yes.

Q.      Which is roughly four times higher, right?

A.      As a percentage basis, yes.

Q.      And this is statistically significant data?

A.      It is statistically significant with a P value of less than .05.

Exhibit 28 at 72:22-74 [CONFIDENTIAL].

**RESPONSE:**

Admitted that plaintiff accurately quotes from the excerpted portion of Dr. Medich's

testimony.

35.     Abbott admits that there was a statistically significant increased risk of lymphoma found in Humira clinical trials before Humira went on the market:

Q.      Okay. And as of this point in time, if you look over on page 192.

Q.      The expected rate of malignancies in RA trials is 2.3, but the SIR is 4.8, right?

A.      We're looking at all lymphomas?

Q.      All lymphomas, right.

A.      So expected based on the SEER database is 2.3.

Q.      And we know from the confidence interval to the right, from 2.4 to 8.6, that it's statistically significant?

A.      Yes.

*Id.* at 90:13-91:2 [CONFIDENTIAL].

**RESPONSE:**

Denied.  The testimony plaintiff quotes does not support her characterization of it.  The

SEER database provides the expected risk of lymphomas in the general population, and does not

provide the expected risk of lymphomas in rheumatoid arthritis patients specifically.  *See* "SEER

Data, 1973-2009," National Cancer Institute, *available at* http://seer.cancer.gov/data/ ("The

SEER research data include SEER incidence and population data associated by age, sex, race,

year of diagnosis, and geographic areas."). Thus, Pl.'s SUMF ¶ 35 does not support her contention that "Humira clinical trial data reflects an increased risk of malignancies compared to placebo [rheumatoid arthritis] patients." (Pl.'s MSJ Opp. (Dkt. 85) at 6.)

36.     Dr. Soiffer has a long history of working with immunosuppressed patient who develop lymphoma:

> Q.     Is that opinion based on reasonable medical probability?
>
> A.     It's based on reasonable medical probability, my practice as an oncologist and my experience with immune-compromised patients at risk for immune suppression-related lymphomas.

Exhibit 34 at 316:3-316:8 (Deposition Excerpts of Dr. Robert Soiffer).

**RESPONSE:**

Admitted that Dr. Soiffer testified he has worked with immunosuppressed patients and that plaintiff has accurately quoted from a portion of Dr. Soiffer's testimony. Abbott does not admit that Dr. Soiffer's opinions are based on a reasonable medical probability.

37.     Dr. Soiffer is the Chief of the Hemotologic Malignancies at the Dana Farber Institute and Professor of Medicine at Harvard Medical School. *Id.* at 2. Further Dr. Soiffer has practiced medicine for nearly 30 years and is board certified in internal medicine and medical oncology. *Id.* at 16.

**RESPONSE:**

Admitted for purposes of this motion, with the clarification that the correct citation is to Plaintiff's Exhibit 35 (Dkt. 88-35) (expert report of Robert Soiffer, M.D.) at 1 & 16-17.

38.     Dr. Soiffer has personally used TNF-blockers in his practice as an oncologist at Dana Farber. *Id.* at 45:21-46:2.

**RESPONSE:**

Admitted for purposes of this motion.

39.     Dr. Soiffer is offering opinions on both general and specific causation in Plaintiff's case:

Q:      And are you competent to make assessments of whether a particular substance in general causes a particular condition? Do you believe that's within your area of expertise?

A.      To some degree, yes.

Q.      Okay. Were you attempting or -- let me ask you this. In rendering your opinions in this case, did you assume based on the work of other experts in this case that Humira is capable of causing lymphoma?

A.      I -- after I reviewed the documents, I believed, as stated here, that Humira is capable of contributing to the development of lymphoma.

Q.      Okay. And we'll talk about that in a little bit more detail. Did you reach that opinion to a reasonable degree of medical and scientific certainty?

A.      Yes.

*Id.* at 33:17-34:10.

**RESPONSE:**

Denied.  In his deposition, Dr. Soiffer confirmed that his impression was that the area of

his testimony "was not general" causation:

Q.      Okay.  Now, we talked a little bit about your prior deposi -- I'm sorry.  Did you want to add something?

A.      Well, I'm not sure that -- I'm not sure -- just to clar -- to clarify that a little, I'm not sure that really concentrate on the specific causation in the plaintiff's lymphoma.  I think that was my impression, that it was not general.  So I'm not quite sure what the term "general causation" actually means from a legal point of view.

(First App. 28 (Dkt. 65-28) at 33:1-10.)

40.      Dr. Soiffer's opinion found that Humira suppresses the immune system, and in so doing increases the risk of cancer: "The primary mode of action of adalimumab (Humira) is inhibition of the activity of tumor necrosis factor (TNF-a). TNF-a is a pro-inflammatory cytokine and has been implicated in the manifestation of inflammatory diseases such as rheumatoid arthritis. TNF-a inhibition results in the suppression of the immune system. There exists multiple examples in related clinical settings which impaired functioning of the immune system is associated with an increase incident of lymphoma." Exhibit 35 at 2 (Expert Report of Dr. Robert Soiffer).

**RESPONSE:**

Denied.  Plaintiff's contention that Dr. Soiffer opined that Humira "increases the risk of cancer" is not supported by Dr. Soiffer's expert report, where he opined only that plaintiff's use of Humira "contributed to the development" of her lymphoma.  (Plaintiff's Exhibit 35 (Dkt. 88-35) at 4.)  Moreover, Dr. Soiffer agreed in his deposition that he "can't rule out the possibility that—that her RA alone was the cause" of plaintiff's disease (Abbott SUF ¶ 138); that "most lymphomas are believed to be idiopathic" and "[p]eople can't identify what caused them;" (*Id.* ¶ 139); and that "a majority of patients who develop that kind of lymphoma [non-Hodgkin's lymphoma] have no known risk factor").  (*Id.*)  And when asked whether he had an opinion "that TNF inhibitors actually cause lymphoma," Dr. Soiffer stated that he did not have an opinion that TNF inhibitors "cause lymphoma directly in that way," but rather only that they make a "contribution to the environment to allow it to grow."  (*Id.* ¶ 141.)  Finally, Dr. Soiffer agreed that he could not conclude that "but for this treatment with Humira, Mrs. Calisi would not have developed lymphoma" (*Id.* ¶ 142) and testified: "I cannot say if not for the Humira, she -- if not for the Humira, she wouldn't have gotten it.  I cannot say that."  (*Id.* ¶ 143.)

41.    Dr. Soiffer explained in deposition how suppression of the immune system leads to lymphoma:

Q:    Okay. Now let's talk a little bit about your opinion. It's not your opinion, as I take it based on what you've written, that there's sufficient evidence to establish to a reasonable degree of medical and scientific certainty that TNF inhibitors actually cause lymphoma?

A:    It is my -- have to clarify the term "cause" versus "contribute."

Q:    Well, what -- how do you understand the difference?

A.    I understand cause as the TNF inhibitors directly cause some transformation of cells that are -- direct effect on the cells that cause lymphoma. Contribute means that they've altered -- in my – the way I view it, they've altered something in the environment of the host, of the patient, to make them more susceptible to the development of a lymphoma, for which in these patients, they're already at risk.

Q:      And they're already at risk because of their RA?

A:      Correct.

Q:      Okay. And so to come back, accepting that -- your distinction, you don't have an opinion that TNF inhibitors actually cause lymphoma?

A:      Using the definition that I just set forth that they transform the lymphocytes to cause a lymphoma --

Q:      Right.

A:      -- to cause lymphoma directly in that way, I don't have an opinion on that. I have an opinion on the contribution to the environment to allow it to grow.

Q:      Right. And so your opinion is that TNF inhibitors act together with the -- essentially the inflammation and risk a patient already has in some ways that creates a circumstance where lymphoma can grow?

A:      More than it would be if it weren't there.

Exhibit 34 at 244:5-245:14.

**RESPONSE:**

Denied.   The testimony quoted by plaintiff does not support her characterization of it.

Dr. Soiffer did not "explain[] . . . how suppression of the immune system leads to lymphoma," as

plaintiff contends; at the most, he opined that TNF inhibitors "contribut[e] to the environment to

allow it [lymphoma] to grow."  (*See also* Response ¶ 40.)

42.     Dr. Soiffer opines that Humira caused Maureen to develop lymphoma:

Q:      Assume with me that the law asks in the definition of the word "cause," whether an agent, particularly in this case, Humira, is a substantial contributing factor in the development of Ms. Calisi's lymphoma. You assume that definition of "cause" with me. Do you have an opinion whether the Humira in Ms. Calisi's case was a substantial contributing factor or cause in her development of lymphoma?

A.      I could say it was a substantial contributing factor.

Q.      Is that opinion based on reasonable medical probability?

A.      It's based on reasonable medical probability, my practice as an oncologist and my experience with immune-compromised patients at risk for immune suppression-related lymphomas.

Q.      Is -- is that experience that you brought to bear in this particular case experience and training you use in a setting in the practice of medicine that is outside of a courtroom?

A.      Yes.

Q.      Is that the same method that you have tried to apply to developing your opinions in this case?

A.      Yes.

*Id.* at 315:17-316:16.

**RESPONSE:**

Denied.  Dr. Soiffer agreed that he could not conclude that "but for this treatment with Humira, Mrs. Calisi would not have developed lymphoma" (Abbott's SUF ¶ 142), and also testified: "I cannot say if not for the Humira, she -- if not for the Humira, she wouldn't have gotten it.  I cannot say that."  (*Id.* ¶ 143.)  Dr. Soiffer's expert report does not state that Humira caused plaintiff's lymphoma or was a substantial contributing factor in the development of her lymphoma.  (*See* Plaintiff's Exhibit 35 (Dkt. 88-35).)  Finally, Dr. Soiffer agreed that most lymphomas are idiopathic and that he could not rule out the possibility that plaintiff's lymphoma was caused by her rheumatoid arthritis alone. (Response ¶ 40.)

43.     Dr. Soiffer also opined that Maureen's use of Humira was "a greater than 50 percent contributor to her developing lymphoma despite her rheumatoid arthritis. *Id.* at 311:22-313:6.

