**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| | ) |
| **MAUREEN E. CALISI,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | )   **Civil Action No. 11-10671-DJC** |
| | ) |
| **ABBOTT LABORATORIES,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    **September 27, 2013**

**I.     Introduction**

Maureen Calisi ("Calisi") has sued Abbott Laboratories ("Abbott") alleging breach of warranty ("Count I") and negligence ("Count II").  In both of these counts, Calisi asserts that Abbott failed to warn Calisi and her treating rheumatologist, Dr. Robert Pastan ("Pastan"), about the alleged risks of developing lymphoma from taking the drug Humira.  Abbott has moved for summary judgment on both counts and has also moved to exclude the testimony of all four of Calisi's proffered expert witnesses under Fed. R. Evid. 702.  D. 59, 61, 64.  For the reasons explained below, the Court GRANTS Abbott's motion to exclude Calisi's "warnings" expert, Michael Hamrell. D. 59.  The Court further GRANTS Abbott's motion for summary judgment on both counts as both amount to claims for negligent duty to warn.  D. 64.  The Court DENIES as moot Abbott's motion to exclude Calisi's "causation" expert witnesses.  D. 61.

**II.     Background**

The following facts are undisputed.   In December 2002, the Food and Drug Administration ("FDA") approved Abbott's drug Humira for use in the United States in treating

1

moderate to severe rheumatoid arthritis.  D. 87 ¶¶ 14, 16.  Humira is a "tumor necrosis factor" or

"TNF" inhibitor, also known as an anti-TNF or TNF-blocker drug.  Id. ¶ 16; D. 65 Exh. 11 at 6.

Humira was the third anti-TNF drug approved by the FDA for treating rheumatoid arthritis; the

first two anti-TNF drugs approved were Remicade and Enbrel.  D. 87 ¶¶ 16-18.  The December

2002 Humira Label ("December 2002 Label" or "2002 Label") stated:

> **WARNINGS**
> **Malignancies**
> Lymphomas have been observed in patients treated with TNF blocking agents
> including HUMIRA.   In clinical trials, patients treated with HUMIRA had a
> higher incidence of lymphoma than the expected rate in the general population
> **(see ADVERSE REACTIONS-Malignancies)**.  While patients with rheumatoid
> arthritis, particularly those with highly active disease, may be at a higher risk (up
> to several fold) for the development of lymphoma, the role of TNF blockers in the
> development of malignancy is not known.
> ...
> Malignancies
> Among 2468 rheumatoid arthritis patients treated in clinical trials with HUMIRA
> for a median of 24 months, 48 malignancies of various types were observed,
> including 10 patients with lymphoma.  The Standardized Incidence Ratio (SIR)
> (ratio of observed rate to age-adjusted expected frequency in the general
> population) for malignancies was 1.0 (95% CI, 0.7, 1.3) and for lymphomas was
> 5.4 (95% CI, 2.6, 10.0).   An increase of up to several fold in the rate of
> lymphomas has been reported in the rheumatoid arthritis patient
> population[footnote], and may be further increased in patients with more severe
> disease activity[footnote] (see WARNINGS-Malignancies). . . .
> ...
> What important information do I need to know about side effects with HUMIRA?
>
> Malignancies: There have been very rare cases of certain kinds of cancer in
> patients taking HUMIRA or other TNF blockers. People with more serious RA
> that have had the disease for a long time may have a higher than average risk of
> getting a kind of cancer that affects the lymph system, called lymphoma. If you
> take HUMIRA or other TNF blockers, your risk may increase.

D. 87 ¶ 21 (footnote text modified).

Abbott made changes to the Humira label between 2003 and 2011.  Ans., D. 42 ¶ 52.  For

example, the label in 2004 included the following language:

> In the controlled portions of clinical trials of all the TNF-blocking agents, more cases of lymphoma have been observed among patients receiving TNF blockers compared to control patients. During the controlled portions of HUMIRA trials in patients with moderately to severely active rheumatoid arthritis, 21 lymphomas were observed among 1380 HUMIRA-treated patients versus 0 among 690 control patients (mean duration of controlled treatment approximately seven months).

D. 105 ¶ 81.

In late 2003, Maureen Calisi suffered from advanced rheumatoid arthritis.  D. 87 ¶ 8. Calisi's treating rheumatologist, Dr. Robert S. Pastan, prescribed Humira.  Id.  Calisi continued taking Humira until February 2008 when Calisi was diagnosed with lymphoma.  Id. ¶ 9.  Calisi's lymphoma was in remission by August 2008.  Id. ¶ 10.  In February 2012, Calisi's lymphoma relapsed.  Id. ¶ 11.

On April 18, 2011, Calisi filed suit against Abbott.  D. 1.  The operative second amended complaint ("SAC") alleges counts of breach of warranty ("Count I") and negligence ("Count II").  D. 39 ¶¶ 58-62.  In both of these counts, Calisi asserts that Abbott failed to warn Calisi and/or her physicians about the alleged risks of developing lymphoma from Humira.[1]  Calisi alleges that Abbott "failed to provide a legally proper warning regarding the risks of Humira,

---

[1] In her opposition to Abbott's motion for summary judgment, Calisi argues that her claims reach beyond failure to warn and include defective design.  D. 85 at 50.  The Court inquired about this issue at oral argument on Abbott's motion.  Tr. of Feb. 13, 2013 Hrg., D. 126 at 41-42, 56-58.  It is true that the SAC does not plead a breach of warranty claim explicitly in terms of failure to warn.  SAC, D. 39 ¶¶ 58-59.  Similarly, the negligence claim alleges that "Abbott was negligent in the design and testing of the drug Humira, in the marketing of the drug, and in the collection and analysis of adverse event data . . . [and that] Abbott was particularly negligent in failing to adequately warn Calisi and/or physicians."  D. 39 ¶¶ 60-61.  But the factual allegations in the SAC and the parties' focus in fact discovery (which is now complete) concerned the alleged failure to warn.  D. 126 at 61:7-17; see also Jt. Statement, D. 24 at 1 (stating Calisi's position at the case's scheduling conference in 2011 to be that "[Humira's label] warning was inadequate and misleading as to the risks involved.  Abbott had an obligation to convey complete and truthful information to Calisi and her physician about the side effects of Humira").  Where Calisi's counsel agrees that there has been no discovery on issues apart from failure to warn, D. 126 at 57, and where the SAC fails to state a plausible claim under any theory apart from failure to warn, the Court finds Calisi's claims to be limited to failure to warn.

including the risk of drug-induced cancer, to either her physician or to her, and that her injections of this drug caused her cancers."  D. 87 ¶ 13.  Noting that rheumatoid arthritis itself is a risk factor for lymphoma, Calisi also alleges that Abbott heavily markets and promotes Humira by "educating physicians" including by directing its salespeople to tell doctors that "all the risk of malignancies lies in the illness, 'not its treatment.'"[2] D. 39 ¶¶ 14, 22.  Calisi alleges that Abbott "placed any risk of malignancy and/or lymphoma on the illness not the disease in its sales message(s) to Pastan." D. 39 ¶¶ 17, 22.

On August 16, 2012, Calisi filed a motion for partial summary judgment seeking to preclude Abbott from relying on the so-called "learned intermediary" doctrine, which is described in more detail below and provides that a pharmaceutical company's duty to warn of risks from a drug flows only to the prescribing doctor and not to the patient who takes the drug. D. 51.  On October 19, 2012, Abbott filed motions for summary judgment and to exclude the testimony of Calisi's proffered expert witnesses under Fed. R. Evid. 702.  D. 59, 61, 64.  The Court heard oral argument on all motions on February 13, 2013.  D. 125.  At that hearing, the Court denied Calisi's motion for partial summary judgment, but took under advisement the question of whether Abbott had voluntarily assumed a duty to Calisi through its communications with her.  See Tr. Statement of Reasons, Hrg. of Feb. 13, 2013, D. 129 at 9-10.  The Court took the remaining motions filed by Abbott under advisement.  D. 125.