**RESPONSE:**

Denied.  Dr. Soiffer agreed that he could not conclude that "but for this treatment with Humira, Mrs. Calisi would not have developed lymphoma" (Abbott's SUF ¶ 142) and testified: "I cannot say if not for the Humira, she -- if not for the Humira, she wouldn't have gotten it.  I cannot say that."  (*Id.* ¶ 143.)  Dr. Soiffer also agreed that "most lymphomas are believed to be

40

idiopathic[.]" (*Id.* ¶ 138.)  Because Dr. Soiffer admitted that most (i.e., over 50%) of lymphomas

are idiopathic, and admitted that he could not conclude that plaintiff would not have developed

lymphoma "but for" treatment with Humira, Abbott denies that the testimony quoted by plaintiff

establishes that Dr. Soiffer opined that plaintiff's use of Humira was "a greater than 50 percent

contributor" to her developing lymphoma despite her rheumatoid arthritis.  (*See also* Response

¶¶ 40-42.)

44.    Dr. Soiffer refers to peer reviewed literature to support his opinions, to
specifically include a study in the Journal of the American Medical Association that showed a
statistically significant increased risk of malignancies and serious infections for persons taking
TNF-blockers. Exhibit 19 at 1; Exhibit 35 at 3.

**RESPONSE:**

Abbott admits for purposes of this motion that Dr. Soiffer's expert report states that he

relied on the Bongartz study in forming his opinion, with the following qualifications.  In his

deposition, Dr. Soiffer admitted that the Bongartz study did not reach a conclusion as to the

increased risk of lymphoma for persons treated with TNF-inhibitors (instead pooling the risk for

all malignancies), and agreed that he could not draw a conclusion as to the increased risk of

lymphoma from a pooled odds ratio of all cancers:

Q.    Bongartz is cited for the proposition that a meta-analysis that confined itself to nine
prospective randomized trial of over 5,000 RA patients receiving TNF antibodies or
placebo found that the pooled odds ratio for all malignancies was 3.3, 95 percent
confidence interval of 1.2 to 9.1 based on 29 cancers of all types, right?

A.    Correct.

Q.    They didn't analyze lymphoma, did they?

A.    Not separately.

Q.    And they didn't report what the statistical significance of the odds ratio was for
lymphoma, did they?

A.    Not specifically.  No, they did not.

                                                        ***

> Q.     Now, you'd agree with me, wouldn't you, that you can't draw a conclusion with respect to lymphoma from a pooled odds ratio of all cancers?
>
> A.     By itself, that's correct.

(App. 28 at 275:20-277:3; *see also id.* at 288:1-4 ("Q.  Okay.  Now with respect to lymphoma, they reached no conclusions concerning possible contribution of TNF therapy?  A.  Correct.")

Dr. Soiffer also agreed that that there is not a single epidemiologic study finding a statistically significant increased risk of lymphoma associated with TNF inhibitors:

> Q.     The fact of the matter is there isn't a single epidemiological study that find a statistically increased risk of lymphoma in patients who take anti-TNF therapy versus patients who have the underlying disease and are naive to the therapy?
>
> A.     As in the epidemiologic studies that -- the more recent epidemio -- the recent epidemiologic study, the Leombruno article, for instance, did not show a higher -- did not -- did not appear to show a higher incidence.
>
> Q.     This is a real -- this is a real precise question, so let me have her reread it and see if you can answer the question --
>
> A.     Okay.
>
> Q.     -- okay?
>
> [Question read.]
>
> A.     Not that I've reviewed.

(*Id.* at 173:20-174:12.)

Finally, Dr. Soiffer also admitted that without the Bongartz publication, he would not have opined that TNF inhibitors can contribute to the development of lymphoma:

> Q.     I'd like you to exclude Bongartz from the analysis.  Is it your opinion today, excluding Bongartz from the analysis, that there's sufficient evidence that TNF inhibitors contribute to the development of lymphoma, leaving Bongartz aside?
>
> A.     I would have a much more difficult time making that case.  Yes.
>
> Q.     And you couldn't make that case, correct?
>
> A.     I wouldn't make that case.

(*Id.* at 275:8-16.)

45.    This same report evidenced a <u>statistically significant</u> dose response relationship with those taking higher doses of TNF-blockers having an increased risk of developing malignancies and serious infections as compared to those taking lower doses of TNF-blocker therapy. Exhibit 35 at 3. "This dose response effects provides strong evidence implicating TNF antibodies in lymphoma development." *Id.*

**<u>RESPONSE:</u>**

Abbott admits that the Bongartz publication reported a statistically significant pooled odds ratio for all malignancies in patients taking higher doses of TNF-inhibitors, but denies plaintiff's contention that the Bongartz publication supports Dr. Soiffer's conclusion that "[t]his dose response effects provides strong  evidence implicating TNF antibodies in lymphoma development."  Dr. Soiffer admitted in his deposition that the Bongartz publication did not reach a conclusion as to the increased risk of ***lymphoma*** for persons treated with TNF-inhibitors (instead pooling the risk for all malignancies), and agreed that he could not draw a conclusion as to the increased risk of lymphoma from a pooled odds ratio of all cancers.  (Response ¶ 41.) Accordingly, the Bongartz publication does not support Dr. Soiffer's statement in his expert report that "[t]his dose response effects provides strong evidence implicating TNF antibodies in lymphoma development."  (Plaintiff's Exhibit 35 (Dkt. 88-35) at 3.)

46.    Dr. Soiffer is also aware of compelling evidence of "dechallange" regarding lymphoma and TNF-blockers:

> Q.    And isn't it the fact that you have dechallenge – or upon dechallenge, people do regress sometimes, and you can't figure out why?
>
> A.    For lymphomas, for lymphoproliferative disorders who are on immune suppression, there have been repeated observations of withdrawal and -- as I stated earlier and -- and -- and resolution. We also know that in numerous circumstances, in several circumstances, that patients on more immune suppression are often more likely to get a malignancy. So if you combine the issue of those going forward who are more immune-suppressed -- more immune-suppressed or more likely to get a malignancy than those who are on less immune suppression, plus the fact that you withdraw the immune-suppressive agent and the malignancy goes away, to me, in my professional opinion, is extremely

43

suggestive of a significant contributing role of that particular agent to the development of that malignancy.

Q.      It's suggestive?

A.      Yes.

Exhibit 34 at 132:17-133:13.

**RESPONSE:**

Abbott admits for purposes of this motion that Dr. Soiffer testified he was aware of two reports of dechallenge, with the qualification that Dr. Soiffer testified that the two reports of dechallenge he identified were in patients with Crohn's disease (not rheumatoid arthritis) and that one of the two had lung cancer and not lymphoma; and that he could not identify a single case of dechallenge in a rheumatoid arthritis patient on anti-TNFs:

Q.      -- correct?  Okay.  And the two patients that you identify -- and the only two you identify -- that had a successful dechallenge on anti-TNFs were Crohn patients?

A.      Those were the two in the report.  Yes.

Q.      And neither of them had non-Hodgkin's lymphoma?

A.      One of them had lymphoma.  I don't make -- one did not have lymphoma.  And I think for the purposes of post transplant lymphoproliferative disorders or post immune-suppressive lymphoproliferative disorders, I think that I would refer to them as lymphomas.  But yes.  One is called Hodgkin's disease; one is called non-Hodgkin's lymphoma.

Q.      Yeah.  In your -- in your field, you -- for purposes of dechallenge in your field, you lump them together.  Do you know if that's appropriate in the context of RA and anti-TNF therapy?

21  A.      I -- it's my opinion that it is.

(First App. 28 (Dr. Soiffer Dep.) at 129:4-21.)

Q.      Sir, I understand.  But in the context of RA and anti-TNFs, you identified not a single case of successful dechallenge, correct?

A.      Correct.

Q.     Okay.  Now, the other case of dechallenge you did identify was a case involving a lung cancer, correct?

A.     Correct.

Q.     Does that -- is that relevant to your opinions here, really?

A.     Not as relevant as the other case, the Hodgkin's lymphoma case.

(*Id.* at 134:22-135:8.)   Additionally, there was no "dechallenge" in plaintiff's case—as Dr. Stein's expert report notes, "the withdrawal of [Humira] produced no change in the status of her tumor."  (Third App. 76 (Stein report) at 3.)

47.     Dr. Soiffer weighed Marueen's various risk factors for lymphoma (age, RA, and Humira use), stratified them according to degree of risk, and then determined to a reasonable degree of medical certainty that her Humira use was the most significant factor. *Id.* at 170:5-171:20.

**RESPONSE:**

Admitted in part, denied in part.  While Abbott admits that Dr. Soiffer purported to rank plaintiff's risk factors for lymphoma, he admitted in his deposition that he could not quantify the respective degree of those risks, and Abbott therefore denies that Dr. Soiffer "determined to a reasonable degree of medical certainty that her Humira use was the most significant factor," as plaintiff contends:

Q.     Okay.  So the three that at least you can -- you could identify from the records were her age --

A.     Yes.

Q.     -- correct?  Her underlying RA itself, correct?

A.     Right.

Q.     And the treatment for her RA?

A.     Yes.

Q.     Those are the three?

A.   Yes.  Again, age.  Since the average age is about her age of getting lymphoma, I'm not sure I would say the age would be that meaningful to me.

Q.   But most people who get it are over -- are her age or over?

A.   Well, the median is about 60.

Q.   Yeah.  And she's 62 --

A.   Right.

Q.   -- I think when she developed lymphoma?

A.   Could be.

Q.   Okay.  So as between these three risk factors, can you, to a reasonable degree of scientific and medical certainty, give me a proportion of risk they contributed?

A.   I would put the age as third at least.  And in my opinion, the treatment that she received was first.  RA was second and --

Q.   And --

A.   And age was third.

Q.   And as between first and second, can you tell me how -- how big a difference there was or is that --would that just be guessing?

A.   It's my -- I can't give you a number in terms of big difference.  I will -- I will -- I have and will acknowledge that RA patients have a higher incidence of lymphoma than the general population.  And I believe with a reasonable degree of medical certainty that the use of immune-suppressive agents, in this case, Humira, increases that risk.

Q.   But you can't tell me to what degree?

A.   I can't tell you to what degree.

(*Id.* at 170:5-171:20.)  Additionally, Dr. Soiffer also agreed that most lymphomas are idiopathic, that most patients who develop non-Hodgkin lymphoma have no known risk factor, and that he could not rule out the possibility that plaintiff's rheumatoid arthritis alone was the cause of her lymphoma.  (Response ¶ 40.)

48.   Defendant's retained oncologist–Dr. Robert Stein– believed Dr. Soiffer to be both well qualified and methodologically sound with respect to his opinions in this case:

Q:     Having reviewed the rough transcript, and you read his report and you've laid out the differences, and you've given the substance of your opinion here today, is there anything in particular in the rough transcript that you reviewed that you want to take issue with, in addition to what you take issue with in your report?