## III.   Discussion

### A.      <u>Abbott Did Not Voluntarily Assume a Duty To Warn Calisi</u>

---

[2] The parties agree that published journal articles have stated that "rheumatoid arthritis . . . increase[s] the risk of lymphoma, regardless of drug treatment," D. 87 ¶ 28-34, and that Calisi's own experts testified that "rheumatoid arthritis is a risk factor for lymphoma," which is consistent with Abbott's position on the matter.  D. 87 ¶¶ 35-36.

The Court first addresses the issue of whether Abbott voluntarily assumed a duty to warn Calisi about alleged risks of developing lymphoma from Humira.  D. 85 at 33-35 (Calisi's argument that Abbott voluntarily assumed a duty).  This Court has already ruled in this case that under Massachusetts law Abbott may rely on the "learned intermediary" doctrine, which "provides that 'a prescription drug manufacturer's duty to warn of dangers associated with its product runs only to the physician; it is the physician's duty to warn the ultimate consumer.'" Cottam v. CVS Pharmacy, 436 Mass. 316, 321 (2002) (quoting McKee v. American Home Prods. Corp., 113 Wash. 2d 701, 709 (1989)).  Calisi argues, however, that Abbott voluntarily assumed a duty to warn her directly through its communications with her.

Calisi points to the Supreme Judicial Court's observation in Cottam that a pharmacy could voluntarily assume a duty to provide complete warnings to its customers where it provides a "detailed list of warnings, or, by way of advertising, promises to provide customers with information."  Id. at 326.  The Cottam court observed:

> A pharmacy, like any other person or entity, may voluntarily assume a duty that would not otherwise be imposed on it, and thus may voluntarily assume a duty to provide information, advice or warnings to its customers. . . . Defining the scope of the duty assumed is a fact-specific inquiry.  [That inquiry depends on] the totality of the pharmacy's communications with the patient and the patient's reasonable understanding, based on those communications, of what the pharmacy has undertaken to provide.

Id. at 323-326.  Here, Calisi alleges that Abbott voluntarily assumed a duty to Calisi directly, effectively nullifying the effect of the learned intermediary doctrine, through "TV ads, . . . a website . . . a patient handout . . . [a]nd most importantly . . . a video designed to be given directly to patients by the prescribing physician."  D. 85 at 34.

This Court has already denied Calisi's motion for summary judgment asking this Court to apply a "direct to consumer" exception to the "learned intermediary" doctrine; such an exception

is not recognized by Massachusetts law.  D. 129 at 9 (transcript of Court's statement of reasons regarding learned intermediary doctrine).  The Court interprets Calisi's voluntary assumption of risk argument not to be that the direct communication per se forfeits the ability to rely on the "learned intermediary" exception, but rather whether through the "totality of . . . communications" Abbott voluntarily assumed a duty that it would not otherwise have.  The Court will assume without deciding that a Massachusetts court would apply the "voluntary assumption of duty" doctrine to a drug manufacturer where Cottam states that "[a] pharmacy, like any other person or entity, may voluntarily assume a duty that would not otherwise be imposed on it."  Cottam, 436 Mass. at 323 (emphasis added).[3]

The "determination of the scope of the duty voluntarily undertaken . . . is a fact-specific inquiry."  Cottam, 436 Mass. at 325-26.  However, "the existence of a legal duty is a question of law for the court."  Medina v. Hochberg, 465 Mass. 102, 106 & n.8 (citing O'Sullivan v. Shaw, 431 Mass. 201, 203 (2000)).  On this record, Calisi has not shown that Abbott voluntarily assumed a duty to warn her directly of any risk of developing lymphoma by taking Humira.  Here, Calisi testified that she "never paid attention" to the warnings given in the television advertisements she saw, D. 80 ¶ 26 (citing Calisi Dep., D. 52 Exh. 2 at 72), and the advertisements themselves are not in the record.  Calisi does not allege that she used the website that Abbott had created and does not describe the website's warnings about Humira.  The video by Abbott that was provided to Calisi, D. 52 Exh. 17, has a twelve-sentence scrolling message at

---

[3] Calisi cites no decision holding that a drug manufacturer voluntarily assumed a duty through its actions.  Abbott points to two cases where courts have found that various communications did not have such an effect. D. 107 at 34; see Seley v. G.D. Searle & Co., 423 N.E.2d 831, 840 (Ohio 1981) (holding that a drug manufacturer's patient brochures distributed via physicians did not trigger a "voluntary duty"); Hernandez v. Schering Corp., 958 N.E.2d 447, 454-55 (Ill. App. 2011) (holding that a drug manufacturer's instructional classes that purported to instruct patients on all side effects of a drug did not create a voluntary duty to warn and that the learned intermediary doctrine still applied).

the end that contains general warnings (e.g., "Check with your doctor before you receive any vaccines"; "You should tell your doctor if you are pregnant"; etc.) and a non-exhaustive list of side effects including "[t]he most common side effects" of the drug.  Id.  At the end of the message is the sentence, "[p]lease see full prescribing information."  Id.  This video was given to Calisi by her treating physician, Dr. Pastan, and not by Abbott. D. 80 ¶¶ 19-21.  See Seley, 423 N.E.2d at 840  (finding no voluntary assumption of duty by drug manufacturer where the patient "did not receive the allegedly deficient informational material directly from the manufacturer, but from her doctor").  Even assuming the video was as a communication by Abbott (and not Pastan who supplied the video) to Calisi, the "totality of . . . communications with the patient and the patient's reasonable understanding, based on those communications" does not support the conclusion that Abbott voluntarily assumed the duty to provide complete warnings directly to Calisi.  Cottam, 436 Mass. at 326.

### B.      Motions to Exclude Expert Testimony Offered Under Fed. R. Evid. 702

Calisi has offered four expert witnesses under Fed. R. Evid. 702 who would opine on issues of causation and the adequacy of Humira's label.  D. 37 at 1-3.  Abbott has moved to exclude all of the proffered testimony as failing to satisfy the prerequisites for admission under Fed. R. Evid. 702.  For the reasons explained below, the Court GRANTS Abbott's motion to exclude Calisi's "warnings" expert, Michael Hamrell, D. 59.  Without such evidence, Calisi cannot show the inadequacy of the warning about lymphoma to Dr. Pastan, to whom the duty to warn flows as discussed above.  Accordingly, there is no triable issue of fact as to this necessary element as to both claims that Calisi asserts against Abbott and Abbott is entitled to summary judgment, D. 64.  Consequently, the Court need not reach Abbott's motion challenging Calisi's

"causation" experts and therefore DENIES its motion seeking to exclude those experts as moot. D. 61.

### 1. Standard of Review

"The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), vested in trial judges a gatekeeper function, requiring that they assess proffered expert scientific testimony for reliability before admitting it." Milward v. Acuity Prods Grp., Inc., 639 F.3d 11, 14 (1st Cir. 2011). The federal rules of evidence reflect the judge's task. Id. Specifically:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed R. Evid. 702. The Daubert court identified four factors that can assist a court in determining whether an expert's proposed testimony should be admitted: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (citing Daubert, 509 U.S. at 593-94). "These factors 'do not constitute a 'definitive checklist or test' [and]   [g]iven that 'there are many different kinds of experts, and many different kinds of expertise,' these factors 'may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" Milward, 639 F.3d at 14 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)).

Daubert analysis focuses on "principles and methodology" used by the expert and a court may reject "opinion evidence that is connected to existing data only by the ipse dixit of the expert." Milward, 639 F.3d at 14 (quoting Daubert, 509 U.S. at 595; Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). "[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998). "This does not mean that trial courts are empowered 'to determine which of several competing scientific theories has the best provenance.'" Milward, 639 F.3d at 15. Instead, the proponent of the expert testimony must show "by a preponderance of proof" that the expert has used a "sound and methodologically reliable" reasoning process to reach his or her conclusion, and that "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. (quoting Kumho, 526 U.S. at 152); Daubert, 509 U.S. at 592 & n.10 (setting out burden).