A:     No.

Q:     I just -- there's nothing that you observed from Dr. Soiffer's process, that is, the method that he employed to come to his conclusion, that, in and of itself, leads you to say, other than disagreeing with his conclusion, that he -- he's just doing this wrong?

A:     I guess there's a question about the completeness of the database he used. But, I mean – which I think is why we have reached different conclusions. But, basically, I think someone who looked at the data and reached a different conclusion, that's basically the way I see the situation.

Q:     And the data specific to the rheumatology field and the relationship of this drug and lymphoma, all of that was provided to you by counsel for Abbott?

A:     That's correct.

Exhibit 1 at 216:10-217:8.

**<u>RESPONSE:</u>**

Denied.   The testimony quoted by plaintiff does not support her contention that "Dr. Robert Stein . . . believed Dr. Soiffer to be both well qualified and methodologically sound with respect to his opinions in this case."   Dr. Stein was not asked (and did not opine) whether he believed Dr. Soiffer to be well qualified and methodologically sound with respect to his opinions.   (Plaintiff's Exhibit 1 (Dkt. 88-1) at 216:10-217:8.)   In the testimony quoted by plaintiffs, Dr. Stein also stated that "there's a question about the completeness of the database [Dr. Soiffer] used."   (*Id.* at 216:23-217:1.)

Additionally, in his deposition Dr. Stein criticized Dr. Soiffer's methodology in opining that immunosuppression affects T-cells and leads to lymphoma:

Q.      And so let me make sure we -- and I think we agree.   Your point on this is that cyclosporin and TNF inhibitors are two different things.   But there is no -- there is no, to your knowledge, difference in the measurement, at least at the present, on anti-TNF function, that gives you a percentage.   You just know that they're different?

47

A.      Yeah.  I would -- yes.

Q.      Okay.  And because they're different, it is your conclusion that the analogies Dr. Soiffer is making are inappropriate analogies?

A.      That basically was my opinion.  I wasn't trying to say anything other -- my comments on the mechanism of action were all related to my critique of his opinion.

THE COURT REPORTER:  I'm sorry.  Say that again.

THE WITNESS:  My comment on T-cell function was related to my critique of his opinion when he said we know that immunosuppression affects T-cells and leads to lymphoma.  And I was saying, well, anti-TNF drugs are a different category of drugs.  It's an extrapolation, and we can't assume it's true because of the similarity.  That's really all I said in the  report.  My feeling is, is that it's kind of lesser immune suppression.  But I'm not going to give a definite statement in terms of that.

(Third App. 78 (Dr. Stein dep) at 185:16-186:20.)  Moreover, Dr. Stein further testified that he

"disagree[d] with [Dr. Soiffer's] opinion, based on what he used to reach his conclusion and

what he concluded," and also criticized "how much material [Dr. Soiffer] may have looked at" in

forming his opinion:

Q.      Are you going to offer the opinion that there's something specific that you've observed that Dr. Soiffer did in his review that you think makes him unqualified to testify in this case?

A.      Not unqualified to testify.  I disagree with his opinion, based on what he used to reach his conclusion and what he concluded.  That's all.

Q.      And I just want to make sure we understand the universe.  You all have reached different conclusions.  But other than that, you've laid out in your report kind of the reasons why you've got some differences with the analogies he makes.

A.      Right.

Q.      And you differ from the final result.  But you don't have a specific criticism of the means that he got there?

A.      Other than how much material he may have looked at.  And, I guess, in terms of his -- let me -- I think that his interpretation of Bongartz isn't right, I guess, is another thing, but . . .

(*Id.* at 214:25-215:19.)

49.     Dr. Stein based his opinions entirely on information provided to him by Abbott's counsel.  *Id.*

**RESPONSE:**

Denied.   The testimony cited by plaintiff (Plaintiff's Exhibit 1 (Dkt. 88-1) at 216:10-217:8) does not support her characterization of it.   While Dr. Stein agreed that "the data specific to the rheumatology field and the relationship of this drug and lymphoma" were provided to him by Abbott's counsel (*Id.* at 217:5-8), that testimony does not support plaintiff's contention that those materials were the ***sole*** basis for Dr. Stein's opinion.   To the contrary, Dr. Stein's expert report explains that in addition to scientific literature, he also reviewed plaintiff's "medical records," "the transcripts of the depositions given by Mrs. Calisi's physicians Dr. Robert Pastan and Dr. Nancy Chun," and "the report of Dr. Soiffer."   (Third App. 76 (Stein report) at 2.)  Dr. Stein based his opinions "on [a] careful and detailed review" of these various materials, "and the knowledge and expertise gained in [his] more than 40 years of medical practice."   (*Id.*)   And when asked by plaintiff's counsel whether the articles provided by Abbott's counsel constituted a comprehensive literature review, Dr. Stein responded "yes," and explained his basis for that conclusion and why he felt it was appropriate to rely on those materials:

Q.      So the articles that were provided to you by Abbott, do you have an opinion of whether they constitute a comprehensive literature review?

A.      I would have to say yes.  In terms of looking at it in terms of what I was -- one, in terms of trying to do an independent search, not finding additional information; and, secondly, because when you read an article, those articles have references to other information, and I was, you know, operating essentially within a closed universe of articles.  So someone was citing things and the main things were articles I've already read, except when they're, you know, discussing a different point that's not germane to what we would consider the issues at hand.  So I thought it was a relatively complete review.  I would not be shocked if you were able to come up with one or two articles that you felt were germane that I didn't include.  But it seemed to me that it was a relatively complete review of the pertinent medical literature on the topic.

Q.      I want to ask, in precision, the -- from your perspective as an expert in this matter, do you feel like it is appropriate to rely on the medical literature provided by Abbott

related to this question of the instance of lymphoma in the RA patient and the relationship between the class of drug and Humira to lymphoma as well?

A. I thought it was reasonable. Of course, I also had Dr. Soiffer's testimony on data that he felt, in terms of plaintiffs' side, on other literature that he felt was worth mentioning. So I had that, too. I thought, you know, I think it's reasonable to get the articles and be able to review them, regardless of the source of the articles. I mean, I've been doing medicine for 40 years, been a professor for a long time, in terms of being able to review things, regardless of source of the articles. I did not have a problem with that.

(Third App. 78 (Stein dep) at 61:14-63:2.)

50.     Dr. Goldsmith conducted a Bradford Hill analysis when considering the relationship between TNF-blockers and lymphoma:

Q:      So, is it fair to say then that number of people had input into the development of the factors or criteria that an epidemiologist would consider in determining whether an exposure causes a disease?

A:      Right. And, farther into my chapter I actually go through the Hill criteria looking at this question about silica and lung cancer. I just want you to know that I think about that, too, almost all of the time I am, you know, working on these issues.

Exhibit 36 at 49:20-50:8 (Deposition Excerpts of Dr. David Goldsmith).

**RESPONSE:**

Denied. Plaintiff's cited testimony (Plaintiff's Exhibit 36 (Dkt 88-36) at 49:20-50:8) does not support her characterization of it. Dr. Goldsmith's testimony that he "thinks about [the Hill criteria] . . . almost all of the time . . . [he is] working on these issues" does not support plaintiff's contention that Dr. Goldsmith conducted a Bradford Hill analysis specifically in considering a relationship between TNF-inhibitors and lymphoma for purposes of this case. In his deposition, Dr. Goldsmith agreed that his expert report contains all of his opinions and the bases and reasons for them. (App. 30 at 152:2-5 ("Q: Does this report contain a complete statement of all of the opinions you will express and the bases and reasons for them? A: Yes.").) Dr. Goldsmith's expert report, however, does not disclose any consideration of the Bradford Hill factors—and, indeed, does not even mention Bradford Hill analysis. (*See* Plaintiff's Exhibit 37 (Dkt. 88-37) at 1-6.)

51.    Dr. Goldsmith relied on published, peer review studies in coming to his conclusions. Exhibit 37 at 2-3 (Expert Report of Dr. David Goldsmith). Among those was a meta analysis in the Journal of the American Medical Association that showed a statistically significant increased risk of malignancies of 3.3 (95% CI 1.2-9.1) in patients taking TNF-blockers.

**RESPONSE:**

Abbott admits for purposes of this motion that Dr. Goldsmith's expert report states that

he relied on the Bongartz study, subject to the following qualifications.  In his deposition, Dr.

Goldsmith agreed that the Bongartz publication calculated an odds ratio for all malignancies, and

did not calculate an odds ratio for lymphoma specifically.

Q.  The authors of the Bongartz study calculated odds ratios for all cancers only; is that right?

A.    That's correct.

Q.    They did not calculate an odds ratio for lymphoma specifically, right?

A.    That's right.  However, I went ahead and did calculate a risk for lymphoma.

Q.    Okay.  So, we will get to that, but let me break it down. Bongartz, himself, did not calculate a lymphoma risk, right?

A.    That's correct.

(App. 30 at 290:19-291:9.)  And while in his expert report Dr. Goldsmith attempted to calculate

"a separate risk for lymphatic cancer" and purported to find that "the elevated OR [odds ratio]

was statistically significant" (Plaintiff's Exhibit 37 (Dkt. 88-37) at 3), at his deposition, Dr.

Goldsmith admitted that his recalculation was incorrect, and that the results of his revised

calculation were "not statistically significant":

Q.   . . . You calculated the lymphoma risk, and the lymphoma risk that you calculated was an odds ratio of 9.11 with a 95 percent confidence interval from 1.24 to infinity; is that correct?

A.  That's correct.

Q.   And you said that is common for the confidence interval to go to infinity when you calculate the odds ratios in this particular manner; is that right?

A.    Right.  That is because you've got, you've got 0 cases in one of the cells so you've got this very, very wide upper confidence limit.  And the question that we are looking at is, does the lower confidence limit, as we talked about before, contain 1.  And in this case, in this example, it does not.

Q.    The, when you say that the -- I think you said the cell or one of the cells is 0.  And I think what you were referring to there is the fact that there were no lymphomas in any of the placebo patients in the Humira studies; is that correct?

A.    Right.  In the placebo arm there were no lymphoma cases, correct.

Q.    When you calculated the odds ratio in the manner that you did, how many lymphomas did you include in the treatment group?

A.    I actually did this twice, because I realized the first time I did it which included the ten lymphoma cases in the treatment group, that six of them had occurred outside of the period of observation.  And they came from the Food and Drug Administration follow-up and not from the investigators themselves.  So, then I calculated a second odds ratio with only four lymphoma cases compared to zero again, and that led to a relative risk and I apologize, I didn't bring it with me, but I believe it was 4.5, the lower 95 percent confidence limits was 0.3, or something like that, so it was not statistically significant.