The First Circuit has cautioned that "so long as an expert's scientific testimony rests upon 'good grounds,' based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." Milward, 639 F.3d at 15 (quoting Daubert, 509 U.S. at 590). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id.

> 2.     *Abbott's Motion to Exclude the Testimony of Michael Hamrell, Ph.D.*

Abbott moves to exclude all testimony from Michael Hamrell, Ph.D. ("Hamrell"). D. 59. Calisi has proffered Hamrell as "an expert in federal Food and Drug Administration regulations

with a specialization in drug labeling."  D. 37 at 3.  Calisi intends to call Hamrell to "testify

about the adequacy of Humira's label while [Calisi] was taking the drug."[4]  Id.  Abbott objects

on the bases that:  (1) he is "not qualified to opine on the adequacy of Humira's labels"; (2) his

"warnings opinions are purely subjective and [are] unsupported"; and that (3) his opinions about

Abbott's conduct are "subjective" and "conclusory."  D. 60 at 8-20.  The Court has reviewed the

relevant filings on this motion including but not limited to Hamrell's expert report and portions

of his deposition testimony, D. 65 Exh. 27, D. 76 Exhs. 1-2.[5]

a)    <u>Hamrell's Knowledge, Skill, Experience, Training and Education</u>

The Court reports Hamrell's background information from his expert report and

curriculum vitae except where noted.  D. 76 Exh. 1 at 3, 20.  Hamrell earned a Bachelor of

Science degree in biochemistry from the University of California, Los Angeles in 1973 and

Ph.D. in pharmacology from the University of Southern California in 1977.  Hamrell describes

pharmacology as "the study of the mechanism of action of drugs and the effects on the body."

Dep. of Hamrell, D. 65 Exh. 27 at 3(12).  After graduate school, Hamrell was a postdoctoral

fellow in cancer research at Duke University Medical Center in Durham, North Carolina.  From

---

[4] In opposing the motion to exclude Hamrell's testimony, Calisi gives a broader reason for calling Hamrell; that is, "[h]e has been designated to assist the jury with understanding why the information that Abbott trumpets as 'adequate' was, in fact, not, as well as how Abbott's marketing efforts undermined whatever words of caution may have been in the label."  D. 75 at 7.

[5] The Court has reviewed two decisions referenced by the parties addressing the admissibility of Hamrell's opinions in other cases.  A judge in California ruled that Hamrell could offer part of his opinion on a drug companies' interactions with the FDA but not as to "general cause [of a plaintiff's disease] or with respect to Defendants' communication of the [disease] risk to healthcare professionals . . . [or] with respect to the motive and intent of [d]efendants," <u>Byetta Cases</u>, JCCP4574 Complex order 6-10-09 (Cal. Sup. Ct. L.A. Jan. 27, 2012) (unpublished), <u>reproduced at</u> D. 65 Exh. 19 at 4-5.  A recent federal case in which a court declined to grant a motion to exclude Hamrell's expert testimony, <u>In Re Celexa & Lexapro Prods. Liab. Lit.</u>, MDL No. 1736, 2013 WL 791784, at *5 (E.D. Mo. Mar. 4, 2013), is discussed and distinguished in footnote 11, <u>infra</u>.

1980 to 1982, he was an Assistant Professor of Pharmacology in the Department of Pharmacology and Therapeutics at the McGill University Cancer Center in Montreal, Canada. After that, he was a drug registration manager for a small company called Anaquest and then worked at the FDA as a pharmacologist reviewer from 1985 to 1990.  Hamrell next worked as chief of regulatory affairs at the National Institutes of Health in the division of AIDS/NIAID, where he managed all regulatory aspects of the research program for clinical development of AIDS therapies from 1990 to 1992.  He worked at a private pharmaceutical company, Vestar, Inc., from 1992 to 1993 where he was director of regulatory affairs.  He then founded a consulting company in 1994,[6] where he provided "comprehensive regulatory affairs consulting and training to pharmaceutical, biotechnological and medical device industries."  D. 76 Exh. 1 at 2.  Over the past twenty-five years, he has "conducted basic research studies, set up regulatory affairs departments for pharmaceutical companies, developed regulatory plans, performed audits to assure compliance with regulatory requirements, and managed the preparation of marketing applications for both domestic and international regulatory agencies."  D. 76 Exh. 1 at 3.

To prepare his opinions in this case, Hamrell stated in his expert report that he reviewed information including depositions of Abbott employees and others; related exhibits; publicly available FDA materials including clinical reviews, labeling supplements and advisory committee meetings; medical literature on TNF inhibitors including Humira; and the expert reports of doctors Gershwin, Soiffer and Goldsmith.  D. 76 Exh. 1 at 5.  Hamrell's expert report

---

[6] The Court also notes that Hamrell has done work for Abbott itself on a number of projects and Calisi notes the irony in Abbott attacking the reliability of its former consultant.  D. 75 at 13.  But here, the Court concludes, for the reasons discussed below, that Calisi has not met her burden to show how Hamrell's opinion regarding the adequacy of warnings is admissible under Fed. R. Evid. 702 based on the record now before the Court.

quotes from portions of the December 2002 label as well as a February 2008 Humira label ("February 2008 label" or "2008 label").  D. 76 Exh. 1 at 14-16.

b)   <u>Hamrell's Proffered Opinions</u>

The opinion that Hamrell offers that Abbott challenges is the ultimate opinion that its warnings regarding lymphoma were inadequate.  Accordingly, this Court shall consider it under the standards set forth by <u>Daubert</u> and its progeny.

(1)   Humira Label Inadequacy and Company "Downplaying" Association

Hamrell opines that "[t]hrough the entire time that Ms. Calisi used Humira, the Humira label failed to provide adequate information to doctors and patients concerning the risk of lymphoma associated with the use of Humira.  Furthermore, statements by the company downplayed the possible association between Humira and lymphoma."  D. 76 Exh. 1 at 6. Abbott challenges these opinions and also challenges statements in Hamrell's proffered basis for his opinion as written in his expert report that the December 2002 and February 2008 labels are "misleading" and that the February 2008 Humira label was "probably more misleading and confusing than the 2002 label."   D. 60 at 11 (quoting D. 76 Exh. 1 at 13-14).   Abbott also challenges Hamrell's proposed warnings that Hamrell contended "could have been implemented and would have been much more informative."  D. 60 at 11.

Hamrell opines that the Humira labels did not provide "adequate information to doctors and patients."  D. 76 Exh. 1 at 6.  First, where Abbott relies on the learned intermediary defense (i.e., that Abbott's duty to warn flows to the doctor), the label's communication to the patient would not "help [the jury] understand the evidence" or "determine a fact in issue."  Fed R. Evid.

703(a).[7]   However, an expert's opinion that the label failed to "provide adequate information to doctors" would be helpful to the jury and so that aspect of the proposed testimony satisfies Fed. R. Evid. 703(a).

Hamrell's opinion as to adequacy of the Humira labels relies in part on his opinion as to the completeness of the label in representing the results of clinical studies.  D. 76 Exh. 1 at 15-17; D. 65 Exh. 27 at 33(131) (opining that the December 2002 Humira label is "not inaccurate, but it's not complete either"); D. 65 Exh. 27 at 58(232) (opining that the February 2008 Humira label "is factually correct . . . but it's not the complete story").  Hamrell's opinion as to the label's factual incompleteness appears to be based on sufficient facts, i.e., the information contained in the various labels' text and on the information about clinical studies that Abbott possessed at the time those labels were created.  D. 76 Exh. 1 at 14-17.  Hamrell's opinion as to completeness inter alia relates to the how Abbott presented the general and statistical results of clinical trials.  Id.  Hamrell testified that he knew and understood statistics.  D. 65 Exh. 27 at 14(55).  Hamrell testified that he reviewed clinical trials and clinical data in his prior jobs, including at the FDA.  D. 65 Exh. 27 at 9(36).