Q.    So, the odds ratio that you present in your report included ten lymphomas; is that right?

A.    That's right.

Q.    And subsequently you came to realize that six of those lymphomas were outside the trial period; is that correct?

A.    Right.  And that is according to what Dr. Bongartz has got in the footnote for Table 2, correct.

Q.    And so to properly calculate the odds ratio you had to exclude those six lymphomas in your revised calculation; is that correct?

A.    That's correct.

Q.    And in that revised calculation you came to an odds ratio of 4.5 with a lower bound of the confidence interval of 0.3, correct?

A.    I think that is correct from memory.

Q.    So, that result was not statistically significant, right?

A.    That's right.  Still elevated but not statistically significant, correct.

(App. 30 at 291:20-294:18.)   Dr. Goldsmith also agreed that he is unaware of any articles

showing a statistically significant elevated risk of lymphoma in anti-TNF patients as compared to

rheumatoid arthritis patients generally:

> Q:  . . . Of all of the articles, full length articles we have looked at today, either cited in
> your report and discussed in your report or that I have shown you for the first time and
> that you have never seen before, do any of them show a statistically significant elevated
> relative risk of lymphoma in anti-TNF patients as compared to RA patients generally?
>
> A:  No.

(*Id.* at 383:8-16.)

52.    Dr. Goldsmith found evidence of a biologically plausible explanation as to how
Humira causes lymphoma "which has been demonstrated by industry experts in this field."
Exhibit 36 at 398:1-398:3.

**RESPONSE:**

Admitted that plaintiff accurately quotes Dr. Goldsmith's testimony, with the

qualification that in his deposition, Dr. Goldsmith also agreed that "[b]iological plausibility on

its own doesn't provide causation" (Abbott's SUF ¶ 132); and agreed that "it is biologically

plausible that TNF inhibitors could either enhance or inhibit cancer development[.]" (*Id.* ¶ 133;

*see also* Response ¶¶ 26-27.)

53.    Dr. Goldsmith also found evidence of a temporal relationship between Humira
and lymphoma, in particular dechallange:

> Q:    Do you consider temporal relationship?
>
> A:    Yes, actually it is sine qua non. You cannot have a finding of, in this case, a
> cancer related to someone who starts the drug on the same day. There is no way
> that those are linked. So, the exposure must always precede the cancer, must
> always precede -- the exposure must always precede the whatever health effects
> you are talking about. And we, we do see that in all of these data that we are
> talking about.
>
> Q:    And when we consider, when you consider temporal relationship is dechallange
> something that you would consider?

A:     Yes, I mean it is something that we know from looking at the Brown study, was something that she reported that when patients stop taking the anti-TNF drugs, their lymphoma regressed, and that is an important point.

*Id.* at 398:9-399:9.

**RESPONSE:**

Admitted that plaintiff accurately quotes Dr. Goldsmith's deposition testimony, with the qualification that Dr. Goldsmith could only identify two reported "dechallenge" cases in patients on anti-TNFs:

Q.     You spoke very briefly about dechallenge and you referenced the Brown study, correct?

A.   That's right.

Q.     And you mentioned patients that were taken off anti-TNFs, their lymphomas improved.

A.   Right.  I believe that there is only two patients where that was, that was reported.

Q.   That was going to be my question.  There were two cases; is that right?

A.   Right.

Q.     Have you, other than the Brown 2002 report, are you aware of any other cases or reports of dechallenge associated with anti-TNFs and lymphoma?

A.     I looked through the PubMed, but I didn't actually look at those in detail.  I may have seen some other case reports where removing the drug allowed the cancer to regress, but I don't have a body of studies or case studies to share with you on that.  This is the only time that I saw that that was mentioned in a peer reviewed paper.

Q.     So as you sit here today the Brown study is the only study you can point to where dechallenge led to regression or lymphoma?

A.   That's right.

(App. 30 at 402:18-403:22.)

54.     Dr. Goldsmith also found evidence of a dose response relationship between Humira and malignancies: "You are looking at dose response, and there is a dose response in Bongartz." *Id.* at 398:4-398:5; Exhibit 37 at 3.

**RESPONSE:**

Admitted for purposes of this motion that Dr. Goldsmith testified that he considered the

Bongartz publication to be evidence of a dose response relationship, with the qualification that

Dr. Goldsmith agreed that the Bongartz publication showed a dose response "for all cancers"—

not lymphomas; and that Dr. Goldsmith could not identify a single report finding a dose response

between anti-TNFs and lymphoma:

> Q.    Okay.  None of the full length articles that you discuss in your report finds a dose
> response relationship between anti-TNFs including Humira and lymphoma.  Is that right?
>
> A.    I'm sorry, could you ask that question again, please?
>
> Q.    Sure.  Let me try to break it down.  None of the full length articles that you cite and
> discuss in your report find a statistically significant dose response relationship between
> anti-TNFs and lymphoma.  True?
>
> A.    That's right.  The only thing that shows a dose response is in Bongartz for all
> cancers.
>
> Q.    Okay.  And none of the full length articles that you cite and discuss in your report
> find a statistically significant dose response relationship between Humira and lymphoma.
> Correct?
>
> A.    That's right.

(App. 30 at 337:9-338:7.)

55.    Dr. Goldsmith found that in the majority of studies he considered both at the time
of his report and during his deposition that there was a consistent trend that persons taking TNF-
blockers or other immunosuppressant were at increased risk of lymphoma, even though the
numbers often failed to reach statistical significance. Exhibit 36 at 396:6-397:15; Exhibit 37 at 2-
5.    Defendant's own epidemiological expert agrees.  Exhibit 18 at 146:23-148:23
[CONFIDENTIAL]. A sampling of these studies presented to Dr. Goldsmith and their findings
are below:

> Geborek found a RR for lymphoma of 4.9 (95% CI .9 to 26.2). Exhibit 12 at 699
> (Geborek P et al., Tumour necrosis factor blockers do not increase overall tumour risk in
> patients with rheumatoid arthritis, but may be associated with an increased risk of
> lymphomas. Ann Rheum Dis. 2005 May;64(5):699-703.)
>
> Leombruno found a OR for lymphoma of 1.26 (95% CI .52 to 3.06). Exhibit 13 at 1136
> (Leombruno JP et al., The safety of anti-tumour necrosis factor treatments in rheumatoid

arthritis: meta and exposure-adjusted pooled analyses of serious adverse events. Ann Rheum Dis. 2009 Jul;68(7):1136-45.)

Wolfe found a <u>statistically significant</u> increased risk of lymphoma when comparing persons with RA taking Humira and methotrexate verse all other treatments (OR=5.6 CI 95% 1.1 to 29.0), and a borderline statistically significant increased risk of lymphoma for those taking Humira verse all other medications (OR=4.5 CI 95% .9 to 23.1. Exhibit 14 at 1437 (Wolfe F *et al.*, *The effect of methotrexate and anti-tumor necrosis factor therapy on the risk of lymphoma in rheumatoid arthritis in 19,562 patients during 89,710 person-years of observation*. Arthritis Rheum. 2007 May;56(5):1433-9.)

Bernatsky found an adjusted RR of 1.92 (95% CI .49-7.5) for hematological cancers. Exhibit 15 at 280 (Bernatsky S *et al.*, *Hematologic malignant neoplasms after drug exposure in rheumatoid arthritis*. Arch Intern Med. 2008 Feb 25;168(4):378-81.)

Askling found a RR for lymphoma of 1.35 (95% CI .82 to 2.11). Exhibit 16 at 648 (Askling J et al., Anti-tumour necrosis factor therapy in rheumatoid arthritis and risk of malignant lymphomas: relative risks and time trends in the Swedish Biologics Register. Ann Rheum Dis. 2009 May;68(5):648-53.)

Askling found a hazard ratio of 2.69 (95% CI .91 to 8.21) for all site cancer excluding non-melanoma skin cancer when looking at Outcome C, which Dr. Goldsmith considered the most conservative outcome. Exhibit 17 at 125 (Askling J *et al.*, *Cancer risk with tumor necrosis factor alpha (TNF) inhibitors: meta-analysis of randomized controlled trials of adalimumab, etanercept, and infliximab using patient level data*. Pharmacoepidemiol Drug Saf. 2011 Feb;20(2):119-30.)

**RESPONSE:**

Denied.    Plaintiff's quoted testimony of Dr. Goldsmith does not support her characterization of it.  Dr. Goldsmith did not testify that he "found that in the majority of studies he considered both at the time of his report and during his deposition that there was a consistent trend that persons taking TNF-blockers or other immunosuppressant were at increased risk of lymphoma, even though the numbers often failed to reach statistical significance."  His quoted testimony, reproduced below, was as follows:

Q.  With regard to relative risks or odd ratios, do they have to be statistically significant?

[Objection.]

A.   It helps obviously if they are statistically significant.  But it isn't necessary when coming to some conclusion about what the evidence says.

56

(App. 30 at 396:6-13.)  Abbott also denies plaintiff's characterizations of the studies listed above to the extent those characterizations are inaccurate.  *See* Response ¶ 10.

56.    When Dr. Gershwin published his paper Kong *et al.*, *Potential Adverse Events with Biologic Response Modifiers*, 5 Autoimmunity Reviews 471,482 (2006) he did not have access to confidential Abbott information he relied on in creating his expert report in this case, including 30(b)(6) deposition testimony of Abbott employees and internal Abbott documents and emails. Exhibit 38 at 1-3.

**RESPONSE:**

Admitted for purposes of this motion, with the qualification that when asked about the

Kong publication at his deposition, Dr. Gershwin did not state that his conclusions in that

paper—that "no causal link exists between TNF Alpha antagonists with lymphoma" and that the

rates of lymphoma reported in the available literature "are actually lower than the annual

incidence among the general population" (App. 29 at 93:13-19; 91:18-21)—would have been

different had he had "access to confidential Abbott information he relied on in creating his expert

report in this case."  (*See* App. 29 at 90:17-94:17.)  Dr. Gershwin likewise did not identify what

"confidential Abbott information" has caused him to change his conclusions.  (*See id.*)

57.    Dr. Gershwin was unaware of "significant data published in 2006 and since" as well as data published in 2004 that he had not seen. Exhibit 39 at 97:8-97:16.