However, Hamrell's proffered opinion concerns not only whether the message of the label is complete, but also the opinion that the labels are "misleading" and "confusing."  D. 76 Exh. 1 at 15.  Hamrell's ultimate opinion is that the label "failed to provide adequate information to doctors."   But adequacy is an undefined concept without a reference point; the relevant question is for what purpose is the information inadequate?   Hamrell acknowledged that the

---

[7] Separately, an expert opinion is not essential as to the question of whether the Humira label provided adequate information to patients where the jury is capable of understanding the evidence in that regard.  See Cottam, 436 Mass. at 326 (rejecting need for expert where evaluation of consumer drug warning "involved a commonsense determination regarding the understanding of an ordinary, reasonably prudent person, a determination properly left to the jury without expert testimony").

label's target audience is "prescribing physicians."  D. 65 Exh. 27 at 35(140).[8]  Here, the plain

purpose of the information is to allow a medical doctor to make a properly informed decision

when prescribing a drug.  Even if a prescribing doctor agreed with all of the alleged defects that

Hamrell identifies in all of the Humira labels (e.g., the label is "not inaccurate, but it's not

complete either"), the key issue is whether the accurate—but incomplete—information would be

adequate information to such a physician.   For instance, the Humira label includes the

information:

> There have been very rare cases of certain kinds of cancer in patients taking
> HUMIRA or other TNF blockers.  People with more serious RA that have had the
> disease for a long time may have a higher than average risk of getting a kind of
> cancer that affects the lymph system, called lymphoma.  If you take HUMIRA or
> other TNF blockers, your risk may increase.

D. 87 ¶ 21.  Looking at this and at other warning language on the label, Hamrell opined that, this

language did not amount to an adequate warning," D. 65 Exh. 27 at 33(129-132), and that the

labels did not give "adequate information to doctors . . . concerning the risk of lymphoma

associated with the use of Humira."  D. 76 Exh. 1 at 6.

The issue before the Court is whether Calisi, as the proponent of expert evidence, has

shown that Hamrell has a reliable basis for his opinion; i.e., that his "testimony is based on

sufficient facts or data" and that the "testimony is the product of reliable principles and methods"

and that he "has reliably applied the principles and methods to the facts of the case."  Fed. R.

Evid. 702.  That is, Calisi must show that Hamrell's opinion on adequacy is not "connected to

existing data only by the ipse dixit of the expert."  Milward, 639 F.3d at 14.

_____

[8] The parties do not dispute that "Dr. Hamrell agreed that 'according to FDA regulations, labeling is written for healthcare practitioner audience because prescription drugs require professional supervision of a practitioner licensed by law to administer such a drug[.]'  He also agreed that 'according to FDA regulations, the purpose of the labeling is to provide healthcare practitioners information necessary for safe and effective use,' testifying '[t]hat's the primary focus.'"  D. 87 ¶ 26.

Calisi has not made this showing.  First, it is not clear that Hamrell possessed sufficient facts or data to provide a basis for his opinion that the Humira labels "failed to provide adequate information to doctors."  Fed. R. Evid. 702(b).  To make this assertion, Hamrell has to have a sufficient basis for understanding what information is needed by a doctor in making his or her prescribing decision.  Without knowing the baseline of what information is needed, it is not possible to opine meaningfully on the information's adequacy for that purpose.

Hamrell is not a medical doctor and does not have "qualifications to opine on what is clinically appropriate in terms of treating patients."  D. 65 Exh. 27 at 14(53).  Hamrell is neither an expert in, nor has he received specialized training in, psychology, cognitive decision making or behavioral science.  D. 65 Exh. 27 at 14(54-55).  Nor does Hamrell point to facts, such as those acquired through his experience, as to how the label's relevant target audience would interpret the Humira labels.  The problem is illustrated by the following exchange between Abbott's counsel and Hamrell at his deposition:

> Q:  You have made an opinion that this warning is not meaningful to doctors, correct?
> A:  Yes.
> Q:  Okay. Is there any data you can point to that shows that this warning is not meaningful to doctors?
> A:  I believe Dr. Pastan said that he didn't find the warning to provide meaningful information to him to understand what the risk was.
> Q:  Okay. Well, we will look at Dr. Pastan's deposition in a minute. Aside from Dr. Pastan, is there one single doctor who has opined on whether he or she considered this warning meaningful?
> A:  I don't know.
> Q:  Have you conducted any research on it?
> A:  No.
> Q:  Have you conducted a focus group?
> A:  No.
> Q:  Have you asked a single treating physician?
> A:  No.
> Q:  Have you asked a rheumatologist?
> A:  No.
> Q:  Have you reviewed any literature addressing this issue?

A:  No.

Q:  You know there is a whole body of literature on cognitive decision making, correct?

A:  I don't know if there is or not.

Q:  Okay. So I take it you have not consulted that body of literature in forming your opinions in this case, correct?

A:  That's correct.

Q:  Is it also your opinion that this language in the 2002 label downplays and otherwise obfuscates the risks and presents the data in a way that is confusing?

A:  Are you reading from something specific -- or I don't know what you are referring to.

Q:  I am referring to your expert report. . . .

. . .

Q:  And is there any empirical data that supports your opinion that the warning downplays the risk?

A:  That's my opinion.

Q:  Okay. Is there any empirical data that supports that opinion?

A:  Not that I'm aware of.

Q:  Okay. Is there any published literature that supports your opinion that the warning downplays the risk?

A:  Not that I know of.

Q:  Is there any published literature that supports your opinion that the warning obfuscates the risk?

A:  Not that I know of.

Q:  Is there any peer reviewed study that supports your opinion the warning downplays the risk?

A:  I don't know.

Q:  You can't name any today, correct?

A:  No.

Q:  Is there any peer reviewed study that supports your opinion that the label obfuscates the risk of lymphoma?

A:  I don't know.

Q:  Have you sought the opinions of any medical doctors regarding whether they thought this language was confusing?

A:  No.

Q:  Have you sought the opinions of any medical doctors regarding whether they thought the language downplayed the risks of lymphoma?

A:  No.

Q:  Have you conducted any survey regarding how doctors interpreted this warning?

A:  No.

Q:  Have you conducted any focus groups regarding how doctors interpreted this warning?

A:  No.

> Q:  Have you solicited the opinion of one single medical doctor regarding how they interpreted this label?
> A: No.
> Q:   And, as we discussed before, it is the prescribing physicians who are the audience for FDA-approved labeling, correct?
> A: Yes.

D. 65 Exh. 27 at 34(135)-35(140) (objections removed); see also id. at 56(223)-57(225) (similar exchange as to 2008 label).  Hamrell offers almost no facts to form the basis for his "adequacy" opinion as it relates to prescribing doctors, i.e., what prescribing doctors would find adequate.[9] The Court finds that Hamrell has not satisfied the requirement under Fed. R. Evid. 702(b) that he has based his opinion on sufficient data so as to be reliable.