**RESPONSE:**

Abbott admits for purposes of this motion that Dr. Gershwin testified he was unaware of

"significant data published in 2006 and since," and that he testified he was not aware in 2006 of

data published in 2004.  (App. 29 (Gershwin Dep.) at 96:20-97:24.)  Dr. Gershwin also testified

that in preparing his 2006 article, he had "depended particularly on what was in the label," but

agreed that he did not "cite the label anywhere" in his article.  (*Id.* at 92:20-93:11.)

58.    Dr. Gershwin's methodology in this case focused primarily on the Bradford Hill factors:

> Q:    So, Dr. Gershwin, I -- could you spend some time talking about the methodology
>       you used in this case to determine that Humira can cause lymphoma?
>
> A:    I can if I can find my notes. So I used Bradford Hill criteria of causality.

Exhibit 39 at 458:5-458:9; *see also id.* at 95:8-95:10 ("I would only testify if I was
certain I could fulfill Bradford Hill criteria with appropriate methodology to address that issue.);
*Id.* at 119:8-119:10 ("I left no stone unturned particularly with respect to methodology in
Bradford Hill...."); *Id.* at 153:15-153:19 ("the basis of my opinions contains additional material
that will fulfill Bradford Hill criteria and reflect the methodology I used, and in addition will
discuss experimental evidence, which is Number 8 of the Bradford Hill criteria."); *Id.* at 268:6-
268:11 ("So a reduction in TNF by analogy, by association, one of the methodologies in
Bradford Hill, including experimental evidence, which is part of Bradford Hill is supportive of
the concept that anti-TNF is at increased risk for lymphoma in some patients with rheumatoid
arthritis."); *Id.* at 167:23-167:25 ("in the situation we have here, we depend on, as with Bradford
Hill, other associated features to help us in that question.").

**<u>RESPONSE:</u>**

Denied.  Dr. Gershwin testified that biologic plausibility was the basis of his expert report

and opinions.  (App. 29 (Gershwin Dep.) at 359:23-25 ("My report and everything I do is

focused entirely on biologic plausibility."); *id.* at 206:17-18 ("I talked about biologic plausibility

and mechanisms of action . . . ."); *id.* at 219:11-13 ("The basis of my opinions is biologic

plausibility and mechanisms of action."); *see* Abbott's SUF (Dkt. 63) ¶ 129.)  Dr. Gershwin's

expert report does not identify any reliance or application of the Bradford Hill methodology (*see*

Plaintiff's Exhibit 38 (Dkt. 88-38) at 1-22), and Dr. Gershwin admitted in his deposition that he

did not discuss the Bradford Hill criteria in his report:

> Q.   And you also agree that you -- when did you download this Exhibit 9 [Bradford Hill
> Criteria] from the internet?  Was this something you did after you submitted your
> reports?
>
> A.   I think so.
>
> Q.   Can you tell me why you did that?
>
> A.    Yeah, because I felt that I should present Bradford Hill criteria to explain biologic
> plausibility.
>
> Q.   And the Bradford Hill criteria aren't discussed in your original expert report; correct?

A.   That's right.

(App. 29 at 472:16-473:1.)   Dr. Gershwin in fact testified that the basis for his opinion had

changed after he had prepared his expert report, and, at his deposition, Dr. Gershwin produced

for the first time an article listing Bradford Hill criteria—which he explained was "something I

just pulled off the internet just in order to have Bradford Hill criteria in front of us so I didn't

have to try to memorize them all.":

> Q.   Okay.   The -- do your three expert reports contain a complete and accurate statement of your expert opinions and the bases therefore?
>
> A.   Well, they're certainly as accurate as I can make them.   I've already told you that I consider the reports to be constantly moving with new opinions to be added if I find new material.   But they were complete at the time that I wrote them.   They're not complete as we sit here this afternoon because of the additional literature that I've provided.
>
> Q.   Okay.   What are your new opinions that you developed after your expert reports were submitted?
>
> A.   So it's really the basis of the opinions.   It's not really new opinions.   My opinion that Humira, H-U-M-I-R-A, can produce lymphoma has not changed.   However, the basis of my opinions contains additional material that will fulfill Bradford Hill criteria and reflect the methodology I used, and in addition will discuss experimental evidence, which is Number 8 of the Bradford Hill criteria.   And based on that paper and Experimental Evidence Number 8, there will be additional data to further the basis of my opinions. And that literature I did bring with us today.

(App. 29 at 152:25-153:23.)

> Q.   Oh, what is that piece of paper?
>
> A.   What I did is I printed off the internet the Bradford Hill criteria, so I didn't type any of the material on here.
>
> Q.   Okay.   And then --
>
> A.   What I --
>
> Q.   -- the handwriting is yours; is that right?
>
> A.   You got to let me finish.
>
> Q.   Oh, sorry.

A.   What I did do, however, was put some handwriting to reflect the Bradford Hill criteria.  So the handwriting is mine, but the typed material is something I just pulled off the internet just in order to have Bradford Hill criteria in front of us so I didn't have to try to memorize them all.

(*Id.* at 154:5-19.)

59.    Dr. Gershwin found evidence of strength of association: "The trend in all of these studies has been towards an increased incidence of lymphoma." *Id.* at 459:23-459:25.

**RESPONSE:**

Denied.   Dr. Gershwin testified that he was not aware of any study that found a statistically significant association between anti-TNFs and lymphoma, much less a "strong association."   Dr. Gershwin acknowledged' "there is . . . no full length peer reviewed epidemiologic study that showed a statistically significant risk of lymphoma in general in patients taking anti-TNF therapy." (Abbott's SUF ¶¶ 120-121)  In fact, Dr. Gershwin himself previously published a review of the available literature that came to the very same conclusion, stating that "[n]o causal link exists between TNF-α antagonists with lymphoma" (*id.* ¶ 122) and noting that the rates of lymphoma reported in the literature were "actually lower than the annual incidence amongst the general population." (*id.* ¶ 122)  Moreover, any assertion that the "trend" in the studies has been towards an "increased incidence of lymphoma" is false. The most comprehensive meta-analyses have found that the relative risk of lymphoma with Humira is less than 1.0. (*id.* ¶ 109)  Moreover, as Dr. Gershwin conceded, where "the confidence interval includes values that are less than one, then that means that the exposure may actually be resulting in *less disease*"—a result that is found in *all* studies on anti-TNFs and lymphoma.

(*Id.* ¶¶125-126.) (*See also* Response ¶¶ 58-59.)

60.    Dr. Gershwin found a temporal association: "Temporality by itself is not sufficient, but I note the cases in which the lymphoma regressed when the anti-TNF was discontinued." *Id.* at 460:10-460:12.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)

61.     Dr. Gershwin found evidence of consistency: "I want to point out that immunosuppression consistently has been associated with lymphoma. That in fact whether it's congenital immune deficiency states, whether it's patients who develop common variable immune deficiency with age, whether it's patients with HIV, they have an increased incidence of lymphoma, all consistent with immunosuppression. People agree consistently that anti-TNF agents produce immunosuppression that is dose dependent. And indeed the studies have addressed other cancers as well, including an alpha beta -- including a Gamma Delta T cell lymphoma consistent with this association." *Id.* at 460:16-461.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)

62.     Dr. Gershwin found evidence of biological plausibility: "So the literature is filled with the mosaic which reflects the relationship between immunosuppression and development of lymphoma. I gave multiple examples in the deposition. Not only is it rational. Not only is it theoretical, but it's been shown in both animals and human studies for more than 25 years." *Id.* at 461:7-461:13.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)  Additionally, Dr. Gershwin has admitted that biological plausibility is,

alone, not evidence of causation.  (Abbott's SUF ¶ 131.)

63.     Dr. Gershwin found evidence of coherence: "It's clear that lymphoma is most common in patients with severe rheumatoid arthritis, severe being severe inflammation. Indeed, the Baekeland study in Arthritis and Rheumatism in 2006 will document that. In fact in studies of lymphoma in rheumatoid arthritis with other drugs, the agent that stands out with the highest risk is Azathioprine, which is used in rheumatoid arthritis and which produces a significant relative risk, and which produces lymphoma. And indeed the reason why it's so common with

Azathioprine unlike the more uncommon event in anti-TNF and rheumatoid arthritis is Azathioprine will interfere with everybody's DNA, whereas the anti-TNF agents firstly are not agents that work in everybody. There are people who seem to be more affected than others. Similarly there are patients who are more likely to be predisposed to lymphoma with anti-TNF. *Id.* at 461:20-462:12.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)

64.    Dr. Gershwin found evidence of specificity in the cause: "The specificity again is immunosuppression backslash dysregulation."  *Id.* at 462:17-462:18.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)

65.    Dr. Gershwin found evidence of a dose response relationships: "There is no doubt that anti-TNF is an immunosuppressive. There is no doubt the more you give, the more immunosuppression takes place."  *Id.* at 463:19-463:21.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)

66.    Dr. Gershwin found experimental evidence: "The data we discussed in the mouse models in which mice are depleted of TNF by their congenital gene deletion, and then overexpressed with BAFF due to their genetic interposition is extremely important. Yes, I agree it is an extreme situation, and it's extreme because you're getting rid of more TNF, and you're giving more BAFF. But on the other hand, patients who develop lymphoma reflect the tip of all-- the tip of all patients with rheumatoid arthritis. They also reflect an uncommon situation. More importantly what the mouse paper does, it provides a molecular mechanism by which lymphoma has developed."  *Id.* at 463:25-464:11.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)

67.     Dr. Gershwin found evidence of analogy: "Immunosuppression, whether it's due
to kids with ataxia telangiectasia or whether it's due to patients who have HIV,
immunosuppression can lead to lymphoma. Moreover, a point to emphasize is
immunosuppression has to be the measure. It has to be a quantitative amount. Meaning that just
because something transiently produces a minor degree of immunosuppression is not the same as
giving an anti-TNF agent which interacts with multiple pathways, multiple cells in the body, by
analogy has more of an impact on immunology than any agents introduced to treat rheumatoid
arthritis in the 50 years in which we've been treating rheumatoid arthritis with agents beyond
aspirin." *Id.* at 465:1-465:15.

**RESPONSE:**

Denied.  Abbott denies that Dr. Gershwin relied on or applied Bradford Hill methodology

in forming his opinion, or that his expert report disclosed or satisfied any Bradford Hill factors.

(*See* Response ¶¶ 58-59.)

68.     The head of regulatory affairs for Humira believes that any warning information
should be based on data not a marketing message:

Q:     Would you agree, sir, that it would be inappropriate for Abbott to issue a warning
       considered primarily on a marketing message?