Moreover, Hamrell has not shown that his testimony would be the product of reliable principles and methods.  Fed. R. Evid. 702(c).  Nor has Hamrell shown that he has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702(d).  Hamrell uses no methodology other than his experience to assess the effect of the label on a prescribing medical doctor.   He took no steps to determine if the label is misleading, confusing or downplayed any relevant risk.   "While an expert may . . . testify solely on the basis of experience, he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and that that experience is reliably applied to the

---

[9] Abbott argues that Hamrell's characterization of Dr. Pastan's testimony does not reflect Pastan's deposition where Pastan does not opine as to whether the warning provided meaningful information.  D. 60 at 16-17; see also D. 75 at 20 (arguing that Hamrell's characterization was correct).  Pastan never directly opined as to whether the label provided him with meaningful information.  Pastan did testify (although when asked about Abbott's sales representatives and not with respect to the label) that "I'm constantly looking for that answer.  Is [lymphoma risk] higher than one would expect in bad RA alone?   And the conclusion has been that it's not known."  Dep. of Pastan, D. 65 Exh. 22 at 80(318); D. 75 at 20 n.27.  Pastan also testified that the language from the Humira label that "people with more serious RA that have had the disease for a long time may have a higher than average risk of getting a kind of cancer that affects the lymph system called lymphoma.  And if you take Humira or other TNF blockers, your risk may increase" was consistent with his understanding in 2003 about the risk of lymphomas.  D. 65 Exh. 22 at 47(185).

facts."  McGovern v. Brigham & Woman's Hosp., 584 F. Supp. 2d 418, 426 (D. Mass. 2008)

(citation omitted).  Here, while Hamrell is qualified to opine on other topics, he is not qualified

to opine as to the adequacy for prescribing purposes or confusion that this may generate in the

label's target audience.   This is especially true where a prescribing physician would have

training, knowledge and expertise not shared by Hamrell, and so based on his own training,

knowledge and expertise Hamrell would not be in the position to opine about how that

prescribing doctor would have interpreted the label.  For these reasons, Calisi has not shown that

Hamrell's testimony as to adequacy or physician perception would be the product of reliable

principles or methods or that he has reliably applied the principles and methods to the facts of the

case.  Fed. R. Evid. 702(c)-(d).  Hamrell also proposes to offer alternative label language that is

more "informative" and more "complete" that Abbott's labels.[10]  He proposes language that

reads in part:

> It is thought that patients with rheumatoid arthritis, particularly those with highly
> active disease, may be at a 2-3 fold increased risk for the development of
> lymphoma. While the SIR of 5.2 for Humira cannot be directly compared to the 2-
> 3 for the rheumatoid arthritis population, such results suggest that the use of
> Humira poses an increased risk for development of lymphoma beyond that of
> rheumatoid arthritis itself.

D. 65 Exh. 27 at 44(175).  The question is whether Hamrell has satisfied the proposed Fed. R.

Evid. 703 factors.  Abbott's counsel and Hamrell had the following exchange at his deposition:

> Q:  Is there any empirical data you can point to showing that the language you
> have suggested would be considered more informative by prescribing physicians?
> A:  No.
> Q:  Okay. Have you asked one single prescribing physician whether the language
> you suggested would have been informative?
> A:  No.
> Q:  Can you cite any published literature supporting your conclusion the language
> that you have cited would have been informative?

---

[10] The Court does not reach Abbott's challenge to the reliability of Hamrell's testimony
that his proposed Humira label "could have been implemented."  D. 60 at 11.

A:  No.
Q:  Or more informative? Sorry.
A:  No.

D. 65 Exh. 27 at 46(184)-47(185).  Asked why his proposed language for the 2002 label would

be stronger than Humira's actual label, Abbott's counsel and Hamrell had this exchange:

Q:  And is there -- what is the basis for that statement?
A:  It's my opinion.
Q:  And is that opinion based on any peer reviewed literature?
A:  No.
Q:  Is that opinion based on any published literature of any kind?
A:  No.
Q:  Is that opinion based on --- is that opinion supported by a single healthcare
professional?
A:  I don't know.
Q:  You haven't inquired of any single healthcare practitioner whether they
interpret your proposed label as stronger than the label that was in effect in 2002?
A:  No.
Q:  You haven't asked a single rheumatologist?
A:  No.
Q:  You haven't surveyed a group of medical professionals?
A:  No.
Q:  You haven't conducted a focus group?
A:  No.

D. 65 Exh. 27 at 47 (187-88) (objection removed).  For the same reasons that this Court found

Hamrell's adequacy testimony not to satisfy Fed. R. Evid. 702, Hamrell would not be qualified

to testify as to this (proposed, alternative) label's impact on prescribing physicians; i.e., whether

they would find the information conveyed to be adequate.  In addition to those reasons given

above, there are additional reasons why Calisi has not shown that Hamrell's proposed label

testimony would be the "product of reliable principles and methods," and as such whether he has

shown that he has "reliably applied the principles and methods to the facts of the case."  Fed. R.

Evid. 702(c)-(d).

While Hamrell testified that he was "sure" he worked on safety labeling while at Vestar

in 1992 and 1993, he did not recall for which drugs he had worked on labeling.  D. 65 Exh. 27 at

13(50).  Similarly, he testified that he had not personally drafted the safety section of a label

while at the FDA.  Id. at 6(21).  Hamrell testified that he was "sure" that he had involvement in

drafting the warning sections of package inserts of drugs while he was at the FDA but he could

not identify any specific experience doing so.  Id.  Abbott notes that Hamrell could not recall or

refused to provide the names of any of the "probably 300 drugs" that he worked on at the FDA.

D. 60 at 13-15.  Hamrell first cited the passage of time as the reason that he could not remember

the names, but later cited confidentiality concerns in revealing the names of the drugs.  D. 65

Exh. 27 at 5(17-18); 6(21)-8(32).  Hamrell's curriculum vitae lists few activities that facially

appear to concern drug label creation.  D. 76 Exh. 1 at 21.  When asked, Hamrell initially could

not recall if he had ever published on the topic of drug labeling, opining that "I'm not sure I have

talked about that specific topic" before identifying one paper related to drug labeling from his

curriculum vitae.  D. 65 Exh. 27 at 14(56).  Where Hamrell "could not recall such salient details,

[he has not shown] expertise sufficient to pass Daubert's qualifications threshold based wholly

on that work."  Carlucci v. CNH Am. LLC, No. 10-12205-DPW, 2012 WL 4094347, at *4 n.2

(D. Mass. Sept. 14, 2012) (noting that plaintiff's attempt "to bolster" an expert's credentials by

past experience failed where at deposition the expert had little recollection of his experience).

For all of these reasons applicable to this Court's "adequacy" finding, and for all of the above

additional reasons specific to the label, Calisi has not satisfied Fed. R. Evid. 702(c)-(d) as to

Hamrell's proposed testimony.

　　　　In sum, Calisi has not met her burden to show that Hamrell would base his testimony on

sufficient facts or data (i.e., information about the target audience), that Hamrell's testimony is

the product of reliable principles and methods or that he has reliably applied the principles and

methods (i.e., his knowledge) to the facts of the case.  Fed. R. Evid. 702(b)-(d).  The Court does

not allow this testimony as to adequacy and labeling.[11]

> (2)     Abbott's Failure to Use Available Methods to Appraise
>          Doctors

Hamrell also not only opines that "[d]espite evidence of a relationship between Humira

and lymphoma, . . . Abbott failed to use available methods to apprise doctors and patients,"  D.

76 Exh. 1 at 6, but also proposes to testify that Abbott made "efforts" to "obfuscate" information,

D. 76 Exh. 1 at 18, and Calisi proffers him as offering an expert opinion that "Abbott's

marketing efforts undermined whatever words of caution may have been in the label."  D. 75 at

7.  For the same reasons that Hamrell cannot testify to the label's "adequacy" as explained

above, Hamrell may not offer this proposed testimony as to the impact of marketing

communications on prescribing doctors where Calisi he has not shown that he would be qualified

to so opine under Fed. R. Evid. 702 (c)-(d).  Without repeating the analysis above in full, for the

same reasons as explained above, Hamrell has not shown that this type of testimony is the

product of reliable principles and methods and that he has reliably applied these methods to be

able to opine that Abbott's marketing undermined the label's adequacy.

> (3)     Abbott's Conduct and the "Standard of Care"

---

[11] The Court wishes to stress that it appears that Hamrell is likely qualified to give his expert opinion on other topics, as other Courts have so found.  However, the denial of a motion to exclude his testimony in a recent case, In re Celexa & Lexapro Prods. Liab. Lit., MDL No. 1736, 2013 WL 791784, at *4 (E.D. Mo. Mar. 4, 2013), is distinguishable for a number of reasons.  First, in that case, Hamrell was proffered to opine regarding the adequacy of warnings regarding Celexa and Lexapro, two antidepressant drugs that are not at issue in this case.  Id. at *1.  Second and more importantly, the defendant's challenge to Hamrell in In re Celexa does not address whether Hamrell is qualified to testify as to the effectiveness of the warnings for those drugs (or any others) to the prescribing doctors.  See id.  By contrast, that Hamrell is not qualified to testify as to the effect of Humira's warning on the physicians is the lynchpin of Abbott's challenge here.