A:     Absolutely.

Q:     And a warning should be data-driven, not message-driven.

A:     Yes, it should be data-driven.

Exhibit  40  at  149:11-149:19  (Deposition  Excerpts  of  Raymond  Votzmeyer)

[CONFIDENTIAL].

**RESPONSE:**

Admitted  for  purposes  of  this  motion,  with  the  clarification  that  when  responding  to

plaintiff's  counsel's  question  about  a  warning  being  "data-driven,  not  message-driven,"

Mr. Votzmeyer did so in the context of plaintiff's counsel's equating "message-driven" with "marketing message."  (*See id.*; *see also* Response ¶ 77.)

69.     When discussing the July 2004 lymphoma label change Abbott management stated: "One thing I would suggest also including in our recommendation for lymphoma section is that because of XXX, you can not compare rates across TNF blockers (or similar language). If we get CI (2 to 8 fold increase in RA population) and *caveats for disease severity*, etc. along with a comment not to compare, *we may be able to make this work commercially* (I still need to think about it before my final recommendation).)." Exhibit 41 at 1 (June 9, 2004 Email) (emphasis added) [CONFIDENTIAL].

**RESPONSE:**

Abbott admits that plaintiff correctly quotes Plaintiff's Exhibit 41 (Dkt. 88-41) [FILED UNDER SEAL] at 1, but disputes plaintiff's characterization of it.  This document does not support plaintiff's contention that "reminding doctors about [lymphoma] risk *sua sponte* was clearly contrary to [Abbott's] internal company directives and 'dynamic message-driven' marketing efforts."  (Pl.'s MSJ Opp. at 33 (citing Pl.'s SUF ¶ 69, among other things).)  This document reflects Abbott's internal discussions about proposed label changes to be reviewed and approved by the FDA.  (Dkt. 88-41 at 3.)  In that context, the remark about being "able to make this work" relate to Abbott obtaining FDA's approval of the updated language—not, as plaintiff contends, any "marketing efforts."

Moreover, plaintiff's own experts admitted that the risk of malignancies increases with the severity of a patient's rheumatoid arthritis.  (Abbott's SUF ¶ 137 (Dr. Soiffer agreeing that "[c]ompared with low overall [rheumatoid arthritis] disease activity, medium overall disease activity was associated with an eightfold increase [in lymphoma risk,]" and that plaintiff "had moderate RA, that middle category[.]").)  The FDA reviewed and approved language to that effect for Humira and other anti-TNFs.  (App. Ex. 7 (07/30/2004 FDA Humira approval letter and label) at ABT 01614329) ("Patients with rheumatoid arthritis, particularly those with highly active disease, are at a higher risk for the development of lymphoma."); App. Ex. 18 (12/17/2004

FDA Remicade approval letter and label) at 17) ("Patients with Crohn's disease or rheumatoid arthritis, particularly patients with highly active disease and/or chronic exposure to immunosuppressant therapies, may be at a higher risk (up to several fold) than the general population for the development of lymphoma.").) Thus, Abbott's consideration of including clarifying language concerning increased risk associated with rheumatoid arthritis severity does not support plaintiff's assertions about Abbott's purported "'dynamic message-driven' marketing efforts."

70. Centocor, the makers of Remicade, sent out a Dear Doctor Letter to physicians regarding their July 2004 lymphoma label change. Exhibit 42 (Remicade Dear Doctor Letter).

**RESPONSE:**

Abbott admits that a Remicade "Dear Healthcare Professional" letter was issued in October 2004 regarding a 2004 change to the Remicade label regarding cancer.

71. Abbott never issued a Dear Doctor Letter to apprise doctors of the newly added lymphoma data in July 2004 despite the fact that Abbott *did* send out an unrelated Dear Doctor Letter in November of 2004:

Q:    Okay. And here, Exhibit 12, is the Centocor dear doctor letter. Have you ever seen it before?

A:    Yes. I have seen this before, but not recently.

Q:    Okay. Do you know whether or not Abbott sent a similar letter to alert rheumatologists and other doctors to this potential risk?

A:    I do not believe that Abbott sent out a similar letter.

Q:    But Abbott did send out a letter to physicians the very next month didn't they?

A:    I don't know.

Q:    Let me show you Plaintiffs' Exhibit 13, and it's dated November 5, 2004, on Abbott stationery.

A:    Yes. I see that.

Q:    Okay. And this in the field is called a dear doctor letter, right?

A:      Yes, it is.

Q:      And this letter doesn't have anything to do with lymphoma or other malignancies, does it?

A:      That is correct.

Exhibit 28 at 97:1-97:21 [CONFIDENTIAL].

**RESPONSE:**

Admitted that Abbott did not send a "Dear Healthcare Professional" letter regarding a malignancy/lymphoma label change in October 2004, with the qualification that the October 2004 Remicade Dear Healthcare Professional letter was related to a 2004 change to the Remicade label to include a warning regarding lymphoma; prior to that change, the Remicade label did not include any warning about lymphoma.  (App. 27 (Hamrell Dep.) at 213-217.)  The Humira label, in contrast, warned about lymphoma from day one.  (*See* App. 11 (12/31/2002 Humira Label) at ABT01614276, ABT01614287.)

72.     Instead, Abbott only sent out an internal letter to their sales representatives informing them that "[a]ll TNF antagonists are associated with an elevated risk of lymphoma." Exhibit 43 (Oct 2004 Sales Rep Letter) [CONFIDENTIAL].

**RESPONSE:**

Abbott admits that it sent a letter to its sales representatives on October 8, 2004, and that the letter stated that "[a]ll TNF antagonists are associated with an elevated risk of lymphoma." (Plaintiff's Exhibit 43 (Dkt. 88-43) [FILED UNDER SEAL] at 1), but disputes plaintiff's characterization of this document.  The letter states that the FDA has determined that a consistent warning concerning malignancy was required to be added for all anti-TNF labeling:

> The Food and Drug Administration ('FDA') convened its Arthritis Advisory Committee in March 2003 to review and advise on safety data for marketed TNF antagonists.  As a result of this evaluation, a warning concerning malignancy was required to be added to the labeling for all TNF antagonists.  Therefore th[e] [Remicade] "dear doctor" letter was issued to inform physicians that Remicade has now added a warning concerning

malignancy to their label.   This is consistent to the wording already contained in Humira's and Enbrel's current label.

(*Id.*)  Thus, contrary to plaintiff's suggestion that Abbott downplayed any lymphoma warnings, this document establishes that Humira had already had the malignancy warning that Remicade added for the first time in 2004.  (*Id.*)

73.    Abbott stated that putting "public/physicians" on "alert" with regard to new malignancy warnings "might not be an issue from your regulatory of clinical development perspective, but it is definitely one from a commercial perspective." Exhibit 44 at 2 (September 2005 Email) [CONFIDENTIAL] . The communication strategy for this new malignancy warning was a 30 second response for sales reps but "only when asked." *Id.* at 1.

**RESPONSE:**

Denied. Abbott denies plaintiff's characterizations of Plaintiff's Exhibit 44 (Dkt. 88-44) [FILED UNDER SEAL].  Abbott denies, for example, that the document indicates that Abbott salespersons would only communicate information about a "new malignancy warning" for thirty seconds.   While the document refers to preparing a "presentation" for sales representatives, plaintiff has offered no evidence that such a presentation was ever generated; that the presentation instructed salespersons to keep conversations about lymphoma to 30 seconds; that any salesperson, and specifically the salespersons who called on Dr. Pastan, saw this presentation or were trained in this manner; or that conversations about lymphoma with Dr. Pastan were limited to 30 seconds.   Plaintiff's contentions are also refuted by the following testimony of Anthony Salvatore, an Abbott sales representative who called on Dr. Pastan:

Q.   Do you remember any guidance, instruction, or education, any of the folks at Abbott that were in charge of training you and keeping you abreast of label changes, about not discussing the malignancy or lymphoma change unless asked by a physician?

A.   I don't recall.

[Objection.]

A.   I don't recall that, no.

Q.   Okay.  Do you -- do you recall being trained to only spend 30 seconds on the label change and then to refocus the physician on the brand differentiation and efficacy portions of the label?

A.   I don't recall that.

(Second App. 64 (6/14/2012 Salvatore Deposition) [FILED UNDER SEAL] at 171:6-18.)[4]

74.      Abbott sales representative were taught that any increased risk of lymphoma in an RA patient was due to the disease and not Humira: "The chronic inflammation associated with RA, *not its treatment*, puts patients at risk for lymphoma; the risk of lymphoma is increased only in the highest levels of disease activity (Baecklund)." Exhibit 45 at 11 (Sales Tool) (Emphasis added) [CONFIDENTIAL].  The scientific article Abbott uses to justify this language is headlined by Dr. Schiff, one of its Key Opinion Leaders that Abbott holds to be a "partner" and for who Abbott has provided ghostwritten manuscripts for publication. Exhibit 4 at 13; Exhibit 8 at 2; Exhibit 11 at 1.

**RESPONSE:**

Denied.  Plaintiff's Exhibit 45 (Dkt. 88-45) [FILED UNDER SEAL] does not support her

contention that "Abbott sales representative were taught that any increased risk of lymphoma in

an RA patient was due to the disease and not Humira."  Plaintiff has not produced any evidence

that the draft document included in plaintiff's submission as Plaintiff's Exhibit 45 (Dkt. 88-45)

[FILED UNDER SEAL] was ever provided to any Abbott sales representative.  The document

does not therefore support plaintiff's assertion that "Abbott sales representative were taught that

any increased risk of lymphoma in an RA patient was due to the disease and not Humira."

Abbott denies plaintiff's assertion that Abbott provided Dr. Schiff with "ghostwritten

manuscripts for publication," because Plaintiff's Exhibit 4 (Dkt. 88-4), Exhibit 8 (Dkt. 88-8), and

Exhibit 11 (Dkt. 88-11) do not support this statement.  (*See* Response ¶¶ 4, 7, 9.)

75.      Melissa Harnch, one the Abbott sales representative who called on Dr. Pastan, stated that the sales message she was giving to physicians, including Dr. Pastan, was that the increased risk of lymphoma for RA patients was due to the disease, not Humira:

---

[4] "Second App" Refers to Dec. of Renee Smith and Omnibus Appendix of Exhs. in Support of Def. Resp. to PX Statement of Undisputed Material Facts, Opp to PX Motion for Partial Summary Judgement, and Statement of Additional Material Facts (Nov., 21 2012, Dkt. No 83)

Q:     Okay. So -- so that right there, the statement you just read -- and we were just going round and round about this a couple minutes ago -- is that the take- home message to progressives like Dr. Pastan was that the chronic inflammation of RA and the undertreatment of the disease is what puts patients at risk of lymphoma, not the treatment, right?