Hamrell opines that "Abbott's conduct falls below the standard of care for a reasonably prudent pharmaceutical company."  D. 76 Exh. 1 at 6.  The complete basis offered to support his opinion is that:

> Taken as a whole as discussed above and based upon my review to date of the discovery materials, Abbott's conduct with respect to lymphoma and Humira consistently demonstrates a pattern of disregard for the safety of patients. Furthermore, Abbott's actions fall below the standard of care for reasonably prudent pharmaceutical companies.

D. 76 Exh. 1 at 18.  At his deposition, Hamrell appeared to question whether a "standard of care" existed for drug labeling:

> COUNSEL:  Is there even a standard of care with respect to labeling?
> HAMRELL:  I don't know.  Is there?
> COUNSEL:  I don't know.  Your report says that Abbott violated it.  So is there a standard of care?
> HAMRELL:  Maybe I chose the wrong word.  It should be standard of practice.

D. 76 Exh. 2 at 21:24-22:5.  Hamrell went on to cite generally the FDA "regulations that govern prescription drug labeling" and stated that "I'm sure there are industry practices and guidances on providing information, but primarily one is [sic] the FDA regulations on labeling" but that he did not use such industry standards and guidance.[12]  Id. at 22:6-23.

The proponent of expert evidence must show that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion."  Milward, 639 F.3d at 15 (citing Daubert, 509 U.S. at 85).  Based on the expert report and deposition testimony, this Court cannot say that Hamrell's opinion on Abbott's satisfaction of a "standard of care" was

---

[12] An expert's decision to use one methodology over another is not grounds for excluding their opinion.  Cf. Ruiz-Troche, 161 F.3d 77, 85 (1998) (stating that "Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion").  The Court simply must satisfy itself that the methodology that was used by the expert was reliable.  Kumho, 526 U.S. at 153.

arrived at in such a fashion and would be reliable. Hamrell's proffered basis for his expert opinion is conclusory and circular to the extent that it in essence opines that "Abbott's conduct falls below the standard of care for a reasonably prudent pharmaceutical company" because Abbott's actions fall below the standard of care for reasonably prudent pharmaceutical companies. D. 76 Exh. 1 at 18. Hamrell has not shown that he had a reliable basis to reach his opinion. He stated that he does not know if there is "a standard of care with respect to labeling." He stated that he is "sure" that there are "industry practices and guidances on providing information," which he did not use, but also did not meaningfully explain how he used the FDA labeling regulations (or other reasoning) to determine that Abbott's "conduct f[ell] below the standard of care for a reasonably prudent pharmaceutical company." See, e.g., D. 76 Exh. 1 at 10 (listing FDA labeling requirements).[13] The Court is concerned that this "opinion evidence . . . is connected to existing data only by the ipse dixit of the expert." Milward, 639 F.3d at 14-15 (stating that "[e]xpert testimony may be excluded if there is 'too great an analytical gap between the data and the opinion proffered'"). Thus, this proposed opinion does not satisfy Fed. R. Evid. 702(b)-(d). [14]

---

[13] The facts here present a different situation than when a court recently allowed a pharmacologist with sufficient experience to testify generally about the standards of care within that industry, where the "foundation for that testimony is his own experience." Bartlett v. Mut. Pharm, 742 F. Supp. 2d 182, 195 (D.N.H. 2010). Here, Hamrell does not identify any relevant experience for his conclusions and at deposition backed away from the opinion offered in his written report. See also D. 76 Exh. 2 at 21-22.

[14] Hamrell also opined that "[i]t is appropriate to look to the TNF inhibitor drugs as a class when reviewing the safety of Humira." D. 76 Exh. 1 at 6. Specifically, Hamrell opines that "Abbott should have been looking to Enbrel and Remicade safety information as well as Humira. Such review is standard practice amongst industry and regulatory authorities." D. 76 Exh. 1 at 14. Abbott does not directly challenge this portion of Hamrell's opinion, D. 60 at 15-16, but still seeks to exclude Hamrell's opinions "in their entirety," D. 59 at 2. However, it is Hamrell's ultimate opinion about the inadequacy of the warnings upon which Abbott's motion to exclude (and its accompanying motion for summary judgment) rests.

C.    **Abbott's Motion For Summary Judgment**

Having ruled above that Abbott's duty to warn flows to the doctor and that Hamrell may not offer his proposed opinion testimony as to whether a doctor would have found the Humira label adequate for such warning, the Court turns to Abbott's motion for summary judgment. Abbott argues that there are four grounds for granting summary judgment in its favor, namely that:  (1) Calisi cannot establish that Humira causes lymphoma or that it caused her lymphoma, D. 66 at 28-38; (2) Calisi cannot show that Abbott's warnings about Humira were inadequate, D. 66 at 41-46; (3) even if the labels were inadequate, Calisi cannot show that the inadequate label proximately caused her injuries, D. 66 at 38-40; and (4) Calisi's claims are preempted by federal law, D. 66 at 40-45.  Since the adequacy of the warnings is a necessary predicate as to both of Calisi's claims against Abbott, if Calisi cannot make this threshold showing, her claims do not survive summary judgment and Abbott is entitled to judgment.  Accordingly, the Court turns its focus to whether Calisi can show that Abbott's warnings about Humira were inadequate.

1.    *Standard of Review*

The Court grants a moving party's motion for summary judgment when there is no genuine dispute of material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In doing so, the Court "must scrutinize the record in the light most favorable to the summary judgment [opponent] and draw all reasonable inferences . . . to that party's behoof."  Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005) (citation omitted).

24

The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000).  If the movant meets its burden, the non-moving party may not rest on the allegations in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts that demonstrate a triable issue.  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  The moving party "need only show that there is an absence of evidence in support of at least one element of the [moving party's] case in order to succeed on summary judgment." Cellco P'ship v. Town of Grafton, Mass., 336 F. Supp. 2d 71, 82 (D. Mass. 2004).  Although the Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor," Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009), "conclusory allegations, improbable inferences, and unsupported speculation" proffered by the non-movant are insufficient to create a genuine issue of material fact to survive summary judgment.  Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (citation omitted).

2.      *Abbott is Entitled to Summary Judgment Where Calisi Cannot Show That the Humira Labels Were Inadequate*

As noted above, Calisi has sued under two theories:  Count I alleges a breach of warranty and Count II alleges negligence.  To prove a claim of negligence, Calisi must allege "(1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury."  Jorgensen v. Massachusetts Port Auth., 905 F.2d 515, 522 (1st Cir. 1990).  To prove breach of warranty on a failure to warn theory, Calisi must allege:  "(1) that the defendant manufactured or sold the product; (2) that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold; (3) that at the time of his injury, the plaintiff was using the product in a manner that the defendant intended or that could

reasonably have been foreseen; and (4) that the defect or unreasonably defective condition . . . was a legal cause of the plaintiff's injury." Alves v. Mazda Motor of Am., Inc., 448 F. Supp. 2d 285, 300 (D. Mass. 2006) (quoting Lally v. Volkswagen Aktiengesellschaft, 45 Mass. App. Ct. 317, 337 (1998)).

The gravamen of both claims is that Abbott failed to warn Pastan about the risk of developing lymphoma due to Humira. The Supreme Judicial Court has effectively collapsed the two standards for negligence and breach of warranty where the plaintiffs' allegations are based upon a failure to warn, determining that "negligent failure to warn and failure to warn under breach of warranty are to be judged by the same standard: the reasonableness of the defendant's actions in the circumstances." Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 637 (2001). Calisi's acknowledges that Massachusetts courts "employ the same criteria" for failure to warn under breach of warranty and negligent failure to warn. D. 85 at 51 n.39; see also Connell v. BRK Brands, Inc., No. 10-12101-TSH, 2013 WL 3989649, at *8 (D. Mass. Aug. 1, 2013) (treating these claims together); Carter v. Scubapro, No. 08-10789-NG, 2011 WL 3107334, at *3 (D. Mass. May 25, 2011) (same); but see Laspesa v. Arrow Intern., Inc., No. 07-12370-NG, 2009 WL 5217030, at *3 (D. Mass. Dec. 23, 2009) (asserting that negligence requires an extra element).