A:     Yeah. It goes back to what we were just talking about.

Q:     I mean -- I mean, I know it –

A:     Yeah.

Q:     -- speaks for itself –

A:     Yeah.

Q:     -- but that's the message you're giving to physicians, right?

A:     Yes.

Exhibit 46 at 112:6-113:1 (Deposition Excerpts of Melissa Harnch) [CONFIDENTIAL].

**RESPONSE:**

Denied.   Plaintiff mischaracterizes Ms. Harnch's testimony.   Ms. Harnch testified that when visiting physicians, she discussed the increased risk of lymphoma in rheumatoid arthritis patients, but also discussed the "increased rate in [Humira] clinical trials for lymphoma":

Q.     Would you ever tell a physician that there is no increased risk of developing lymphoma for patients on Humira?

A.     We talk about our lymphoma rates in our clinical trials.  And we do not say that there is -- there is -- there is warnings and precautions in our package insert, which is what we have to discuss, and that is something that they have to discuss with their patients when choosing a biologic.  There is an increased rate in our clinical trials for lymphoma.  So you cannot say that it's not there because it is there.  If it's not there, it wouldn't be in the warning and precaution section of our -- of our package insert.  It's there.  It's listed.  And then they have to decide, with what we can show them in our package insert and in our clinical trials, which is what's in our package insert, the risk.

(Second App. 63 at 139:5-139:22.)

76.     Abbott was concerned about how increased warnings affects profits. Exhibit 47 at 1 (October 2004 Email) [CONFIDENTIAL].

**RESPONSE:**

Denied.  Abbott denies plaintiff's characterization of Plaintiff's Exhibit 47 (Dkt. 88-47)

[FILED UNDER SEAL].   Abbott denies, for example, that the document supports any link

between "increased warnings" and "profits," as plaintiff contends.

77.    Abbott's strategic communication plan to impact prescribing practices was to be
"message driven" not "data driven".  Exhibit 48 at 4 (Strategic Communications Plan)
[CONFIDENTIAL].

**RESPONSE:**

Denied.  Abbott denies plaintiff's characterization of Plaintiff's Exhibit 48 (Dkt. 88-48)

[FILED UNDER SEAL].   For example, plaintiff has provided no evidence to support her

misleading implication that "message driven" means a "marketing message" rather than a

scientific communication.  (*See, e.g.*, Pl.'s MSJ Opp. at 32 (asserting that "Abbott chose to

emphasis [sic] a marketing message to impact prescribing practices of doctors like Dr. Pastan,

that was 'dynamic message-driven (rather than data-driven), scientific communications

strategy.'") (citing Pl.'s SUMF ¶ 77.)  That implication is refuted by Plaintiff's Exhibit 48 itself,

which states that "message-driven communication planning has been incorporated as a tool to

establish the ***scientific basis*** of the product profile[.]"  (Dkt. 88-48 at 4) (emphasis added.)  The

document further states that the communications plan is a "scientific communications strategy,"

and that "[s]cientific data will be used to support all aspects  (Dkt. 88-48 at 4.)

78.    The FDA Briefing document from the 3/4/2004 advisory meeting stated that
"[t]he observed SIR for all lymphomas was 5.4 (95% CI, 2.6, 10.0) compared to the general
population. The increased incidence of lymphomas observed among these adalimumab-treated
patients raised concerns about whether adalimumab increases the risk of development of
lymphomas. Published literature suggests that RA patients have an approximately 2-fold higher
risk of lymphoma than the general population. Exhibit 49 at 27-28 (FDA Briefing Document). In
addition, in controlled clinical trials there were 6 cases of lymphoma found in those treated with
TNF-blockers, and 0 cases of lymphoma in the controls. Exhibit 50 at 216:5-217:20 (FDA
Minutes).

**RESPONSE:**

Abbott admits for purposes of this motion that plaintiff correctly quotes Plaintiff's Exhibit 49 (Dkt. 88-49) at 27-28, with the qualification that plaintiff omits relevant language immediately following her quote (omitted language indicated in bold):

> The observed SIR for all lymphomas was 5.4 (95% CI, 2.6, 10.0) compared to the general population.  The increased incidence of lymphomas observed among these adalimumab-treated patients raised concerns about whether adalimumab increases the risk of development of lymphomas.  Published literature suggests that RA patients have an approximately 2-fold higher risk of lymphoma than the general population.  **Furthermore, RA patients with highly active disease have an even greater risk of lymphomas, in the same range as the SIR reported for adalimumab-treated patients. Analysis of the time-to-onset of the cases of lymphoma seen with adalimumab did no provide evidence of a relationship to duration of adalimumab therapy.**

(*Id.*) (emphasis added.)

Abbott admits for purposes of this motion that Plaintiff's Exhibit 50 (Dkt. 88-50) states that (1) "For adalimumab in the controlled portions of the clinical trials, two cases of lymphoma were observed among 1380 patients who saw a mean exposure of 0.6 years. In the placebo control arms of these trials, zero cases of lymphoma were observed among 690 patients with 0.5 years mean exposure." (*Id.* at 216:5-10); (2) "For etanercept, one case of lymphoma was observed in the controlled portions of the clinical trials in the etanercept arm, among 2502 patients receiving a mean exposure of 0.5 years.  In the placebo arms of these trials, no cases of lymphoma were observed among 921 patients with a mean exposure of 0.5 years." (*Id.* at 216:21-217:5); and (3) "Finally, for infliximab, in the controlled portions of the clinical trials, three cases of lymphoma were seen among infliximab treated patients, among 2421 patients who received a mean exposure of one year.  In the placebo control arms of those same studies, there were no cases of lymphoma among 489 patients with a mean exposure that was similar to the infliximab group of 0.9 years." (*Id.* at 217:12-20.)

79.     Dr. John Medich believes there existed a risk difference between RA patients and RA patients treated with Humira that was not explained by the label:

Q:     And we've already talked about this, but the data showed that the risk of lymphoma for those patients you studied in your clinical trials showed it was five times higher than expected in the background population correct?

A:     Than in the general population.

Q:     And if it's true that the FDA said, well, in the RA population, it should be twice as high, then there's still a 2-and-a-half-times greater risk that's not explained by that particular confounder; true or not?

A:     It still means there's a difference that's not explained by the FDA position of two-fold increase.

Exhibit 28 at 49:17-50:6 [CONFIDENTIAL].

**<u>RESPONSE:</u>**

Denied.  Abbott denies that the testimony quoted in Plaintiff's Exhibit 28 (Dkt. 88-28) [FILED UNDER SEAL] at 49:17-50:6 establishes that Dr. Medich believed there existed a lymphoma risk difference between rheumatoid arthritis patients and rheumatoid arthritis patients treated with Humira that was not explained by the label, as plaintiff asserts.  Dr. Medich did not testify that the risk difference was "not explained by the Humira label"; rather, he testified "[i]t still means there's a difference that's not explained by the FDA's position of two-fold increase." (*Id.* at 50:5-6.)  Additionally, as Plaintiff's Exhibit 49 (Dkt. 88-49) (FDA Briefing Document 3/4/2003) makes clear, the FDA has recognized that "RA patients have an approximately 2-fold higher risk of lymphoma than the general population," and that "[f]urthermore, RA patients with highly active disease have an even greater risk of lymphomas, in the same range as the SIR [standardized incidence ratio] reported for adalimumab [Humira]-treated patients." (*Id.* at 27-28.)

80.     The 2002 Humira label that was in effect at the time Dr. Pastan prescribed Humira to Maureen Calisi said nothing about the risk difference seen in clinical trials between those persons with RA taking Humira, and those with RA taking placebo:

"Lymphomas have been observed in patients treated with TNF blocking agents including HUMIRA. In clinical trials, patients treated with HUMIRA had a higher incidence of lymphoma than the expected rate in the **general population** (see ADVERSE REACTIONS-Malignancies). While patients with rheumatoid arthritis, particularly those with highly active disease, may be at a higher risk (up to several fold) for the development of lymphoma, the role of TNF blockers in the development of malignancy is not known.

Among 2468 rheumatoid arthritis patients treated in clinical trials with HUMIRA for a median of 24 months, 48 malignancies of various types were observed, including 10 patients with lymphoma. The Standardized Incidence Ratio (SIR) (ratio of observed rate to age-adjusted expected frequency in the general population) for malignancies was 1.0 (95% CI, 0.7, 1.3) and for lymphomas was 5.4(95% CI, 2.6, 10.0). An increase of up to several fold in the rate of lymphomas has been reported in the rheumatoid arthritis patient population, and may be further increased in patients with more severe disease activity. (see WARNINGS-Malignancies). The other malignancies observed during use of HUMIRA were breast, colon-rectum, uterine-cervical, prostate, melanoma, gall bladder, bile ducts, and other carcinomas.

Exhibit 51 at 7, 11 (2002 Label) (Emphasis added).

**RESPONSE:**

Admitted for the purposes of this motion.

81.     The clinical trial comparison data between those with RA taking Humira verse those with RA taking placebo was added in 2004: "In the controlled portions of clinical trials of all the TNF-blocking agents, more cases of lymphoma have been observed among patients receiving TNF blockers compared to control patients. During the controlled portions of HUMIRA trials in patients with moderately to severely active rheumatoid arthritis, 21 lymphomas were observed among 1380 HUMIRA-treated patients versus 0 among 690 control patients (mean duration of controlled treatment approximately seven months). Exhibit 52 at 11 (2004 Label).

**RESPONSE:**

Abbott admits that Plaintiff's Exhibit 52 (Dkt. 88-52) states: "In the controlled portions of clinical trials of all the TNF-blocking agents, more cases of lymphoma have been observed among patients receiving TNF blockers compared to control patients.  During the controlled portions of HUMIRA trials in patients with moderately to severely active rheumatoid arthritis, 2

lymphomas[5] were observed among 1380 HUMIRA-treated patients versus 0 among 690 control patients (mean duration of controlled treatment approximately 7 months)." (*Id.* at 11.)

82.     Maureen Calisi unequivocally testified that if she was aware that her use of Humira could potentially cause her cancer, she would have not taken it:

Q:     If during the period of time from 2003, when you started taking Humira, until 2008, when you discovered this lump in your breast, if you had received a warning from Abbott, whether on TV or video or in any way that was calculated to get your attentions, and they said to you, "hey Maureen, this drug, you know, could cause you to have cancer, what would you have done?