Under either standard, the adequacy of the warning must be "comprehensible to the average user" and "commensurate with the danger involved." Wasylow v. Glock, Inc., 975 F. Supp. 370, 378 (D. Mass. 1996) (quoting MacDonald v. Ortho Pharm. Corp., 394 Mass. 131, 140 (1985)); Wolfe v. Ford Motor Co., 6 Mass. App. Ct. 346, 349 (1978)). Moreover, a plaintiff must show that the failure to warn proximately caused the plaintiff's injuries. Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 48 (1991); Wasylow, 975 F. Supp. at 378 (observing that "as

with all negligence actions, failure to warn will not constitute negligence if it is not a proximate cause of the injuries").  "There are some products, especially drugs, which are quite incapable of being made safe for their intended and ordinary use, and yet the marketing and use of which is justified because they may avert an otherwise inevitable death.  Such a drug, properly prepared, and accompanied by proper directions and warnings, is not defective, nor is it unreasonably dangerous."  Lareau v. Page, 840 F. Supp. 920, 933 (D. Mass. 1993) (citing Restatement (Second) of Torts § 402A, comment k); see also Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 22 (1998) (citation and internal quotation marks omitted) (stating that "liability under the implied warranty of merchantability in Massachusetts is congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A").  As indicated above, Massachusetts recognizes the "learned intermediary" doctrine, so that "'a prescription drug manufacturer's duty to warn of dangers associated with its product runs only to the physician; it is the physician's duty to warn the ultimate consumer.'"  Cottam v. CVS Pharmacy, 436 Mass. 316, 321 (2002) (quoting McKee v. American Home Prods. Corp., 113 Wash. 2d 701, 709 (1989)).  In Garside, 976 F.2d at 81, the First Circuit observed that under Massachusetts law "the plaintiff carries the initial burden of producing sufficient evidence that the defendant manufacturer failed to warn of a non-obvious risk about which the manufacturer knew or should have known."  Id. (quotation marks and citation omitted).

Under Massachusetts law, when "[t]he nature of the defect or breach of warranty and its causal relation to the [injury is] complex," a plaintiff must introduce expert testimony.  Hochen v. Bobst Grp., Inc., 290 F.3d 446, 451 (1st Cir. 2002).  Where the jury cannot find of their own lay knowledge that a warning falls below the objective standard of reasonableness, "failure to adduce expert testimony . . . [is] fatal to their case."  Wiska v. St. Stanislaus Soc. Club, Inc., 7

Mass. App. Ct. 813, 821 (1979).  Such determinations are beyond the jury's lay knowledge where they are "generally beyond the scope of an average person's knowledge."  Esturban v. Massachusetts Bay Transp. Auth., 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment after excluding expert).  That is, although "[e]xpert testimony is not always necessary to establish the existence of a warning defect [in cases] such as when the product requires technical knowledge, juries may need expert guidance regarding whether a warning would have been appropriate."  Laspesa, 2009 WL 5217030, at *6 (citing Wiska, 7 Mass. App. Ct. at 819-21);[15]  Wiska, 7 Mass App. Ct. at 821 (stating in design defect case that "[t]he plaintiffs' failure to adduce expert testimony on the issues of design negligence or failure to warn . . . was fatal to their case").  Where a court precludes a plaintiff from presenting evidence as to an expert and that expert is essential to that plaintiff's case, it is appropriate to enter summary judgment in favor of the defendant.  Carlucci v. CNH America LLC, No. 10-12205-DPW, 2012 WL 4094347, at *1, *10 (D. Mass. Sept. 14, 2012) (noting that "[a]fter

---

[15] Calisi cites Knowlton v. Deseret Medical Inc., 930 F.2d 116, 121 (1st Cir. 1990) for the proposition that "[t]he jury did not need the help of an expert to explain or formulate a warning." Id.; D. 85 at 31.  In Knowlton, the First Circuit affirmed a district court's refusal to instruct the jury that expert testimony was necessary to evaluate the sufficiency of the warning.  There, the plaintiffs alleged that the manufacturer of a catheter failed to sufficiently warn physicians that the catheter could leak, id. at 118, where the only warning stated:  "CAUTION: If catheter placement is not successful, pull out needle and catheter together.  DO NOT pull out catheter first as sharp bevel edge of needle may cut catheter as it is being withdrawn." Id. at 119.  As an initial matter, the First Circuit found that for the district court to have instructed the jury expert testimony was required would have been "superfluous" because "[a]ll of the liability evidence was by physicians." Id. at 121.  Indeed, the Court later refers to plaintiff's witnesses as "experts." Id. at 122.  Furthermore, the warning in Knowlton utterly failed to warn physicians of the nature of the danger (i.e., leakage of hazardous chemicals).  Accordingly, the jury did not require the assistance of an expert to find that the warning was inadequate.  This is not the case here, where Abbott provided a complex explanation of the melanoma risk to physicians through the label insert, D. 63 ¶ 21, and Dr. Pastan had at his disposal a significant amount of other evidence relating to the potential link between Humira and lymphoma.  Id. ¶¶ 80-82.  This clearly brings the determination as to the adequacy of the aggregated warnings "beyond the scope of an average person's knowledge." Esturban, 68 Mass. App. Ct. at 911.

determining to grant [the defendant's] motion to exclude [the plaintiffs' defective design and warnings expert's] testimony, [the court] conclude[s] [it] should grant [the defendant's] motion for summary judgment" since "[a]s to their negligence and breach of implied warranty claims for design defects . . . the [plaintiffs'] lack of expert testimony is fatal"); see also Morse v. Ford Motor Co., No. 08-11930-RGS, 2010 WL 2773527, at *1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony is required because the answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors . . . . As the only expert witness identified by the [plaintiff] has been disqualified [as not qualified to offer an expert opinion], summary judgment may appropriately enter for [the defendant]"); Alves v. Mazda Motor of Am., Inc., 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is being excluded").

Here, Abbott's motion for summary judgment is grounded upon its motion to exclude the warnings expert, Hamrell.  That is, with the exclusion of the warnings expert, Abbott contends that Calisi cannot make out a prima facie case on either claim.  D. 66 at 44-45.  Here, expert opinion regarding the adequacy of warnings is essential given that some warnings regarding lymphoma were provided by Abbott and whether those given were adequate warning to the rheumatologist is beyond the ken of the lay jury.  Moreover, even if expert testimony were not required per se, it is the opinion of Hamrell upon which Calisi relies for her position that the warnings given by Abbott were inadequate and her opposition to Abbott's motion for summary judgment on both failure-to-warn claims.  Calisi offers no other witness to explain the adequacy

of Abbott's warning, merely arguing to the Court (without the aid of expert testimony) that other warnings would have been adequate where the instant warning was not. D. 85 at 38-44.

For example, Calisi seeks to minimize the importance of the "small print" of the Humira label, arguing that the jury should also consider the "warning's expression of the facts and the method or form in which it was conveyed." D. 85 at 38. Yet where the warning flows to the physician, see D. 129 at 9 (statement of reasons regarding partial entry of summary judgment on learned intermediary doctrine), such expert testimony would address the combined impact of the label and its "expression of the facts." Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1168 (S.D. Fla. 1996) (granting summary judgment and noting that "because a manufacturer's duty to warn of a drug's hazards runs to the physician, the adequacy or inadequacy of a manufacturer's warning to inform a physician must also be proved by expert testimony"), aff'd, 158 F.3d 588 (11th Cir. 1998).