A:     Well, as I -- as I responded before, if you see the word "cancer" in something, you're not going to take it, and I would not have taken it. I would have called Dr. Pastan immediately.

Exhibit 53 at 72:20-72:8 (Deposition Excerpts of Maureen Calisi).

**RESPONSE:**

Denied.  Plaintiff's self-serving testimony is contradicted by both the warnings provided by Abbott and by Dr. Pastan's sworn testimony, which is consistent with the contemporaneous medical records.   The Humira Patient Information included in the Humira package explicitly warned that Humira could "increase her risk for cancer":

Malignancies: There have been very rare cases of certain kinds of cancer in patients taking HUMIRA or other TNF blockers. People with more serious RA that have had the disease for a long time may have a higher than average risk of getting a kind of cancer that affects the lymph system, called ***lymphoma***.  ***If you take HUMIRA or other TNF blockers, your risk may increase***.

(App. 11 (12/31/2002 Humira label) at ABT01614287) (emphasis added).)   And Dr. Pastan testified that, as indicated in his hand-written progress note from plaintiff's November 20, 2003 visit, he explicitly discussed the potential risks of Humira, including lymphoma, with plaintiff before prescribing the drug:

---

5 Plaintiff's filed version of Pl.'s SUMF (Dkt. 86) contains a typo in ¶ 81, stating "21 ympbomas" instead of "2 lymphomas."  To avoid any confusion, the July 30, 2004 Humira label states that "2 lymphomas were observed among 1380 HUMIRA-treated patients."

Q.  Let's move to the third point in the plan on Page 24 of Exhibit 2, your November 20, 2003 patient visit with her.  Could you tell me what you noted in Point 3?

A.  That I discussed TNF inhibitors with -- with her.  Specifically we talked about Humira at length, and we discussed -- it says all toxicities, the risk of infection, hematologic problems, neurologic problems, possible association with neoplasia, leukemia, lymphoma, and that I gave her a video to look at, as well as literature.

(App. 22 (Pastan Dep.) at 156:11-21; *see also* App. 15 (November 20, 2003 Progress Note) at

CALISI-PASTAN-000024 [FILED UNDER SEAL].)

83.     Plaintiff's rheumatologists, Dr. Robert Pastan, believes that Maureen had other treatment options still available to her at the time of her Humira prescription:

Q:      So apart from TNF inhibitors, what other treatment options were available to Mrs. Calisi at this point, after you've gone through the nonsteroidals, the corticosteroids and the DMARDs and they either weren't having an effect or they were having toxic side effects?

A:      Oh, I'm sorry. You know, there were a few. There's a drug called leflunomide, Arava, that I didn't put her on.

Exhibit 54 at 154:1-154:1 (Deposition Excerpts of Robert Pastan).

**RESPONSE:**

Denied.  Plaintiff mischaracterizes Dr. Pastan's testimony.  Dr. Pastan testified that "it

was appropriate to start moving on to a TNF inhibitor" because all other therapies had failed for

lack of efficacy or because plaintiff experienced toxicities and was still "miserable" from her

rheumatoid arthritis pain (Abbott's SUF ¶ 89.).  Dr. Pastan also testified that plaintiff by then

"had very significant disease" and had "graduated beyond corticosteroids, DMARDs, and

nonsteroidals." (*Id.* ¶ 90.)  Finally, contrary to plaintiff's contention, Dr. Pastan concluded that

leflunomide was not an appropriate alternative course of treatment for plaintiff:

Q.      So apart from TNF inhibitors, what other treatment options were available to Mrs. Calisi at this point, after you've gone through the nonsteroidals, the corticosteroids and the DMARDs and they either weren't having an effect or they were having toxic side effects?

A.      Oh, I'm sorry.  You know, there were a few.  There's a drug called leflunomide, Arava, that I didn't put her on. ***But I just felt that that's very similar to methotrexate.  It***

75

*doesn't, you know -- I felt that in my opinion, she'd graduated beyond these kinds of drugs.*

Q.    So it was your opinion in November '03 she had graduated beyond corticosteroids, DMARDs and nonsteroidals?

A.    And that her disease was so severe and so -- affecting her so badly that I wanted to do what I could to help her.  Yeah.  That's correct.

Q.    And this one drug that you had mentioned, leflunomide, is that another DMARD?

A.    It is.  Leflunomide.

Q.    And you said it was similar to methotrexate?

A.    Yes.

Q. So trying yet a fifth DMARD, in your opinion as a rheumatologist, wouldn't be the right way to go?

A.    In this particular patient, no.

(App. 22 (Pastan Dep.) at 154:5-155:6 (emphasis added).)

84.    On September 28, 2012, in a separate Humira/lymphoma case in which the prescribing physician was being directly paid to Abbott, Massachusetts Federal Judge William Young acting as a visiting Judge both denied Abbott's learned intermediary defense and certified the learned intermediary question to the Tennessee Supreme Court, stating that warnings issues are usually for a jury to decide.

"Minute Entry for proceedings held before Judge William G. Young: Motion Hearing held on 9/28/2012 re [190] MOTION for Summary Judgment filed by Abbott Laboratories. After hearing from the parties, the Court enters an Order granting in part, denying in part [ 190] MOTION for Summary Judgment - the motion is allowed as to Count I, Count V is dismissed and denied as to all other counts. The Court grants [193] MOTION to Certify Questions of State Law to Tennessee Supreme Court, finds as moot [ 185] MOTION for Hearing (*for Scheduling Conference and New Scheduling Order*).

Exhibit 55 at 1.

**RESPONSE:**

Admitted in part, denied in part.  Abbott admits that on September 28, 2012, Judge

Young denied in part Abbott's motion for summary judgment on learned intermediary in *Jones*

*v. Abbott Labs.* (W.D. Tenn.) and granted plaintiff's motion to certify questions of state law to

the Tennessee Supreme Court.  Abbott denies that Plaintiff's at 77:20-78:16 Exhibit 55 supports

plaintiff's contention that Judge Young "stat[ed] that warnings issues are usually for a jury to

decide."

Abbott also denies plaintiff's misleading implication that Judge Young denied Abbott's

motion for summary judgment because plaintiff's prescribing physician in *Jones v. Abbott Labs.*

had received compensation from Abbott.  Judge Young did not issue a written opinion stating the

grounds for his partial denial of the motion for summary judgment.  (*See* Plaintiff's Exhibit 55

(Dkt. 88-55.)   Plaintiff has offered no evidence to support her implication that physician

compensation was the basis for this partial denial, and Abbot denies that Plaintiff's Exhibit 55

supports her assertion that "[t]he direct payments that Abbott was making to Dr. Pastan . . . are

ample records facts, in and of themselves, to deny Abbott's learned intermediary arguments."

(Pl.'s MSJ Opp. at 35 (citing Pl.'s SUMF ¶ 84).)

85.    In response to the Bongartz publication, Abbott specifically orchestrated an
"action plan" to discredit and/or otherwise minimize the study results. Exhibit 22
[CONFIDENTIAL]. Included in their plan was soliciting advise, strategy, and the assistance of
their "non-independent" Key Opinion Leaders, Schiff, Cush, and Kavanaugh. *Id.* Components
included a communications strategy, publication, and sales force talking points. *Id.*

**<u>RESPONSE:</u>**

Denied.  Abbott denies plaintiff's characterization of Plaintiff's Exhibit 22 (Dkt. 88-22)

[FILED UNDER SEAL].  Plaintiff has offered no evidence that Abbott sought to "discredit" or

to "minimize" the results of the Bongartz study, and Abbott denies that Plaintiff's Exhibit 22

supports this characterization.   Thus, Abbott denies that Plaintiff's Exhibit 22 supports her

contention that "[Abbott] orchestrated a widespread attack on the Bongartz paper in the scientific

community and went to great lengths to both minimize and discredit the results."  (Pl.'s MSJ

Opp. at 14-15 n.17 (citing Pl.'s SUMF ¶¶ 16, 85).)  (*See also* Response ¶ 16.)

Dated:  December 14, 2012

Respectfully submitted,

_/s/ Michael P. Foradas_

| | |
|---|---|
| Richard M. Zielinski (BBO No. 540060) | Michael P. Foradas (Ill. Bar No. 6180229) |
| Elizabeth K. Levine (BBO No. 658532) | Douglas G. Smith (Ill. Bar No. 6238127) |
| GOULSTON & STORRS | Renee D. Smith (Ill. Bar No. 6229448) |
| 400 Atlantic Ave | Andrew P. Bautista (Ill. Bar No. 6280952) |
| Boston, MA 02110-2607 | Brenton Rogers (Ill. Bar No. 6291926) |
| (617) 574-4029 | Whitney L. Becker (Ill. Bar No. 6302375) |
| (617) 574-7664 (fax) | (all admitted _pro hac vice_) |
| rzielinski@goulstonstorrs.com | KIRKLAND & ELLIS LLP |
| elevine@goulstonstorrs.com | 300 North LaSalle Street |
| | Chicago, IL 60654 |
| Traci L. Shafroth (Cal. Bar No. 251673) | (312) 862-2000 |
| (admitted _pro hac vice_) | (312) 862-2200 (fax) |
| KIRKLAND & ELLIS LLP | mforadas@kirkland.com |
| 555 California Street | dsmith@kirkland.com |
| San Francisco, CA 94104 | rdsmith@kirkland.com |
| (415) 439-1400 | abautista@kirkland.com |
| (415) 439-1500 (fax) | brogers@kirkland.com |
| traci.shafroth@kirkland.com | whitney.becker@kirkland.com |

_Attorneys for Defendant Abbott Laboratories_   _Attorneys for Defendant Abbott Laboratories_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 14, 2012, I electronically filed the foregoing document with the clerk of the U.S. District Court for the District of Massachusetts, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who are known as the "Filing Users":

Arnold A. Vickery
Jim M. Perdue
Fred H. Shepherd
PERDUE KIDD & VICKERY
510 Bering Dr., Suite 550
Houston, TX 77057-1469
(713) 526-1100
(713) 523-5939 (fax)
andy@justiceseekers.com
jperduejr@justiceseekers.com
fred@justiceseekers.com

Christopher C. Trundy
240 Union Street
P.O. Box 1203
New Bedford, MA 02741
(508) 984-4000
(508) 999-1670 (fax)
christrundy@trundylaw.com

*Attorneys for Plaintiff*

/s/ Andrew P. Bautista
Andrew P. Bautista