Similarly, Calisi enumerates what more Abbott could have done to warn Dr. Pastan. For instance, Calisi asserts that Abbott's method of communication to physicians was not "data driven," D. 86 ¶¶ 68, 77, and therefore its label could have included more specific information "about the risk difference with respect to lymphoma in the Humira clinical trials between those RA patients taking Humira and those that did not." D. 85 at 39; D. 86 ¶¶ 79-80. This difference, Calisi argues, was not explained in the 2002 Humira label. D. 85 at 39 (citing D. 86 ¶¶ 79-81). Calisi further argues when Abbott revised its label in 2004, Abbott could have sent out a "Dear Doctor" letter, but instead only instructed its sales representatives to raise the changes in the label's malignancy warning if doctors asked. D. 85 at 39 (citing D. 86 ¶¶ 30-32, 35). As such, Calisi argues, Abbott instructed its sales representatives to downplay the risks of lymphoma through aggressive marketing. D. 85 at 40 (citing D. 86 ¶ 7); D. 52 ¶¶ 7, 19-23. Moreover,

Calisi points out, despite changing the label 12 times during the four years Calisi was taking Humira, id. ¶ 29, Dr. Pastan only received one phone call from Abbott's sales representatives informing him of a safety-related label change. Id. ¶ 33. Even accepting arguendo these facts as undisputed, this does not change the fact that there would be no expert testimony before the jury even in light of these facts, to determine whether Abbott's warning adequately warned the reasonable physician of the risk of lymphoma. See Cash Energy, Inc. v. Weiner, No. 95-1800, 81 F.3d 147, 1996 WL 141787, at *2 (1st Cir. Mar. 29, 1996) (per curiam) (affirming summary judgment where plaintiff "describe[d] the evidence that he would be able to present at trial," but "without expert testimony . . . failed to demonstrate a trialworthy issue of fact"); see also Carlucci, 2012 WL 409437, at *10 (noting that the failure to warn claim is "not categorically barred by exclusion of the [expert's testimony]" where the issue is whether the warning was "comprehensible to the average user," but finding that summary judgment for the defendant was still warranted where plaintiffs "have not provided a single competent witness who has opined that the warnings on the skid-steer loader were inadequate or otherwise failed to convey the danger of the loader to a reasonable person. There is nothing in the bits and pieces of the testimony of the various actors in this case that supports a failure to warn claim. If no adequate lay evidence exists in the record, then expert testimony is necessary to give the jury an adequate basis to decide the failure to warn claim. . . . Since no such competent expert testimony has been provided, summary judgment is appropriate"). This is because the plaintiff's burden in a failure to warn case involving prescriptive evidence applying the learned intermediary doctrine is to produce evidence that demonstrates that the warning was not appropriate to educate the reasonable physician. Cottam, 436 Mass. at 322; Hoffman, 434 Mass. at 637. Because the jury cannot evaluate the adequacy of Abbott's warning in the absence of such expert testimony,

"except by engaging in impermissible conjecture," <u>Carlucci</u>, 2012 WL 4094347, at *10, this evidence necessarily cannot defeat summary judgment.[16]

Finally, Calisi argues that the warning was ineffective on Dr. Pastan himself.  D. 85 at 41-44.  Calisi points to:  Dr. Pastan's testimony that he was "not convinced" that Humira increased lymphoma risk, D. 87 ¶ 87; that Dr. Pastan was "unlearned about the risk," D. 85 at 43; Dr. Pastan's alleged inability to fully convey the risks of Humira to Calisi, D. 52 ¶ 10; the financial incentives that Abbott provided to Dr. Pastan, <u>id.</u> ¶¶ 15-17; and Abbott's failure to properly educate Dr. Pastan through the means described above, D. 85 at 43 (citing D. 52 ¶¶ 3, 7-10, 21, 30-35).

Ultimately, however, even if all of these facts were undisputed, they are insufficient to defeat summary judgment as they are not germane to the final analysis of whether the warnings were adequate.  A pharmaceutical company discharges its duty under the learned intermediary doctrine by providing a warning that is appropriate to inform a reasonable doctor.  <u>See</u> <u>Cottam</u>, 436 Mass. at 321 (adopting reasoning of <u>McKee v. American Home Prods. Corp.</u>, 113 Wash. 2d

---

[16] Courts in other jurisdictions have taken a similar approach to this issue where the effect of the warning label on the user is beyond the ken of the jury.  <u>See</u> <u>Menz v. New Holland N. Am., Inc.</u>, 507 F.3d 1107, 1111-12 (8th Cir. 2007) (affirming district court's grant of summary judgment where plaintiff failed to proffer expert testimony regarding failure to warn and noting in its analysis that the "necessity of expert testimony in a failure to warn case turns on the complexity of the subject matter"); <u>LaBarre v. Bristol-Myers Squibb Co.</u>, No. 06-6050, 2013 WL 144054, at *8-9 (D.N.J. Jan. 11, 2013) (granting summary judgment where plaintiff failed to present expert testimony on adequacy of warning); <u>In re Aredia & Zometa Products Liab. Litig.</u>, MDL 06-1760, 2009 WL 8638121, at *1 (M.D. Tenn. Aug. 13, 2009) (denying summary judgment but concluding that "[w]hether the warnings were adequate to warn a physician of the possibility that the drug might be causing the condition experienced must be presented through the testimony of an expert"); <u>Benedict v. Zimmer, Inc.</u>, 405 F. Supp. 2d 1026, 1033 (N.D. Iowa 2005) (granting summary judgment where plaintiff failed to provide expert testimony in support of both design defect and failure to warn claims as to medical device); <u>Nail v. State</u>, 686 S.E.2d 483, 486 (Ga. App. 2009) (concluding that expert affidavit was required for failure to warn claim where "duty to warn falls squarely upon the physician and thus clearly involves the exercise of professional medical judgment").

701, 709 (1989)).  But what the prescribing physician did or did not do in response to warnings does not answer the initial issue of whether the warnings given were adequate.  McKee, 113 Wash. 2d at 709 (noting that by providing a sufficient warning, "the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained in conjunction with his own independent learning, in the best interest of the patient") (quoting Terhune v. A.H. Robins Co., 90 Wash. 2d 9, 14 (1978).  Calisi has not met her initial burden of producing sufficient evidence that the defendant manufacturer failed to warn of a non-obvious risk about which the manufacturer knew or should have known.  Cf. Enrich v. Windmere Corp., 416 Mass. 83, 87 (1993).

In sum, Calisi cannot proceed on either of her claims at trial without demonstrating that the warning failed to reasonably warn physicians.  Cottam, 436 Mass. at 322; Hoffman, 434 Mass. at 637.  As the Court has excluded Calisi's only expert testimony that bears upon this issue, Calisi has failed to produce admissible evidence in support of an essential element of her claims.  Alves, 448 F. Supp. 2d at 301. [17]  This necessarily requires the Court to grant summary judgment in Abbott's favor, Cellco, 336 F. Supp. 2d at 82, as without admissible facts, Calisi has failed to meet her burden in opposing summary judgment.  Borges, 605 F.3d at 5.

---

[17] Where a court determines that a plaintiff cannot prevail on a dispositive issue, the court need not reach other issues.  See, e.g., Howe v. Bank for Int'l Settlements, 194 F. Supp. 2d 6, 14 n.8 (D. Mass. 2002) (declining to reach challenge to personal jurisdiction where court found grounds for dismissal elsewhere); Morgan v. Driscoll, No. 98-10766-RWZ, 2002 WL 15695, at *6 (D. Mass. Jan. 3, 2002) (declining to reach issue of causation in claim for intentional infliction of emotional distress based on finding that plaintiff could not establish that defendant's actions were extreme and outrageous).

**IV.     Conclusion**

The Court GRANTS Abbott's motion to exclude the testimony of Michael Hamrell, D. 59.  The Court GRANTS Abbott's motion for summary judgment, D. 64.  The Court DENIES as moot Abbott's motion to exclude causation testimony, D. 61.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge